WILLKIE FARR & GALLAGHER LLP
Rachel C. Strickland
Christopher S. Koenig
Debra C. McElligott
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

-and-

Jennifer J. Hardy
600 Travis Street, Suite 2310
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DACCO Transmission Parts (NY), Inc., et al.,[1] | : | Case No. 16-_____ (    ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |
-----------------------------------------------------------x

## DECLARATION OF JOSEPH SANTANGELO IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

      I, Joseph Santangelo, declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that:

      1.     I am the Executive Vice President and Chief Financial Officer of

Speedstar Holding Corporation ("**Speedstar**"), Transtar Holding Company ("**Transtar**

**Holdings**"), and certain of the other above-captioned debtors and debtors in possession

---

[1]     A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer
identification number is attached as Schedule I hereto.  The Debtors' executive headquarters are located at
7350 Young Drive, Walton Hills, OH 44146.

(collectively, the "**Debtors**" or the "**Company**").  I have acted as Executive Vice President and Chief Financial Officer since July 27, 2015.  As part of my employment and service in such capacities, I have become familiar with the history, day-to-day operations, businesses and financial affairs of the Debtors.[2]

2.      On the date hereof (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

3.      Prior to the Petition Date, the Debtors began the solicitation of votes on the *Joint Prepackaged Plan of Reorganization for Speedstar Holding Corporation, Transtar Holding Company and Their Affiliated Debtors* (including all exhibits, schedules, appendices, and supplements thereto, and as amended, modified, or supplemented from time to time, the "**Prepackaged Plan**"), through their disclosure statement related to the Prepackaged Plan (including all exhibits, schedules, appendices, and supplements thereto, and as amended, modified, or supplemented from time to time, the "**Disclosure Statement**").  As of the date that solicitation commenced, the Debtors, holders of approximately 98.8% of the aggregate principal amount of the Debtors' first lien term loan facility and first lien revolving credit facility, and the majority equity holder of Speedstar Holding Corporation ("**Speedstar**"), funds managed by the majority equity holder that hold equity interests in Speedstar, the general partner of such funds, and their affiliates (collectively, the "**Majority Equity Holder**") had entered into a restructuring support agreement, dated November 18, 2016 (as amended, the "**Restructuring Support Agreement**") whereby such parties agreed to support the Prepackaged Plan.  The Debtors have

---

[2]      The Company's corporate structure is set forth in the chart annexed hereto as <u>Schedule II</u>.

filed concurrently herewith a motion seeking, among other things, to schedule a combined

hearing on the confirmation of the Prepackaged Plan and approval of the Disclosure Statement.

4.     In order to enable the Debtors to operate effectively postpetition and to

avoid adverse effects with respect to these chapter 11 cases, the Debtors have requested various

types of relief in "first day" motions and applications (collectively, the "**First Day Motions**")

filed with the Court, including a motion seeking to have the Debtors' chapter 11 cases

consolidated for procedural purposes and jointly administered.

5.     I submit this declaration pursuant to Rule 1007 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Rules**"):  (a) in support of the relief

requested in the First Day Motions; (b) to explain to the Court and other interested parties the

circumstances that compelled the Debtors to seek relief under the Bankruptcy Code; and (c) to

provide certain information that I understand is required by Local Rule 1007-2.  Except as

otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge

and the knowledge I have acquired from those who report to me, consultation with other officers

of the Debtors, my review of relevant documents, or my opinion based upon experience,

knowledge and information concerning the Debtors' operations and financial condition.  If called

upon to testify, I could and would testify competently to the facts set forth herein.  I am duly

authorized to submit this declaration.

6.     DACCO Transmission Parts (NY), Inc. is incorporated under New York

law and the Debtors have three locations in the State of New York.

7.     Part I of this declaration provides background with respect to the Debtors'

businesses, capital structure and reorganization efforts.  Part II sets forth the relevant facts in

support of the Debtors' First Day Motions.  Part III provides the information that I understand is required by Local Rule 1007-2.

## I.  <u>BACKGROUND</u>

### A.    General.

8.    The Company, a privately held corporation headquartered in Cleveland, Ohio, is the largest integrated distributor of automotive aftermarket driveline solutions in the United States.  Its primary business is to manufacture, remanufacture and distribute aftermarket driveline replacement parts and components to the transmission repair and remanufacturing market.  The Company is also a growing supplier of autobody refinishing products such as clear coats, paints, and primers and is a manufacturer of air conditioning, cooling and power steering assemblies and components.

9.    The Company's expansive distribution network includes over seventy locations, and primarily serves customers throughout the United States, Canada and Puerto Rico as well as other customers throughout the world.  Its primary end-customers include transmission repair shops, general repair shops, warehouse distributors, production rebuilders and automotive fleets.

10.    The Company was founded in 1975 in Cleveland, Ohio, as a supplier of products related to the transmission and drivetrain.  The Company grew both organically and through acquisitions and capitalized on the opportunity created by technological innovation, driveline platform proliferation, and increasing transmission complexity to build an industry leading distribution platform.  By 2006, the Company had grown to the largest distributor of automotive transmission parts with 34 locations across 23 states, Canada and Puerto Rico.  In 2007, the Company acquired Axiom Automotive Technologies, which at the time was a top

- 4 -

competitor.  Through this acquisition, the Company firmly cemented itself as the market leader
and created the only total driveline supplier in the industry.

11.     On December 21, 2010, the Company was acquired from Linsalata Capital
Partners by current majority equity holder Friedman Fleischer & Lowe LLC ("**FFL**").  The
acquisition was financed with $425 million of senior secured credit facilities, as described further
below.

12.     On February 28, 2014, the Company acquired ETX Holdings, Inc. and its
subsidiaries (collectively, "**ETX**").  ETX's businesses include (i) supplying aftermarket
transmission replacement parts, torque converters and complete transmissions,
(ii) remanufacturing torque converters and air conditioning compressors, and (iii) manufacturing
air conditioning, cooling and power steering assemblies and components.  The ETX acquisition
enhanced the scope of the Company's businesses and products and enhanced its capability as the
complete aftermarket transmission solutions provider.

**B.     Key Businesses.**

13.     The Company's business is the remanufacture, manufacture and
distribution of certain automotive parts and products, as described further below.  The Company
distributes its products through over seventy distribution locations in the United States.  Through
non-debtor affiliates, the Company distributes certain of its products to customers in Canada and
Puerto Rico.

*(i)     Transmission and Drivetrain Distribution Segment*

14.     For over 40 years, the Company has distributed transmission and
drivetrain-related solutions to customers in the United States, Canada, and Puerto Rico, as well
as various other countries around the world.  In its core business, the Company offers a
comprehensive line of transmission and drivetrain products, including automatic and standard

- 5 -

transmission units, transmission rebuild kits and components, remanufactured torque converters, hard parts, valve bodies, differentials and transfer case kits and components. The Company's products include original equipment and aftermarket equipment (both new and remanufactured replacement parts). The Company also offers transmission and drivetrain parts programs for automotive retailers, buying groups and traditional warehouse distributors, which allows such customers to customize their transmission and drivetrain purchasing from the Company's catalog of thousands of different parts.

15.     The Company's flagship product is its transmission rebuilder kit, which is designed in various configurations, effectively providing the customer with a convenient, pre-packaged kit with all of the soft parts necessary to rebuild a particular transmission model. As part of a critical link in the supply chain, the Company consolidates approximately 45 parts from 10-12 different suppliers to create a typical repair kit, which offers a single OEM-quality product solution for all high fail items within a transmission.

16.     The Company's driveline segment also remanufactures torque converters, hard parts, and standard transmission units, which are sold through the Company's expansive distribution network.

17.     The Company has the industry's broadest transmission and drivetrain product line, offering over 47,000 SKUs, including rebuilder kits, replacement soft parts, torque converters, remanufactured transmission units, differentials, gears, shafts, bearings, seals, clutch kits, flywheels and synchronizer assemblies. The Company's products are marketed through various brands including Transtar, Recon, DACCO, Axiom Automotive Technologies, King-O-Matic, Pro-King and Nickels Performance.

(ii)   *Manufacturing and Remanufacturing Segment*

18.     The Company's acquisition of ETX in 2014 expanded its automotive parts remanufacturing business.  ETX itself is a holding company which was established to acquire certain automotive companies: Alma Products Company, ATCO Products, Inc., and DACCO, Inc.  These ETX companies have a wide range of product offerings, some of which were integrated into the Transtar brand, while others continue to be operated under the Alma Products and ATCO brands.

19.     DACCO is based in Cookeville, Tennessee.  Prior to the ETX acquisition, DACCO had dozens of locations throughout the country and was a full line supplier of transmission parts, including torque converters, hard parts, soft parts, electronics and complete transmissions.  The DACCO business was merged into the Transtar brand, although the Company still sells DACCO branded torque converters.  Transtar is now the leading remanufacturer of torque converters in the industry.

20.     Alma Products is based in Alma, Michigan and manufactures and remanufactures a number of different product lines for the automotive market, including air conditioning compressors, torque converters, clutch and disc assemblies and transmissions.

21.     ATCO Products is based in Ferris, Texas and is primarily a supplier of mobile air conditioning components for the OEM specialty and replacement parts markets.  Its product lines include accumulators and driers, hose assemblies, crimpers and tools, crimp measure calipers, refrigerant fittings, thermal expansion valves and evaporators.

22.     Since the ETX transaction, the Company has manufactured various products for the automotive aftermarket, including drivetrain components, clutch and disc assemblies, and air conditioning components for original manufacturers, and has remanufactured torque converters, transmissions, a variety of hard parts for transmissions, and air conditioning

components.  This internal manufacturing and remanufacturing capability provides the Company

with certain supply chains of parts for its sale and distribution of automotive products to its

customers.

     *(iii)*    *Paint and Autobody Segment*

     23.    Through Transtar Autobody Technologies, the Company also produces an

extensive line of products for automotive repair, refinish and detail.  Specifically, the Company

manufactures and distributes a wide variety of repair and refinish products targeted to

professional aftermarket automotive refinishers and autobody repair shops.  The Company

provides a full line of value-priced auto body solutions, offering an attractive alternative to the

premium priced products provided by its larger competitors in the paint and body supplies sector.

These products are offered through a national network of jobbers, warehouse distributors, and

automotive retail chains — ultimately reaching tens of thousands of autobody shops across the

country.  Examples of these product offerings include a wide variety of clear and color coatings,

primers, adhesives, sealants, and plastic repair and refinish products.

     24.    This business segment broadly competes with original equipment

manufacturers as well as various aftermarket competitors.  This business segment also positions

itself as an alternative to its larger competitors by providing similar quality products at a more

attractive price.

     *(iv)*    *High Performance Segment*

     25.    The Company is a full-line wholesale distributor of high performance

automotive parts and accessories for drag racing, circle track racing, street performance and

muscle car restoration.  Specifically, the Company distributes high performance engine

enhancement components for both professional and enthusiast race car drivers.  This segment

focuses on supplying speed shops and individuals looking to rebuild or improve the engine

performance of race cars.  Positioned as a regional distributor, the Company's high performance segment competes with large national competitors.  A key competitive advantage that the Company's high performance segment has over its larger competitors is the strength of its sales force, which is made up of racing enthusiasts, race car owners and drivers and is known as the most knowledgeable sales force in the performance industry and can offer customers the benefit of their real-world experience.

**C.    Facilities.**

26.    The Company maintains over seventy local branch locations, four manufacturing and production facilities (in Alma, Michigan; Brighton, Michigan; Cookeville, Tennessee; and Ferris, Texas), and four regional distribution centers throughout the United States, Canada and Puerto Rico.

**D.    Employees.**

27.    As of the Petition Date, the Company employs approximately 2,000 full-time and 50 part-time employees in the United States, and approximately 100 full-time employees in Canada and Puerto Rico.  Approximately 30% of the Company's employees are members of one of two unions which have entered into collective bargaining agreements with certain Debtors: (i) the Local 2-540 of the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service International Union (the "**Local 2-540 CBA**") and (ii) the Local 2409 of the International Union of the United Automobile, Aerospace and Agricultural Implement Workers of America (the "**Local 2409 CBA**").  The Local 2-540 CBA has been effective since July 28, 2014 and is currently scheduled to expire on April 30, 2018.  The Local 2409 CBA has been effective since March 18, 2014 and is currently scheduled to expire on March 19, 2018.

28.     Further, the Company sponsors two single employer pension plans (one
for certain hourly employees and a second for certain salaried employees) (the "**Pension Plans**")
and similar benefit plans worldwide for certain of its employees.  Only employees whose
employment with the Debtors began before November 1, 2006 are eligible to participate in the
Pension Plans.  The Debtors make certain required contributions on a quarterly basis to the
Pension Plans.  The Pension Plans were underfunded in the aggregate by approximately $17
million as of December 31, 2015.  The Debtors are required to make a total of approximately
$1.014 million in payments to the Pension Plans in 2016, and will make weekly payments
averaging approximately $33,000 until the total amount due for 2016 has been paid.

**E.     Customers.**

29.     Since its founding, the Company's leading market position is a result of its
focus on providing its customers with superior service.  The Company's broad selection of high
quality products and timely delivery is unmatched in the industry and has helped forge strong,
long-term relationships between the Company and its customer base.

30.     The Company offers a full suite of products encompassing the entire
driveline.  The Company maintains approximately 47,000 SKUs—an unmatched breadth of
products that includes rebuilder kits, replacement soft parts, torque converters, remanufactured
transmission units, differentials, gears, shafts, bearings, seals, clutch kits, flywheels and
synchronizer assemblies.  The Company is known as a one-stop shop within the driveline
market.  In fact, several of the Company's regional competitors actually source products from the
Company due to their inability to economically source and offer those products independently.
Because repair shops often lack the resources and time needed to manage multiple supplier
relationships, shop managers generally prefer to consolidate supplier relationships with a vendor
that can provide their complete product needs.  The Company's broad product line allows its

customers to place a large order for all their product needs with just one phone call.  Overall, the

Company's breadth of product offering is a key ingredient to its success in the driveline

aftermarket.

31.      Another key aspect of the Company's business is its ability to deliver its

products to nearly all of its customers via same-day or next-day delivery.  Due to the Company's

facility network of four strategically located master distribution facilities and over 70 local

branches, the Company is able to service most of the largest metropolitan areas in the United

States with same-day deliveries by truck or delivery service, and in many instances, on a next-

day basis by overnight carrier to customers in most locations in the United States.  Speed of

delivery is crucial for the Company's repair shop customers, who almost always require same-

day or next day delivery.

32.      The Company has strong, longstanding relationships with a highly

fragmented customer base of over 23,000 accounts.  Its diversified customer base insulates the

Company from risks associated with reliance on any single customer.  The Company's customers

fall into eight primary categories: (i) general repair shops; (ii) transmission repair specialists;

(iii) warehouse distributors; (iv) large production remanufacturers; (v) fleets; (vi) major retailers;

(vii) autobody jobbers and distributors; and (viii) original equipment manufacturers.

**F.      Debtors' Prepetition Capital Structure.**

33.      As of November 6, 2016, the Debtors had approximately $607.7 million of

consolidated outstanding indebtedness to third parties.  The components of the Debtors'

outstanding indebtedness are summarized below.

*(i)   First Lien Credit Facility*

34.      The Company is a borrower under (a) a $50 million revolving credit

facility, including a $5 million swing line loan sub-facility and a $5 million letter of credit sub-

facility (collectively, the "**Revolving Facility**") and (b) a $370 million term loan facility (the

"**First Lien Term Loan Facility**," and, together with the Revolving Facility, the "**First Lien**

**Credit Facility**"), each pursuant to that certain Amended and Restated First Lien Credit

Agreement, dated as of October 9, 2012 (as amended, supplemented or otherwise modified from

time to time), by and among Speedstar, Transtar Holdings, as borrower; the other Debtors,

including Speedstar, as guarantors; the lenders party thereto from time to time and Royal Bank of

Canada, as administrative agent and collateral agent (the "**First Lien Credit Agreement**").

35.    As of the Petition Date, there is approximately $358.3 million in principal

and $18.3 million in accrued but unpaid interest and fees outstanding under the First Lien Term

Loan Facility and $45.8 million in principal and $2.2 million in accrued but unpaid interest

outstanding under the Revolving Facility, as well as $3.9 million in issued and outstanding letters

of credit.  The First Lien Credit Agreement provides for maturity dates for the Revolving Facility

of October 9, 2017 and for the First Lien Term Loan Facility of October 9, 2018.

36.    The First Lien Credit Agreement provides for payment of cash interest on

the principal amount of the First Lien Credit Facility (a) on the last business day of each of

March, June, September and December with respect to any base rate loan and (b) with respect to

any Eurodollar rate loan, on the last day of the applicable interest period (provided that for any

Eurodollar rate loan with an interest period of more than three months, interest thereon is payable

every three months).  Transtar Holdings is also required to make amortization payments equal to

0.25% of the original aggregate principal amount of the First Lien Term Loan Facility on the last

business day of each of March, June, September and December.

37.    The indebtedness under the First Lien Credit Facility is secured by a first

priority security interest in and liens on substantially all of the Debtors' assets.

(ii)   *Second Lien Term Loan Facility*

38.   The Company is also a borrower under a $170 million term loan facility

(the "**Second Lien Term Loan Facility**"), pursuant to that certain Amended and Restated

Second Lien Credit Agreement, dated as of October 9, 2012 (as amended, supplemented or

otherwise modified from time to time), by and among Speedstar, Transtar Holdings, as borrower;

the other Debtors, including Speedstar, as guarantors; the lenders party thereto from time to time

and Cortland Capital Markets LLC (as successor to Royal Bank of Canada), as administrative

agent and collateral agent (the "**Second Lien Credit Agreement**").

39.   As of the Petition Date, there is approximately $170 million in principal

and $13.2 million in accrued but unpaid interest outstanding under the Second Lien Term Loan

Facility.  The Second Lien Credit Agreement provides for a maturity date for the Second Lien

Term Loan Facility of October 9, 2019.

40.   The Second Lien Credit Agreement provides for payment of cash interest

on the principal amount of the Second Lien Term Loan Facility (a) on the last business day of

each of March, June, September and December with respect to any base rate loan and (b) with

respect to any Eurodollar rate loan, on the last day of the applicable interest period (provided that

for any Eurodollar rate loan with an interest period of more than three months, interest thereon is

payable every three months).

41.   The indebtedness under the Second Lien Term Loan Facility is secured by

a second priority security interest in and liens on substantially all of the Debtors' assets.

(iii)   *Intercreditor Agreement*

42.   The collateral agents under the First Lien Credit Agreement and Second

Lien Credit Agreement are party to that certain Amended and Restated Intercreditor Agreement,

dated as of October 9, 2012 (the "**Intercreditor Agreement**"), which governs the relative rights

of the lenders under the First Lien Credit Agreement and the Second Lien Credit Agreement with respect to their shared collateral.

    *(iv)*    *Equity Ownership*

    43.    Friedman Fleisher & Lowe LLC, through certain of its affiliates, owns approximately 93.6% of the outstanding common equity interests in the Company.  G.E. Capital Corporation owns approximately 0.4% of the outstanding common equity interests, and the remainder is held by certain current or former employees, officers or directors of the Company.

**G.    Related-Party Transactions.**

    44.    As discussed above, the Company has operations in the United States, Canada and Puerto Rico.  The Company's foreign operations are conducted by non-Debtor subsidiaries incorporated in Canada and Puerto Rico which are not borrowers or guarantors under the First Lien Credit Agreement or the Second Lien Credit Agreement.  The Company's foreign and domestic operations are highly interdependent, making the Company's foreign operations essential to the Company's overall strategy.  The foreign operations allow the Company to provide products to its customers in many locations throughout North America.  In the ordinary course of the Company's businesses prior to the Petition Date, the Company's domestic Debtor entities and its foreign non-Debtor entities maintained significant business and financial relationships which resulted in intercompany trade receivables and payables arising from the purchase and sale of goods among the various Debtor and non-Debtor foreign entities. In addition, as part of the Company's global management of cash, the Company maintains a complex system of intercompany loans among Debtor and non-Debtor entities, allowing the Company to transfer liquidity to where it is needed in the Company's global operations.  The Company can identify the amounts due to and due from its domestic and foreign subsidiaries.

As will be articulated to the Court, obtaining the authority to continue to provide financial support to their foreign subsidiaries during the course of these cases is critical.

**H.      Events Leading to Chapter 11 Cases.**

45.      Due to, among other things, higher than anticipated difficulty related to the integration of the newly-acquired ETX's businesses, the Company significantly underperformed in 2015.  This underperformance is evidenced by a 2015 Consolidated EBITDA decline of 22% on a year over year basis and subsequent decline in last twelve month revenue of 2.8% for the end of the first quarter of 2016.  This decline in revenue and earnings gave rise to a liquidity crisis at the Company, as well as to defaults of the financial covenants set forth in the First Lien Credit Agreement and Second Lien Credit Agreement.

46.      Beginning in the first quarter of 2016, the Company and its equity sponsor engaged in discussions with ad hoc committees of lenders under the First Lien Credit Facility and the Second Lien Term Loan Facility.  Certain of the Company's lenders entered into forbearance agreements with the Company, which were extended multiple times, to facilitate restructuring negotiations which took place throughout the second, third and fourth quarters of 2016.  Over the course of the past several months, the Company negotiated with lenders under the prepetition First Lien Credit Agreement (the "**First Lien Lenders**") to reach a long-term solution to the Debtors' current liquidity issues.  Their agreement is memorialized in that certain Restructuring Support Agreement, dated as of November 18, 2016, (as amended, the "**Restructuring Support Agreement**" which is attached hereto as Exhibit M), among the Debtors, certain of the First Lien Lenders (the "**Consenting First Lien Lenders**") representing approximately 98.8% of the outstanding principal amount under the First Lien Credit Agreement and FFL, funds managed by FFL that hold equity interests in Speedstar, the general partner of such funds, and their affiliates (collectively, the "**Majority Equity Holder**").

- 15 -

47.    In accordance with the terms of the Restructuring Support Agreement, on November 19, 2016, the Debtors proposed the Prepackaged Plan and began the solicitation of votes on the Prepackaged Plan through the Disclosure Statement.  The Prepackaged Plan provides that each First Lien Lender shall receive, subject to dilution by the Management Incentive Plan and distributions to the lenders under the Senior Exit Facility (each as defined and further described in the Term Sheet attached to the Restructuring Support Agreement as <u>Exhibit A</u>), its *pro rata* share of (a) 100% of the equity interests in Speedstar, as reorganized on the effective date of the Prepackaged Plan, (b) $60 million in new unsecured notes to be issued by the reorganized Debtors on the effective date of the Prepackaged Plan, which shall mature on the date that is five years from the effective date of the Prepackaged Plan and bear interest at 8.75% per annum, of which interest 1% shall be payable semi-annually and payable in cash, and of which interest 7.75% shall be payable semi-annually and payable-in-kind (the "**New PIK Notes**"), and (c) $200,000,000 in principal amount of remaining claims under the First Lien Credit Agreement, as amended by the First Lien Credit Agreement Amendment (as defined in the Prepackaged Plan).  The Prepackaged Plan further provides that unsecured claims against the Debtors (including, for the avoidance of doubt, the claims under the Second Lien Credit Agreement) will share in a maximum aggregate recovery of $500,000; <u>provided</u> that holders of Ordinary Course General Unsecured Claims (as such term is defined in the Prepackaged Plan, including the Debtors' employees, ordinary course professionals, trade creditors, and the Debtors' pension and retiree benefits) will have the option to elect to continue to provide goods and services to the Debtors, and in the event of such election, the Reorganized Debtors shall pay such undisputed claims in the ordinary course of business.  Under the Prepackaged Plan, all existing interests in Speedstar shall be cancelled.

48.      Pursuant to the terms of the Restructuring Support Agreement, the Debtors

have filed concurrently herewith a motion seeking, among other things, to schedule a combined

hearing on the confirmation of the Prepackaged Plan and approval of the Disclosure Statement.

## II.      SUMMARY OF FIRST DAY MOTIONS[3]

49.      To enable the Debtors to operate effectively and to avoid the adverse

effects of the chapter 11 filings, the Debtors have filed, or will file in the near term, the motions

and applications described below.

50.      In connection with the preparation for these bankruptcy cases, I have

reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared

with my input and assistance, or the input and assistance of employees working under my

supervision.  I believe the information contained in the First Day Motions is accurate and correct.

As set forth more fully below, I believe that the entry of orders granting the relief requested in

these motions and applications is critical to the Debtors' ability to preserve the value of their

estates and will assist in their reorganization efforts.

### A.      Motions Related to Case Management.

*(i)      Joint Administration Motion.*

51.      The Debtors seek the joint administration of their chapter 11 cases —

forty-seven in total — for procedural purposes only.  I believe that it would be far more practical

and expedient for the administration of these chapter 11 cases if the Court were to authorize their

joint administration.  First, each of the Debtors is a co-obligor under the Debtors' prepetition

credit facilities, either as a borrower or a guarantor.  In addition, the treatment of certain

contracts and business relationships of a single Debtor may impact the assets and operations of

---

[3]      Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

other Debtors.  Further, many of the motions, hearings, and other matters involved in these

chapter 11 cases will affect all of the Debtors.  Hence, joint administration will reduce costs and

facilitate the administrative process by avoiding the need for duplicative hearings, notices,

applications and orders.  It is my understanding that no prejudice will befall any party by the

joint administration of the Debtors' cases as the relief sought therein is solely procedural and is

not intended to affect substantive rights.

   *(ii)*  *Motion to Approve Solicitation Procedures and Schedule*
      *Combined Hearing on Disclosure Statement and Confirmation of Plan.*

   52.  The Debtors also filed a motion seeking an order scheduling a combined

hearing with respect to the approval of their Plan solicitation procedures, Disclosure Statement,

and confirmation of the Plan (the "**Combined Hearing**"), and approving the form and manner of

the notice of the Combined Hearing.  In connection with the Plan, the Debtors prepared the

Disclosure Statement describing, among other things, the proposed reorganization and its effects

on holders of claims against and interests in the Debtors.  On November 19, 2016, the Debtors

caused a copy of the Disclosure Statement, the Plan and the appropriate ballots to be delivered to

each known holder of First Lien Credit Agreement Claims that was entitled to vote on the Plan.

The Debtors established November 13, 2016 as the voting record date and December 4, 2016 as

the deadline for the receipt of votes to accept or reject the Plan (the "**Voting Deadline**").  The

Debtors' voting agent will file an affidavit with the Court certifying the results of the solicitation

of votes on the Plan following the Voting Deadline.

   53.  At the Combined Hearing, the Debtors will request approval of the

Solicitation Procedures and Disclosure Statement and confirmation of the Plan.

**B.       Applications and Motions Related to the Retention of Professionals.**

*(i)       Application to Employ and Retain Prime Clerk LLC as Notice and Claims Agent.*

54.       Concurrently herewith, the Debtors filed an application to retain Prime Clerk LLC ("**Prime Clerk**") as this Court's notice and claims agent for the Debtors' chapter 11 cases. I believe that the retention of Prime Clerk is critical because of the large number of creditors identified in these cases.

55.       I understand that Prime Clerk is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases. The Debtors solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting Prime Clerk and believe Prime Clerk's rates are reasonable given the quality of Prime Clerk's services and prior bankruptcy experience. Given the need for the services described above and Prime Clerk's expertise in providing such services, I believe that retaining Prime Clerk will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts.

56.       The Debtors also intend to file a separate application to retain Prime Clerk as an administrative agent to provide, among other things, certain solicitation and balloting services.

*(ii)      Other Retention Applications.*

57.       The Debtors also intend to file certain applications, upon the scheduling of a further hearing by the Court, to retain professionals who will assist the Debtors in the administration of these chapter 11 cases. Among certain other professionals, the Debtors will seek to retain: Willkie Farr & Gallagher LLP as bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases; FTI Consulting, Inc. as restructuring advisor; Ducera Partners LLC as investment banker and financial advisor; and may retain additional

professionals, such as auditors, at a later date.  The Debtors also intend to file a motion seeking

authorization and establishing procedures for compensating and reimbursing professionals on a

monthly basis, on terms comparable to the procedures established in other chapter 11 cases in

this district.

58.     In addition, the Debtors intend to file a motion authorizing the Debtors to

retain certain professionals utilized in the ordinary course of their businesses without the

submission of separate retention applications and the issuance of separate orders approving the

retention of each individual professional and authorizing the Debtors to pay each professional in

accordance with the terms set forth in the motion without application to the Court by such

professional.

**C.      Motion to Approve Debtor-in-Possession Financing.**

59.     Concurrently herewith, the Debtors seek authority to enter into that certain

senior secured, superpriority Debtor-in-Possession Credit Agreement pursuant to which the DIP

Lenders will provide postpetition debtor-in-possession financing (the "**DIP Facility**"), on a

priming, superpriority basis, shall consent to the Debtors' use of cash collateral, provide

"adequate protection" to prepetition secured lenders, and schedule a final hearing with respect to

the relief requested, all as more fully described in the relevant motion.

60.     As part of the process of obtaining and negotiating debtor in possession

financing, the Debtors' investment banker and financial advisor, Ducera Partners LLC, contacted

a number of potential sources of financing in order to obtain the best terms possible for the

Debtors.  As described in more detail in the DIP Motion, the DIP Facility was the sole offer to

emerge from extensive negotiations and a competitive marketing process, and the DIP Facility

presents the Debtors' only opportunity to obtain postpetition financing under the circumstances.

61.     The DIP Facility is a $55 million delayed draw term loan, with an additional $14.7 million available to be drawn with the consent of the DIP Agent and DIP Lenders.  I understand that all of the Debtors' prepetition secured lenders, who have liens which will be primed by liens granted to secure the DIP Facility, have either (i) explicitly consented under the DIP Credit Agreement or (ii) are deemed to have consented pursuant to the terms of the First Lien Credit Agreement, Second Lien Credit Agreement and/or the Intercreditor Agreement, to the priming of their liens and to the Debtors' use of cash collateral.  The Debtors conducted an extensive negotiation process with the DIP Lenders before determining that a comprehensive DIP financing jointly arranged by the DIP Lenders provided the most cost-effective and beneficial DIP financing, and the DIP Facility has the best terms available to the Debtors for debtor in possession financing.

62.     On an interim basis, the Debtors are requesting access to $30 million of the $55 million in availability under the DIP Facility.  Such amounts will be used to fund fees under the DIP Facility, pay restructuring expenses, pay the Debtors' vendors and provide working capital in connection with the Debtors' operations.

63.     The reasons supporting the Debtors' request for authority to enter into the DIP Facility are compelling.  As explained in greater detail in the relevant motion, the DIP Facility will be used to provide liquidity for working capital and other general corporate purposes of the Debtors.  The usage of cash collateral and the funds available under the DIP Facility will provide the Debtors with funds necessary for the operation of their businesses, including meeting their payroll and other business obligations.  Without the immediate use of cash collateral and the funds available under the DIP Facility, the Debtors would be unable to fund their operations, which would be catastrophic for the Debtors' businesses.  I believe that access to cash collateral and the funds available under the DIP Facility is crucial to the Debtors'

ability to maintain their businesses and to avoid immediate and irreparable harm to their estates,

employees, customers, and creditors.  Further, the terms of the DIP Facility are reasonable as

they include favorable pricing terms, reasonable adequate protection measures for the prepetition

secured creditors' interests and reasonable fees payable to the DIP Lenders.

64.    For the foregoing reasons, I believe that the DIP Facility embodies the

best available financing under these circumstances and that entry into the DIP Credit Agreement

is in the best interest of the Debtors and their estates.

**D.    Motion to Authorize Continued Use of the Debtors'
        Cash Management System and Bank Accounts.**

65.    In the ordinary course of their businesses prior to the Petition Date, and as

is typical with business organizations of similar size and scope, the Debtors maintained a

centralized cash management system to collect, transfer, and disburse funds generated through

their operations efficiently and to record such transactions accurately.

66.    It is my understanding that the U.S. Trustee Guidelines require chapter 11

debtors to, among other things, close all existing bank accounts and open new accounts which

must be designated debtor-in-possession bank accounts and obtain, establish and maintain

separate debtor-in-possession accounts.  The Debtors intend to request a waiver of such

requirements.

67.    I believe that the Debtors' existing cash management and intercompany

accounting procedures are essential to the orderly operation of the Debtors' businesses.  Creating

a new Cash Management System could cause confusion, disrupt payroll, introduce inefficiency

into the Debtors' operations when efficiency is most essential, and strain the Debtors'

relationships with critical third parties, each of which could diminish the prospects for a

successful reorganization.  Thus, the Debtors seek authorization to continue the management of

their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date.

68.     In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements.  The Debtors believe their current Cash Management System meets those requirements.  Moreover, the Debtors request authority to continue performing, in their discretion, their prepetition practices with respect to intercompany transactions and to grant superpriority administrative expense status to obligations arising out of intercompany claims.  Thus, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date and to continue intercompany transfers in the ordinary course of business.

69.     I believe that allowing the Debtors to maintain their Cash Management System would be in the best interests of the Debtors' estates, creditors and other parties in interest.

**E.      Motion for Authorization to Pay Certain Prepetition Claims of Employees.**

70.     Concurrently herewith, the Debtors have filed a motion seeking authority to, among other things, satisfy certain of their prepetition obligations to their Employees, pay prepetition payroll-related taxes and withholdings associated with the Company's employee wage claims and employee benefit obligations, and other similar tax obligations, continue any employee benefit programs in place as of the Petition Date (including satisfying any prepetition obligations associated with such programs) and reimburse Employees for prepetition travel and other business expenses that were incurred on behalf of the Debtors.  This relief is critical to the Debtors' businesses and reorganization efforts.

71.     In order to achieve a successful reorganization, it is essential that the Company's Employees work with the same or greater degree of commitment and diligence as they did prior to the Petition Date.  The requested authority to continue to pay the Prepetition Employee Obligations and to maintain the current employee benefits programs is critical to ensure that:  (i) the Debtors can retain personnel knowledgeable about the Debtors' businesses; (ii) the Debtors' Employees continue to provide quality services to the Debtors at a time when they are needed most; and (iii) the Debtors remain competitive with comparable employers.

72.     If this motion were not granted, I believe that it would result in a significant deterioration in morale among Employees, which undoubtedly would have a devastating impact on the Debtors, the value of estate assets and the Debtors' ability to reorganize.  The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the importance of the Employees to the restructuring effort.  Prepetition Employee Obligations paid pursuant to the Interim Order will not exceed $12,850 for any individual employee.  I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their estates, their creditors and other parties in interest, and will enable the Debtors to continue to operate their businesses without disruption, in an economic and efficient manner.

**F.     Certain Other Motions.**

*(i)     Motion to Authorize Debtors to Honor Prepetition Customer Programs.*

73.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors seek to develop and sustain a positive reputation in the marketplace through the implementation of certain customer programs (the "**Customer Programs**"), including (a) honoring accrued obligations under the Debtors' various warranty programs, (b) a credit

system for the return of used automobile parts and other products to the Debtors, (c) the Debtors'

product return policy, and (d) the Debtors' various customer rebate, discount and promotional

programs.  The termination of the Customer Programs would undoubtedly have an adverse effect

on the Debtors' businesses and their ability to reorganize.  Therefore, I believe that the

continuation of the Customer Programs is necessary to preserve the Debtors' critical customer

relationships and is in the best interests of the Debtors and their estates.

*(ii)      Motion to Authorize Payment of Prepetition Claims of Critical Vendors.*

74.      In order to continue operating their businesses, the Debtors must rely on

certain vendors and suppliers (the "**Critical Vendors**") that provide the Debtors with certain

goods and services that are critical to the Debtors' operations and financial viability.  Absent the

cooperation of these Critical Vendors, the Debtors may be unable to continue their operations

without materially inflated costs or substantial interruptions.

75.      In connection with determining which vendors are actually essential to the

Debtors' business operations, the Debtors considered the following criteria, among other things:

(a) whether the vendor in question is a sole source provider; (b) whether the Debtors receive

advantageous pricing or other terms from a vendor such that replacing the vendor postpetition

would result in significantly higher costs to the Debtors; (c) whether the Debtors are dependent

upon such vendors to ensure the timely and successful completion of ongoing projects;

(d) whether certain customizations, specifications or volume requirements prevent the Debtors

from obtaining services from alternative sources within a reasonable timeframe, given the

anticipated length of operations; (e) whether, if a vendor is not a sole source provider, the

Debtors have sufficient in-house capabilities to continue operations while a replacement vendor

is found and put in place; (f) whether a vendor is otherwise contractually obligated to continue to

provide services to the Debtors; and (g) whether a vendor is likely to refuse to provide services

to the Debtors postpetition if its prepetition balances are not paid.

76.     Based on the foregoing considerations, the Debtors identified Critical

Vendors whose cessation of services or provision of goods would negatively impact in short

order the Debtors' businesses and result in irreparable harm to the Debtors' estates.  The Debtors

believe that if the Critical Vendors refuse to supply services and/or goods to the Debtors

postpetition, then the immediate replacement of the Critical Vendors would be impracticable or,

in some cases, impossible.  Without authority to pay the Critical Vendors, the Debtors would not

be able to supply their customers, which would likely cause temporary, and perhaps even

permanent, revenue decline, which could cripple their businesses in short order and result in

irreparable harm.  Accordingly, the Debtors seek authorization to pay the Critical Vendors in the

ordinary course of business.  As of the Petition Date, the Debtors estimate, based on a thorough

review of their books and records, that the aggregate amount owed to Critical Vendors totals

approximately $9,000,000.  The Interim Order, if entered, will grant the Debtors the authority to

pay only a portion of the claims of Critical Vendors up to the maximum amounts designated in

the Interim Order.  I believe that the limited relief requested on an interim basis, to be paid

within the twenty-one (21) day period following the Petition Date, is the minimum amount

necessary to avoid the immediate and irreparable harm that would befall the Debtors' estates if

the Debtors were unable to pay any Critical Vendors prior to the final hearing on this motion.

While the Debtors are seeking limited relief on an interim basis, I submit that the full relief

requested pursuant to the Proposed Final Order is critical to maximizing the value of the

Debtors' estates beyond the initial interim period.

77.    For the reasons stated above, and explained more fully in the motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

   (iii)    *Motion for Authorization to Pay Prepetition Common Carrier and Warehouse Obligations.*

78.    In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers operated by third parties, including trucking services, carriers by water, rail services and air transport (the "**Common Carriers**") to receive shipments of materials from their vendors and to transport materials, equipment and key personnel to various facilities and locations.  As a result, the Common Carriers regularly possess, among other things, certain of the Debtors' materials and equipment in the ordinary course of the Debtors' operations.  The Debtors also supplement their own storage and distribution facilities with third-party warehouse facilities (the "**Warehouse Providers**" and together with the Common Carriers, the "**Service Providers**") to store materials and equipment.  The Warehouse Providers regularly possess materials owned by the Debtors.

79.    It is essential for the Debtors' continuing business viability and the success of their restructuring efforts that they maintain the reliable and efficient delivery of, and access to, materials and equipment.  Therefore, the Debtors respectfully request authority to pay, in their discretion, any claims of the Service Providers (the "**Service Claims**") owing as of the Petition Date.  As of the Petition Date, the Debtors estimate, based on a thorough review of their books and records, that the Service Claims total approximately $1,600,000.  The Proposed Interim Order, if entered, will grant the Debtors the authority to pay only a portion of the Service Claims up to the maximum amounts designated in the Proposed Interim Order.  I believe that the limited relief requested on an interim basis, to be paid within the twenty-one (21) day period

following the Petition Date, is the minimum amount necessary to avoid the immediate and irreparable harm that would befall the Debtors' estates if the Debtors were unable to pay any Service Claims prior to the final hearing on the Motion. While the Debtors are seeking limited relief on an interim basis, I submit that the full relief requested pursuant to the Proposed Final Order is critical to maximizing the value of the Debtors' estates beyond the initial interim period.

    (iv)    *Motion for Authority to Pay Certain*
                 *Prepetition Sales, Use and Other Taxes and Regulatory Fees.*

    80.    The Debtors seek entry of an order authorizing them to pay various prepetition sales and use taxes (collectively, the "**Trust Fund Taxes**") and other taxes (the "**Other Taxes**") to various federal, state, local and foreign authorities (collectively, the "**Taxing Authorities**"), and certain licensing, permitting and regulatory fees (the "**Regulatory Fees**" and together with the Trust Fund Taxes and the Other Taxes, the "**Taxes**") to certain federal, state, local and foreign government agencies (collectively, the "**Regulatory Authorities**" and together with the Taxing Authorities, the "**Applicable Authorities**") on a periodic basis, in each case, as and when such obligations become due. In the ordinary course of their businesses, the Debtors collected Trust Fund Taxes and hold them for a period of time before remitting them to the appropriate Taxing Authorities. The Debtors are also required to pay Regulatory Fees, including, but not limited to, certain business licensing and permit fees. The Debtors also pay certain Other Taxes, including, but not limited to, property taxes and state and local income taxes, to certain Applicable Authorities on a periodic basis.

    81.    Payment of the prepetition Taxes is critical to the Debtors' continued, uninterrupted operations. The Debtors' failure to pay these obligations may cause the Applicable Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt

the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors'

estates.  Failure to pay the prepetition Taxes could also have a negative impact on the Debtors'

existing permits and licenses.  In addition, the Debtors believe that most of the prepetition Taxes

are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect

only the timing of the payments, and not the amount of the ultimate recovery.  As of the Petition

Date, the Debtors estimate, based on a thorough review of their books and records, that the total

amount of prepetition Taxes is approximately $1,500,000.  The Proposed Interim and Final

Orders, if entered, will grant the Debtors the authority to pay the Taxes in accordance with the

Debtors' prepetition practices.

    82. I believe that the authority to pay the Applicable Authorities in accordance

with the Debtors' prepetition business practices is in the best interest of the Debtors and their

estates.

    *(v)*  *Motion to Provide for Adequate Assurance to Utilities.*

    83. In connection with the operation of their businesses and management of

their properties, the Debtors obtain electricity, natural gas, water, telecommunications, waste

disposal and other similar utility products and services (collectively, the "**Utility Services**") from

various utility companies (collectively, the "**Utility Companies**").  The Debtors intend to file a

motion seeking an order of this Court prohibiting the Utility Companies from altering or

discontinuing the Utility Services and deeming the Utility Companies adequately assured of

future performance by virtue of the Debtors' proposed adequate assurance.

    84. To provide adequate assurance of payment for future services to the

Utility Companies, the Debtors propose to provide a deposit equal to two (2) weeks of Utility

Services in a segregated account upon the request of any Utility Company for such a deposit (the

"**Adequate Assurance Deposit**").  I believe that the Debtors' Adequate Assurance Deposit

constitutes sufficient adequate assurance to the Utility Companies.  However, in light of the

severe consequences to the Debtors of any interruption in services by the Utility Companies and

the recognition that Utility Companies have the right to evaluate the proposed adequate

assurance on a case-by-case basis, if any Utility Company believes additional assurance is

needed, the Debtors have proposed procedures for the Utility Companies to request additional

adequate assurance.  I believe these procedures, as outlined in the motion, are not only fair and

reasonable, but also necessary for the Debtors' stability.  Furthermore, the Debtors fully intend to

timely comply with their postpetition obligations to Utility Companies.

85.    I believe that without the relief requested in the motion, the Debtors could

be harmed by having to address numerous requests by Utility Companies in a disorganized

manner at a critical period in their reorganization efforts.

*(vi)    Motion for Authority to Continue Honoring Prepetition Insurance Financing
Agreements.*

86.    In connection with the day-to-day operations of their business, the Debtors

maintain various forms of insurance.  Certain of these insurance policies require the Debtors to

prepay the full premium amount for the applicable coverage period.  Because these insurance

policies typically cover policy periods of at least twelve months, the requirement to prepay the

full premium would impose a significant financial burden on the Debtors.  To lessen this burden,

prior to the Petition Date, the Debtors financed certain of their property, automotive,

employment practices, pollution, cyber liability and general liability insurance (collectively, the

"**Insurance Policies**") pursuant to prepetition insurance premium finance agreements by and

between Debtors Transtar Holding Company and Transtar Industries, Inc., on the one hand, and

AFCO Premium Credit LLC (the "**Insurance Lender**"), on the other hand (combined, the

"**Insurance Finance Agreements**").

87.    The Debtors are seeking authority to continue honoring their obligations under the Insurance Finance Agreements, which are secured obligations.  Under the Insurance Finance Agreements, in the event of non-payment by the Debtors, the Insurance Lender is appointed as attorney in fact for all named insureds under the applicable Insurance Policies and is granted the authority to, among other things, cancel the applicable Insurance Policies.  If the Insurance Policies were cancelled, the Debtors would be forced to seek replacement insurance coverage, giving rise to additional expense to their estates, distraction to management, and even potentially a gap in insurance coverage which could prove costly.  Further, in such a scenario the Debtors may not be able to replace their Insurance Policies on terms and conditions as favorable as those presently in place.  In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing certain of their insurance premiums, I believe that the authority to continue to honor the Insurance Finance Agreements in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors and their estates.

### III.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

88.     It is my understanding that Local Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

89.    Schedule II is the corporate organizational chart of the Debtors and their non-Debtor affiliates.

90.    Exhibit A hereto sets forth the *ad hoc* committee that, to the Debtors' knowledge, was formed prior to the Petition Date.

91.    Exhibit B hereto provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims:  (i) each creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in

the post office address) and telephone number; (ii) the nature and approximate amount of such

creditor's claim; and (iii) an indication of whether the claim is contingent, unliquidated, disputed,

or partially secured.

92.    <u>Exhibit C</u> hereto provides the following information with respect to the

holders of the five (5) largest secured claims against the Debtors:  (i) the creditor's name, address

(including the number, street, apartment or suite number, and zip code, if not included in the post

office address) and telephone number; (ii) the amount of the claim; (iii) a brief description of

such creditor's claim; (iv) if known, an estimate of the value of the collateral securing the claim;

and (v) whether the claim or lien is contingent, unliquidated or disputed.

93.    <u>Exhibit D</u> hereto provides a summary of the Debtors' assets and liabilities.

94.    <u>Exhibit E</u> hereto provides that the outstanding equity interests of the

Debtors are privately held, and that there is no established public trading market for such equity

interests or the Debtors' debt securities.

95.    <u>Exhibit F</u> hereto sets forth a list of the property of the Debtors in the

possession or custody of a custodian, public officer, mortgagee, pledge, assignee of rents, or

secured creditor, or agent for any such entity.

96.    <u>Exhibit G</u> hereto sets forth a list of the owned or leased premises from

which the Debtors operate their businesses.

97.    <u>Exhibit H</u> hereto sets forth the location of the Debtors' substantial assets

and the location of their books and records.

98.    <u>Exhibit I</u> hereto sets forth the nature and present status of each action or

proceeding, pending or threatened, against the Debtors or their property where a judgment or

seizure of their property may be imminent.

99.    <u>Exhibit J</u> hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

100.    <u>Exhibit K</u> hereto sets forth the estimated amount to be paid to: (i) employees; (ii) officers, stockholders and directors; and (iii) financial and business consultants retained by the Debtors, for the thirty (30) day period following the Petition Date.

101.    <u>Exhibit L</u> hereto sets forth a list of the Debtors' estimated cash receipts and disbursements, net gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, for the thirty (30) day period following the Petition Date.

*[The rest of this page is intentionally left blank]*

## **CONCLUSION**

In furtherance of their reorganization efforts, the Debtors respectfully request that

orders granting the relief requested in the First Day Motions be entered.

Dated:  November 20, 2016
       Walton Hills, Ohio

                                       DACCO Transmission Parts (NY), Inc., et al.,
                                       Debtors and Debtors in Possession

                                   /s/ Joseph Santangelo
                                   Joseph Santangelo
                                   Chief Financial Officer and/or Authorized
                                   Signatory of Debtors and Debtors in
                                   Possession

## Schedule I

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| ABC Transmission Parts Warehouse, Inc. (4283) | DACCO/Detroit of Minnesota, Inc. (2680) |
| Alma Products I, Inc. (7468) | DACCO/Detroit of Missouri, Inc. (2727) |
| Atco Products, Inc. (1120) | DACCO/Detroit of New Jersey, Inc. (4093) |
| Axiom Automotive Holdings Corporation (5609) | DACCO/Detroit of Ohio, Inc. (3792) |
| Axiom Automotive Technologies, Inc. (5382) | DACCO/Detroit of Oklahoma, Inc. (4662) |
| Axiom Technologies Holding Corp., Inc. (3030) | DACCO/Detroit of Pennsylvania, Inc. (8101) |
| DACCO, Incorporated (7528) | DACCO/Detroit of South Carolina, Inc. (6285) |
| DACCO Transmission Parts (CA), Inc. (9023) | DACCO/Detroit of Texas, Inc. (7215) |
| DACCO Transmission Parts (CO), Inc. (6584) | DACCO/Detroit of Virginia, Inc. (6972) |
| DACCO Transmission Parts (LA), Inc. (2980) | DACCO/Detroit of West Virginia, Inc. (7862) |
| DACCO Transmission Parts (NC), Inc. (6504) | DACCO/Detroit of Wisconsin, Inc. (6394) |
| DACCO Transmission Parts (NJ), Inc. (1141) | DIY Transmission Parts, LLC (4443) |
| DACCO Transmission Parts (NM), Inc. (1236) | ETX Holdings, Inc. (0247) |
| DACCO Transmission Parts (NY), Inc. (9519) | ETX Transmissions, Inc. (6362) |
| DACCO/Detroit of Alabama, Inc. (9469) | ETX, Inc. (2359) |
| DACCO/Detroit of Arizona, Inc. (7510) | Michigan Equipment Corporation (3229) |
| DACCO/Detroit of Chattanooga, Inc. (4587) | Nashville Transmission Parts, Inc. (8881) |
| DACCO/Detroit of Florida, Inc. (8128) | Speedstar Holding Corporation (5351) |
| DACCO/Detroit of Georgia, Inc. (0368) | Transtar Autobody Technologies, Inc. (4194) |
| DACCO/Detroit of Indiana, Inc. (8377) | Transtar Group, Inc. (3464) |
| DACCO/Detroit of Kentucky, Inc. (0345) | Transtar Holding Company (3429) |
| DACCO/Detroit of Maryland, Inc. (5187) | Transtar Industries, Inc. (0632) |
| DACCO/Detroit of Memphis, Inc. (7291) | Transtar International, Inc. (9464) |
| DACCO/Detroit of Michigan, Inc. (2811) | |

## <u>Schedule II</u>

**Organizational Structure Chart**



Corporate Structure of Speedstar Holding Corporation, Transtar Holding Company, and each of their Direct and Indirect Subsidiaries*

Speedstar Holding Corporation
DE

Transtar Holding Company
DE

Axiom Automotive Holdings Corporation
DE

Axiom Technologies Holdings Corp., Inc.
DE

1%

Partes Remanufacturadas de Mexico S.A. de C.V.
MEXICO

Axiom Automotive Technologies, Inc.
DE

99%

King-O-Matic Industries, Ltd.
CANADA

Trans Mart, Inc.
PUERTO RICO

Transtar Group, Inc.
DE

Transtar Autobody Technologies, Inc.
OH

Transtar Industries, Inc.
OH

ETX Holdings, Inc.
DE

Transtar International, Inc.
OH

DIY Transmission Parts, LLC
DE

ETX, Inc.
DE

Alma Products I, Inc.
MI

ETX Transmissions, Inc.
DE

DACCO, Incorporated
OH

Atco Products, Inc.
DE

Michigan Equipment Corporation
DE

[Each direct subsidiary of DACCO, Incorporated]

Direct Subsidiaries of DACCO, Incorporated:

ABC Transmission Parts Warehouse, Inc.
TN

DACCO/Detroit of Alabama, Inc.
AL

DACCO/Detroit of Arizona, Inc.
AZ

DACCO/Detroit of Chattanooga, Inc.
TN

DACCO/Detroit of Florida, Inc.
FL

DACCO/Detroit of Georgia, Inc.
IN

DACCO/Detroit of Indiana, Inc.
IN

DACCO/Detroit of Kentucky, Inc.
KY

DACCO/Detroit of Maryland, Inc.
MD

DACCO/Detroit of Memphis, Inc.
TN

DACCO/Detroit of Michigan, Inc.
MI

DACCO/Detroit of Minnesota, Inc.
MN

DACCO/Detroit of Missouri, Inc.
MO

DACCO/Detroit of New Jersey, Inc.
NJ

DACCO/Detroit of Ohio, Inc.
OH

DACCO/Detroit of Oklahoma, Inc.
OK

DACCO/Detroit of Pennsylvania, Inc.
PA

DACCO/Detroit of South Carolina, Inc.
SC

DACCO/Detroit of Texas, Inc.
TX

DACCO/Detroit of Virginia, Inc.
VA

DACCO/Detroit of West Virginia, Inc.
WV

DACCO/Detroit of Wisconsin, Inc.
WI

DACCO Transmission Parts (CA), Inc.
CA

DACCO Transmission Parts (CO), Inc.
CO

DACCO Transmission Parts (LA), Inc.
LA

DACCO Transmission Parts (NC), Inc.
NC

DACCO Transmission Parts (NJ), Inc.
NJ

DACCO Transmission Parts (NM), Inc.
NM

DACCO Transmission Parts (NY), Inc.
NY

Nashville Transmission Parts, Inc.
TN

☐ = Debtor Entities

▨ = Non-Debtor Entities

*As of 11/6/16.

## EXHIBIT A

### Committees Organized Prior to the Order for Relief

To the best of the Debtors' knowledge and pursuant to Local Rule 1007-2(a)(3), prior to the Petition Date, certain lenders under the Second Lien Credit Agreement formed an ad hoc group, which is represented by Latham & Watkins LLP.  Contact information for counsel is below:

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Attn:   Richard A. Levy, Esq.
            Matthew L. Warren, Esq.

## **EXHIBIT B**

**50 Largest Unsecured Claims**
**(on a consolidated basis)**

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case and this filing:</strong></td></tr>
</table>

Debtor Name <u>DACCO Transmission Parts (NY), Inc., et al.</u>

United States Bankruptcy Court for the: <u>Southern</u> District of <u>New York</u>
(State)

Case number (*If known*): 16-<u>        </u>

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders[1]     12/15

**A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 50 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[2]<br><br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[3] | Deduction for value of collateral or setoff | Unsecured claim |
| 1. | Cortland Capital Market Services LLC<br>21 W. 46th Street, Suite 1110<br>New York, NY 10036<br><br>and<br><br>Cortland Capital Market Services LLC<br>c/o Latham & Watkins LLP<br>330 N. Wabash Avenue<br>Suite 2800<br>Chicago, IL 60611 | Attn: Chris Capezuti, Director<br>Tel.: 917-979-2772<br>Email: chris.capezuti@cortlandglobal.com<br><br>and<br><br>Attn: Richard A. Levy, Esq. and Matthew L. Warren, Esq.<br>Tel.: 312-876-7700<br>Email: richard.levy@lw.com and matthew.warren@lw.com | Debt | | | $170,000,000.00 |
| 2. | Alma Pension Liability<br>151 Maddox-Simpson Parkway<br>Lebanon, TN 37090<br><br>and<br><br>Alma Pension Liability<br>503 N. Euclid Avenue<br>Bay City, MI 48706-2965 | Attn: Tim Smith, International Representative<br>Tel.: 615-443-7654<br>Email: t.smith@uaw.net<br><br>and<br><br>Attn: William L. Laney, Jr., USW Staff Representative<br>Email: blaney@usw.org | Pension | | | $17,027,320.00 |

---

[1]      The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

[2]      These claim amounts are as of November 6, 2016 and represent maximum potential liabilities as of such date. Actual amounts owed, if any, may be significantly lower.

[3]      This list does not include any claims for which security has been granted, regardless of whether the claims may be undersecured.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim² If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured³ | Deduction for value of collateral or setoff | Unsecured claim |
| 3. | Ford Component Sales 290 Town Center Drive Suite 1000 Dearborn, MI 48126 | Attn:  Thad Bostwick, Executive Director, Sales Tel.:  313-390-3860 Email:  tbostwic@ford.com | Trade | | | $4,331,641.00 |
| 4. | Borg Warner Automotive 700 25th Avenue Bellwood, IL 60104 | Attn:  Tom Hardies, Business Development Tel.:  708-203-3356 Email: thardies@borgwarner.com | Trade | | | $2,518,950.00 |
| 5. | Sunny Bright Enterprise Co., Ltd. No. 220, 38th Road Industrial Zone Taichung Taichung, Taiwan 40768 | Attn:  Catherine Liu, Sales Tel.:  +04 235-873-19 Email: catherine@sunupmaster.com.tw | Trade | | | $1,768,402.000 |
| 6. | Shinsei Automotive Industry Co., Ltd. 1-11 Oyodo Minami 3-Chome Kita Ku Osaka, Japan 531-0075 | Attn:  Kazumi Shibata, Managing Director Tel.:  +06 645-118-21 Email:  saico@shinseiauto.com | Trade | | | $1,548,662.00 |
| 7. | ACDelco – Chicago 6200 Grand Point Drive Grand Blanc, MI 48439 | Attn:  Kurt W. Pursche, Customer Care and Aftersales Tel.:  810-606-3759 Email:  kurt.pursche@gm.com | Trade | | | $1,360,306.00 |
| 8. | Tsang Yow Industrial No. 18, Chung-Shan Road Minhsiung Industrial Park Chia-Yi County, Taiwan 62154 | Attn:  Vicky Yang, Account Representative Tel.:  +886 522-008-88 Email: vicky@tsangyow.com.tw | Trade | | | $1,078,960.00 |
| 9. | Rostra Precision Controls, Incorporated 2519 Dana Drive Laurinburg, NC 28352 | Attn:  Tom Eibel, Vice President – Powertrain Division Tel.:  910-291-2500 Email:  teibel@rostra.com | Trade | | | $1,008,349.00 |
| 10. | Sonnax Industries, Incorporated 1 Automatic Drive Bellows Falls, VT 05101 | Attn:  Seth Baldasaro, Director, Strategic Accounts Tel.:  802-463-0380 Email:  sdb@sonnax.com | Trade | | | $949,955.00 |
| 11. | ATC – Drive Train 9901 W. Reno Oklahoma City, OK 73127 | Attn:  Greg Jaegar, Business Developer Tel.:  405-577-9819 Email:  greg.jaegar@atcdt.com | Trade | | | $864,279.00 |
| 12. | Brunswick Automart 3041 Center Road Brunswick, OH 44212 | Attn:  Eric Avondet, Wholesale Parts Manager Tel.:  330-460-7080 Email:  bam.eric@gmail.com | Trade | | | $689,695.00 |
| 13. | TransGo d/b/a Transco 2621 Merced Avenue El Monte, CA 91733 | Attn:  David Hardin, Owner Tel.:  626-443-7451 Email: transgoeast@sbcglobal.net | Trade | | | $575,247.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim²  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured³ | Deduction for value of collateral or setoff | Unsecured claim |
| 14. Filtran, LLC 875 Seegers Road Des Plains, IL 60016 | Attn:  Erwin van Boven, Vice President, Sales & Marketing Tel.:  847-635-3830 Email: erwin.vanboven@filtranllc.com | Trade | | | $512,375.00 |
| 15. Buffalo Engine Component 1824 Fillmore Avenue Buffalo, NY 14214 | Attn:  Jason Pellitieri, Owner/Partner Tel.:  716-893-2661 Email: jason@buffaloengine.com | Trade | | | $454,286.00 |
| 16. Custom Made Components, Inc. 8F, No. 168, Section 1, Central N. Road Peitou District Taipei, Taiwan | Attn:  Paul Chan, Manager Tel.:  +886 228-948-299 Email:  plc.com@msa.hinet.net | Trade | | | $443,422.00 |
| 17. Freudenberg-NOK d/b/a Transtec 21 Golf View Lane N. Olmstead, OH 44070 | Attn:  John Galloway, Sales Manager, Transmission Tel.:  216-533-3403 Email:  jgg@fnst.com | Trade | | | $435,485.00 |
| 18. United Parcel Service 6940 Eagle Road Middleburg Heights, OH 44130 | Attn:  Rodd Rottman, Director, Enterprise Account Sales Tel.:  440-742-8319 Email:  rottman.rodd@ups.com | Logistic Services | | | $404,598.00 |
| 19. Concept Paints Lot 40, Charles Street St. Marys, NSW 2760 Australia | Attn:  Joe Kaltoum, Director Tel.:  +61 296-732-555 Email: joe.k@conceptpaints.com.au | Trade | | | $385,535.00 |
| 20. Victory Packaging 3555 Timmons Lane Houston, TX 77027 | Attn:  Ed Franza, National Account Manager Tel.:  214-957-9003 Email: efranza@victorypackaging.com | Trade | | | $359,291.00 |
| 21. H & A Transmissions, Inc. 8727 Rochester Avenue Rancho Cucamonga, CA 91730 | Attn:  Gil Dickason, President/CEO Tel.:  909-941-9020 Email:  gilhna@msn.com | Trade | | | $346,121.00 |
| 22. Dorman Products 1019 Harvin Way Suite 150 Rockledge, FL 32955 | Attn:  Joe Wright, National Sales Manager, Specialty Tel.:  215-712-5580 Email: jwright@dormanproducts.com | Trade | | | $346,088.00 |
| 23. EXEDY Globalparts Corporation 8601 Haggerty Road S. Belleville, MI 48111-1607 | Attn:  Mark McGowan, Senior Operations Manager Tel.:  734-397-6613 Email: mmcgowan@exedyusa.com | Trade | | | $337,574.00 |
| 24. Samgong Gear Ind. Co., Ltd. 64, Aenggogae-ro 654 beon-gil (741-4, Gojan-dong) Namdong-gu, Inchon, Korea | Attn:  Darby Yoon, Customer Service Representative Tel.:  +82 (32) 821-3030 Email:  yoon@samgong.co.kr | Trade | | | $320,186.00 |
| 25. Linesoon Industrial Co. No. 466 Chung Shang Road Shi Kang Hsiang | Attn:  Alice Lin, Sales Manager Tel.:  +886 679-619-29 x111 | Trade | | | $313,273.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[2] If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[3] | Deduction for value of collateral or setoff | Unsecured claim |
| | Tainan Shien Taiwan R.O.C. | Email: alice_lin@linesoon.com.tw | | | | |
| 26. | Moveras 22 Northwestern Drive Salem, NH 03079 | Attn: John Cutter, Vice President, Operations Tel.: 603-894-9228 Email: jcutter@moveras.com | Trade | | | $309,622.00 |
| 27. | Sung Yong High-Tech Co., Ltd. 322-9, Ongjeong-ri, Tongjin-eup, Gimpo-si, Gyeonggi-do, Korea | Attn: Chris Kim, General Manager, Overseas Sales Team Tel.: +82 319-996-037 Email: sool70@naver.com | Trade | | | $275,199.00 |
| 28. | Gajra Gears Limited Station Road, Dewas 455-001 Madhya Pradesh India | Attn: Gautam Gajra, President Tel.: +91 989-302-0083 Email: gautam@gajra.com | Trade | | | $268,544.00 |
| 29. | Alto Products Corporation One Alto Way Atmore, AL 36502 | Attn: David Landa, President Tel.: 251-368-7717 Email: david.landa@altousa.com | Trade | | | $238,660.00 |
| 30. | S-Tec Service Technologies LLC 1400 W. Fuson Road Muncie, IN 47302 | Attn: Aldo Pallisco, Sales Director Tel.: 248-680-3842 Email: aldo.pallisco@magnapowertrain.com | Trade | | | $232,152.00 |
| 31. | Diligent 333 N. Sam Houston Parkway E., Suite 1000 Houston, TX 77060 | Attn: Scott Bruder, CSO/EVP, Sales Tel.: 281-854-1317 Email: sbruder@diligentusa.com | Trade | | | $224,334.00 |
| 32. | Lubrication Technologies, Inc. 900 Mendelssohn Avenue N. Golden Valley, MN 55427 | Attn: Dan Gregg, Executive Vice President Tel.: 763-417-1309 Email: dangre@lubetech.com | Trade | | | $177,386.00 |
| 33. | Superior Transmission Parts – Tallahassee 3770 Hartsfield Road Tallahassee, FL 32303 | Attn: Robert White, Global Sales Manager Tel.: 850-574-2369 x207 Email: bob.stp@comcast.net | Trade | | | $174,625.00 |
| 34. | Koyo Bearings USA LLC 29570 Clemens Road P.O. Box 45028 Westlake, OH 44145 | Attn: Charles Kotkowski, Business Manager NA Tel.: 440-788-2377 Email: chuck.kotkowski@jtekt.com | Trade | | | $161,738.00 |
| 35. | Chin Chih Metal Industrial Co. 51 Ba Ku Road Sanyi Miaoli, Taiwan | Attn: Kelly, Account Manager Tel.: +86 510-887-09662 Email: kelly@chinchih.com | Trade | | | $161,241.00 |
| 36. | Dana Canada Corporation 3939 Technology Drive Maumee, OH 43537 | Attn: Ben Apgar, District Sales Manager Tel.: 419-261-5622 Email: ben.apgar@dana.com | Trade | | | $154,340.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim² If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured³ | Deduction for value of collateral or setoff | Unsecured claim |
| 37. | J.P. Transmission Recycling 1220 Dowdy Ferry Road Hutchins, TX 75141 | Attn:  Dennis Corkill, General Manager Tel.:  800-443-8135 Email: dennis@jptransmission.com | Trade | | | $148,819.00 |
| 38. | Precision International 14 Todd Court Yaphank, NY 11980 | Attn:  Jon Sallazzo, Vice President, Sales and Marketing Tel.:  631-498-3008 Email: jsollazzo@transmissionkits.com | Trade | | | $142,630.00 |
| 39. | AAL Chem 8075 28th Street S.E. Grand Rapids, MI 49301 | Attn:  Kaz Darehshori, President Tel.:  616-247-9851 Email:  kaz@aalchem.com | Trade | | | $140,267.00 |
| 40. | Hoerbiger Bernbeurener Straße 17 Schongau, Germany 86959 | Attn:  Michael Pfeifer, Sales Account Manager Tel.:  +49 886-125-662526 Email: michael.pfeifer@hoerbiger.com | Trade | | | $137,250.00 |
| 41. | ZF Services North America, LLC 777 Hickory Hill Drive Vernon Hills, IL 60061 | Attn:  Steve De Tomaso, Account Manager Tel.:  847-478-5866 Email: steve.detomaso@zf.com | Trade | | | $130,176.00 |
| 42. | Federal-Mogul Corporation 27300 W. 11 Mile Road Southfield, MI 48034 | Attn:  Doug Chase, Global Business Manager Tel.:  248-354-2694 Email: doug.chase@federalmogul.com | Trade | | | $128,922.00 |
| 43. | Seal Aftermarket Products 2315 S.W. 32nd Avenue Pembroke Park, FL 33023 | Attn:  Chris MacLeod, Domestic Sales Manager Tel.:  810-444-5515 Email: chris.macleod@sealsap.com | Trade | | | $124,286.00 |
| 44. | Nuplex 4730 Crittenden Drive, Louisville, KY 40209 | Attn:  Todd Yonker, Controller Tel.:  502-375-5305 Email: todd.yonker@nuplex.com | Trade | | | $121,907.00 |
| 45. | North Side Imports 835 New Durham Road Edison, NJ 08817 | Attn:  Lynn Oleferuk, Sales Tel.:  888-472-0455, ext. 2251 Email: loleferuk@northsideimports.com | Trade | | | $116,675.00 |
| 46. | Stellar Group 4935 Panther Parkway Seville, OH 44273 | Attn:  Justin Archer, President Tel.:  330-769-8484 Email: jarcher@stellargroupinc.com | Trade | | | $116,186.00 |
| 47. | Pipeline Packaging 1421 Piedmont Troy, MI 48083 | Attn:  Jim Zuidema, Sales Representative Tel.:  248-743-0248 Email: jzuidema@pipelinepackaging.com | Trade | | | $114,404.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Amount of unsecured claim[2]  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|
| | | | Total claim, if partially secured[3] | Deduction for value of collateral or setoff | Unsecured claim |
| 48. | Corporate Transit of America P.O. Box 682909 Franklin, TN 37068-2909 | Attn:  Bryan Jessee, National Sales Manager Tel.:  937-789-7042 Email:  bjessee@gocta.com | Trade | | | $114,064.00 |
| 49. | Alabama Bands, Inc. 202 Industrial Drive Muscle Shoals, AL 35661 | Attn:  Jimmy Fuller, Owner Tel.:  256-386-0027 Email: jimmy@alabamabands.net | Trade | | | $112,870.00 |
| 50. | Mickey Thompson Tires 4600 Prosper Drive Stow, OH 44224 | Attn:  Lisa, Account Manager Tel.:  330-688-4538 Email: customerservice@mickeythompsontires.com | Trade | | | $111,154.00 |

## EXHIBIT C

### Holders of Five Largest Secured Claims Against the Debtors[1]

| Creditor | Mailing Address and Phone Number | Approximate Amount of Claim[2] | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| Royal Bank of Canada as Administrative Agent and Collateral Agent for the First Lien Credit Agreement | Royal Bank of Canada c/o Paul Hastings LLP 75 East 55 Street New York, NY 10022 Tel: 212-318-6000 | $424,600,000 | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | No |
| Cortland Capital Market Services LLC as Administrative Agent and Collateral Agent for the Second Lien Credit Agreement | Cortland Capital Market Services LLC c/o Latham & Watkins LLP 330 N. Wabash Ave., Suite 2800 Chicago, Illinois 60611 Attn: Richard Levy and Matthew Warren Tel: (312) 876-7700 | $183,200,000 | Substantially all of the Debtors' assets (to the extent set forth in the governing agreements) | No.  The Debtors estimate that this claim is entirely unsecured |
| Penske Truck Leasing Co. | P.O. Box 563 Reading, PA 19603-0563 | $1,670,196 | 20 Tractor units and 33 trailer units | No |

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors.

[2]    These figures are as of the Petition Date and are inclusive of principal and accrued interest.  The Debtors have not apportioned the secured and unsecured portions of these claims.

| AFCO Premium Credit LLC | 5600 North River Road Suite 400 Rosemont, IL 60018-5187 | $577,011.04 | Any and all unearned premiums and dividends under the financed insurance policies, loss payments received pursuant to the Insurance Policies and rights pursuant to applicable state insurance guarantee funds relating to the Insurance Policies | No |
|---|---|---|---|---|
| IBM Global Financing | 1 North Castle Drive Bowling Green, KY 42101 | $107,000 | IBM Power 8286 41A & 9994 002 Software | No |

## EXHIBIT D

### Summary of Debtors' Assets and Liabilities
### on a Consolidated Basis, as of November 6, 2016[1]



| Consolidated Balance Sheet ($ in 000s) | | November 6th, 2016 |
|---|---|---|
| Cash | $ | 4,912 |
| Accounts receivable trade, net of reserves | | 51,435 |
| Accounts receivable other | | 8,232 |
| Inventory, net of reserves | | 152,480 |
| Prepaid expense | | 5,457 |
| Other current assets | | 8,676 |
| **Total current assets** | | **231,194** |
| | | |
| **Fixed assets, net** | | **41,387** |
| Goodwill, net | | 182,990 |
| Intangible assets, net | | 161,768 |
| Deposits | | 4,660 |
| Other assets | | 1,069 |
| **Total other assets** | | **350,487** |
| **Total assets** | **$** | **623,068** |
| Accounts payable | $ | 39,495 |
| Accrued expenses | | 31,764 |
| Accrued interest | | 30,669 |
| Current portion of notes payable | | 3,660 |
| Current portion of capital lease obligations | | 435 |
| **Total current liabilities** | | **106,024** |
| Revolving debt | | 45,588 |
| Note payable, first lien | | 354,621 |
| Note payable, second lien | | 170,000 |
| Original issue discount | | (5,495) |
| Debt origination, net of amort | | (3,290) |
| Capital lease obligations | | 1,393 |
| Pension and other post retirement benefit plans | | 16,758 |
| Deferred taxes | | 25,888 |
| Other long term liabilities | | 2,276 |
| **Total long term liabilities** | | **607,740** |
| **Total shareholder's equity** | | **(90,696)** |
| **Total liabilities and shareholder's equity** | **$** | **623,068** |

---

[1]    This unaudited balance sheet includes the assets and liabilities of the Debtors' foreign non-Debtor affiliates. The assets of the non-Debtor affiliates total approximately $30,000,000 and their liabilities are a portion of the Accounts Payable and Accrued Expenses reflected above.

## <u>EXHIBIT E</u>

### Publicly Held Securities

Local Bankruptcy Rule 1007-2(a)(7) requires the Debtors to identify the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held, and the number of holders thereof, listing separately those held by each of the Debtors' officers and directors and the amounts so held.

The outstanding equity interests of the Debtors are privately held, and there is no established public trading market for such equity interests.  The Debtors have no public debt securities.

## <u>EXHIBIT F</u>

**Debtors' Property Not in the Debtors' Possession**

Local Bankruptcy Rule 1007-2(a)(8) requires the Debtors to list property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits, cash collateral securing letters of credit or other collateral with counterparties to certain commercial relationships) is likely to be in the possession or control of various third parties, including, shippers, vendors, distributors, parties with consignment agreements with the Debtors, and other related service providers, or agents, where the Debtors' ownership interest is not affected.

Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property, would be impractical.

## EXHIBIT G

### Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Alma Products I, Inc. | 2000 Michigan Avenue<br>Alma, MI 48801 | Owned |
| Alma Products I, Inc. | 6655 Jerome Road<br>Alma, MI 48801 | Owned |
| Alma Products I, Inc. | 150 North Court Avenue<br>Alma, MI 48801 | Owned |
| Alma Products I, Inc. | 725 E. Superior Street<br>Alma, MI 48801 | Owned |
| Alma Products I, Inc. | 140-200 Williams Road<br>Alma, MI 48801 | Owned |
| Atco Products, Inc. | 601 Interstate 45 S.<br>Ferris, TX 75125 | Owned |
| Axiom Automotive Technologies, Inc. | 3543 Lamar Avenue<br>Memphis, TN 38118 | Leased |
| DACCO, Incorporated | 741 Dacco Drive<br>Cookeville, TN 38506 | Owned |
| DACCO, Incorporated | 1903 Bowser Road | Owned |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
|  | Cookeville, TN 38506 |  |
| Transtar Autobody Technologies | 2040 Heiserman Drive<br>Brighton, MI 48114 | Owned |
| Transtar Industries, Inc. | 501 County Road 30<br>Florence, AL 35634 | Leased |
| Transtar Industries, Inc. | 2917 3rd Avenue<br>South Birmingham, AL 35233 | Leased |
| Transtar Industries, Inc. | 4523 W. 65th Street<br>Little Rock, AR 72209 | Leased |
| Transtar Industries, Inc. | 145 W. Juanita Avenue, Suite 4<br>Mesa, AZ 85210 | Leased |
| Transtar Industries, Inc. | 4530 N. 43rd Avenue<br>Phoenix, AZ 85031 | Leased |
| Transtar Industries, Inc. | 3139 S. Dodge Boulevard<br>Tucson, AZ 85713 | Leased |
| Transtar Industries, Inc. | 1112 N. Marshall Avenue<br>El Cajon, CA 92020 | Leased |
| Transtar Industries, Inc. | 5391 E. Home Avenue<br>Fresno, CA 93727 | Leased |
| Transtar Industries, Inc. | 1006 W. Hoover Avenue<br>Orange, CA 92867 | Leased |
| Transtar Industries, Inc. | 12250 E. 4th Street<br>Rancho Cucamonga, CA 91730 | Leased |
| Transtar Industries, Inc. | 725 Rivera Street<br>Riverside, CA 92501 | Leased |
| Transtar Industries, Inc. | 4350 Raley Boulevard, Suite 400 | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| | Sacramento, CA 95838 | |
| Transtar Industries, Inc. | 434 Perrymont Avenue<br>San Jose, CA 95125 | Leased |
| Transtar Industries, Inc. | 1987 Davis Street<br>San Leandro, CA 94577 | Leased |
| Transtar Industries, Inc. | 15010 Calvert Street<br>Van Nuys, CA 91411 | Leased |
| Transtar Industries, Inc. | 12330 E. 46th Avenue, Suite 700<br>Denver, CO 80239 | Leased |
| Transtar Industries, Inc. | 472 W. McNab Road<br>Fort Lauderdale, FL 33309 | Leased |
| Transtar Industries, Inc. | 1057 Ellis Road N.<br>Jacksonville, FL 32254 | Leased |
| Transtar Industries, Inc. | 600-3 Suemac Road<br>Jacksonville, FL 32254 | Leased |
| Transtar Industries, Inc. | 4290 Seaboard Road<br>Orlando, FL 32808 | Leased |
| Transtar Industries, Inc. | 9900-D N. Palafox Street, Unit C<br>Pensacola, FL 32534 | Leased |
| Transtar Industries, Inc. | 9220 Palm River Road, Suite 104<br>Tampa, FL 33619 | Leased |
| Transtar Industries, Inc. | 5125 Rio Vista Avenue<br>Tampa, FL 33634 | Leased |
| Transtar Industries, Inc. | 3810 Lake Street<br>Macon, GA 31204 | Leased |
| Transtar Industries, Inc. | 5755 Goshen Springs Road, Suite A | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| | Norcross, GA 30071 | |
| Transtar Industries, Inc. | 2801 W. Idaho Street<br>Boise, ID 83702 | Leased |
| Transtar Industries, Inc. | 780 W. Belden Avenue, Suite G<br>Addison, IL 60101 | Leased |
| Transtar Industries, Inc. | 514 W. Merrill Street, Unit B<br>Indianapolis, IN 46225 | Leased |
| Transtar Industries, Inc. | 3899 Produce Road<br>Louisville, KY 40218 | Leased |
| Transtar Industries, Inc. | 1528-30 River Oaks Road W.<br>New Orleans, LA 70123 | Leased |
| Transtar Industries, Inc. | 1611 N. Market Street<br>Shreveport, LA 71107 | Leased |
| Transtar Industries, Inc. | 3 Polito Drive<br>Shrewsbury, MA 01545 | Leased |
| Transtar Industries, Inc. | 6405 Ammendale Road, Unit C<br>Beltsville, MD 20705 | Leased |
| Transtar Industries, Inc. | 3514 S. Saginaw Street<br>Flint, MI 48503 | Leased |
| Transtar Industries, Inc. | 2915 Prairie Street S.W.<br>Grandville, MI 49418 | Leased |
| Transtar Industries, Inc. | 654 E. 10 Mile Road<br>Hazel Park, MI 48030 | Leased |
| Transtar Industries, Inc. | 290 University Drive<br>Pontiac, MI 48342 | Leased |
| Transtar Industries, Inc. | 3900 Jackson Street N.E., Suite 150<br>Minneapolis, MN 55421 | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Transtar Industries, Inc. | 4605 World Parkway Circle<br>Berkley, MO 63134 | Leased |
| Transtar Industries, Inc. | 1651 N. Topping Avenue<br>Kansas City, MO 64120 | Leased |
| Transtar Industries, Inc. | 1840 N. Topping Avenue<br>Kansas City, MO 64120 | Leased |
| Transtar Industries, Inc. | 1316 Atando Avenue<br>Charlotte, NC 28206 | Leased |
| Transtar Industries, Inc. | 350 Dixon Street<br>Lexington, NC 27292 | Leased |
| Transtar Industries, Inc. | 1029 N. West Street<br>Raleigh, NC 27603 | Leased |
| Transtar Industries, Inc. | 7 Raymond Avenue, Unit 1-2<br>Salem, NH 03079 | Leased |
| Transtar Industries, Inc. | 330 Campus Drive<br>Edison, NJ 08837 | Leased |
| Transtar Industries, Inc. | 2415 Phoenix Avenue N.E.<br>Albuquerque, NM 87107 | Leased |
| Transtar Industries, Inc. | 125 Newtown Road, Suite 400<br>Plainview, NY 11803 | Leased |
| Transtar Industries, Inc. | 5 Marway Circle, Suite 12<br>Rochester, NY 14624 | Leased |
| Transtar Industries, Inc. | 1200 Century Circle N.<br>Cincinnati, OH 45246 | Leased |
| Transtar Industries, Inc. | 3316 Refugee Road<br>Columbus, OH 43232 | Leased |
| Transtar Industries, Inc. | 6110 Merger Drive<br>Holland, OH 43528 | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Transtar Industries, Inc. | 7350 Young Drive<br>Walton Hills, OH 44146 | Leased |
| Transtar Industries, Inc. | 101 N. Robinson Avenue, Suite 700<br>Oklahoma City, OK 73102 | Leased |
| Transtar Industries, Inc. | 204 N. Robinson Avenue, Suite 710<br>Oklahoma City, OK 73102 | Leased |
| Transtar Industries, Inc. | 404 S. Eagle Lane<br>Oklahoma City, OK 73128 | Leased |
| Transtar Industries, Inc. | 1804B N.E. Argyle Street<br>Portland, OR 97211 | Leased |
| Transtar Industries, Inc. | 1814 N.E. Argyle Street<br>Portland, OR 97211 | Leased |
| Transtar Industries, Inc. | 1900 N.E. Argyle Street<br>Portland, OR 97211 | Leased |
| Transtar Industries, Inc. | 451 E. Ross Street<br>Lancaster, PA 17602 | Leased |
| Transtar Industries, Inc. | 3913 Nebraska Street<br>Newportville, PA 19056 | Leased |
| Transtar Industries, Inc. | 6550 Hamilton Avenue<br>Pittsburgh, PA 15206 | Leased |
| Transtar Industries, Inc. | 718 S. Edisto Avenue<br>Columbia, SC 29205 | Leased |
| Transtar Industries, Inc. | 2622 Texas Avenue<br>Knoxville, KY 37921 | Leased |
| Transtar Industries, Inc. | 2689 Longate Drive<br>Memphis, TN 38132 | Leased |
| Transtar Industries, Inc. | 210 N. 1st Street | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| | Nashville, TN 37213 | |
| Transtar Industries, Inc. | 3710 Vulcan Drive<br>Nashville, TN 37211 | Leased |
| Transtar Industries, Inc. | 293 Industrial Park Road<br>Piney Flats, TN 37686 | Leased |
| Transtar Industries, Inc. | 3015 Industrial Terrace<br>Austin, TX 78758 | Leased |
| Transtar Industries, Inc. | 1231 Security Drive<br>Dallas, TX 75247 | Leased |
| Transtar Industries, Inc. | 2425 Irving Boulevard<br>Dallas, TX 75207 | Leased |
| Transtar Industries, Inc. | 2504 Weaver Street<br>Ft. Worth, TX 76117 | Leased |
| Transtar Industries, Inc. | 3202 Harrisburg Boulevard<br>Houston, TX 77003 | Leased |
| Transtar Industries, Inc. | 1339 S. Brazos Street<br>San Antonio, TX 78207 | Leased |
| Transtar Industries, Inc. | 1218 Texas Boulevard<br>Texarkana, TX 75501 | Leased |
| Transtar Industries, Inc. | 1713 Milam Street<br>Texarkana, TX 75501 | Leased |
| Transtar Industries, Inc. | 3006 Franklin Avenue<br>Waco, TX 76710 | Leased |
| Transtar Industries, Inc. | 3472 W. 2100 S. Street<br>Salt Lake City, UT 84119 | Leased |
| Transtar Industries, Inc. | 4840 Brookside Court<br>Norfolk, VA 23502 | Leased |

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| Transtar Industries, Inc. | 5016 Byrd Industrial Drive<br>Richmond, VA 23231 | Leased |
| Transtar Industries, Inc. | 1399 Air Rail Avenue<br>Virginia Beach, VA 23455 | Leased |
| Transtar Industries, Inc. | 22435 76th Avenue<br>Kent, WA 98032 | Leased |
| Transtar Industries, Inc. | 5015 208th Street S.W., Unit 6<br>Lynnwood, WA 98036 | Leased |
| Transtar Industries, Inc. | 314 N. Crestline Street<br>Spokane, WA 99202 | Leased |
| Transtar Industries, Inc. | 3655 N. 126th Street, Unit F<br>Milwaukee, WI 53005 | Leased |
| Transtar Industries, Inc. | 5518 MacCorkle Avenue S.W.<br>South Charleston, WV 25309 | Leased |

## **EXHIBIT H**

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtors' substantial assets, the locations of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States:

### **Location of Debtors' Substantial Assets**

The Debtors' owned properties and leaseholds are provided in <u>Exhibit G</u>.

### **Location of the Debtors' Books and Records**

7350 Young Drive,
Walton Hills, OH 44146

2000 Michigan Avenue
Alma, MI 48801

741 Dacco Drive
Cookeville, TN 38506

### **Debtors' Assets Outside of the United States**

Certain of the Debtors have wholly-owned direct and indirect foreign subsidiaries which hold assets outside of the United States.

## <u>EXHIBIT I</u>

**Summary of Actions or Proceedings Pending Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the Debtors are involved in multiple pending or threatened actions or proceedings in various jurisdictions.  However, judgement against any of the Debtors or a seizure of any of the Debtors' property is not imminent in any such litigation.  The Debtors will provide information regarding pending or threatened litigations in the Debtors' Statements of Financial Affairs and/or Schedules of Assets and Liabilities, as applicable.

## EXHIBIT J

### Senior Management of the Debtors

| Name | Tenure | Position | Experience/Responsibilities |
|------|--------|----------|-----------------------------|
| Edward H. Orzetti | June 2015 – Present | Chief Executive Officer | Mr. Orzetti joined Transtar in June 2015, having spent the last eight years as the President and CEO of Keystone Automotive Operations.  Prior to Keystone, Mr. Orzetti held senior leadership positions at VWR International, Textron and General Electric. |
| Joseph Santangelo | July 2015 – Present | Chief Financial Officer & Executive Vice President | Mr. Santangelo joined Transtar in July 2015 from Keystone Automotive Operations where he was Vice President and General Manager of its NTP-STAG business unit.  Prior to that role, Mr. Santangelo also served as Vice President of Consumer Operations and Vice President of Financial Planning and Analysis for Keystone.  Prior to Keystone, Mr. Santangelo also worked for Textron and General Electric. |
| Benjamin DePompei | April 2012 – Present | Chief Human Resources Officer & Executive Vice President | Mr. DePompei joined Transtar in April 2012, from E.P. Management Corporation, where he was the Executive Vice President of Human Resources.  Mr. DePompei has more than 20 years of experience in the automotive market, in both human resources and manufacturing roles, with an extensive background in private equity. |
| Kevin J. Canavan | August 2015 – Present | Senior Vice President Category Management | Mr. Canavan joined Transtar in August 2015 from Keystone Automotive Operations, where he held a variety of senior leadership positions, including running its B2B and B2C ecommerce business units.  Prior to working for Keystone, Mr. Canavan worked for WVR International, Textron, Booz Allen Hamilton, and Procter & Gamble. |
| J. Michael Coyler | September 2015 – Present | Senior Vice President Operations and Remanufacturing | Mr. Coyler joined Transtar in September 2015 from VWR International, where he most recently served as Vice President of Global Strategic Sourcing.  Prior to that role, Mr. Coyler held other roles at VWR and also worked for Textron and General Electric. |

## **EXHIBIT K**

### **Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions, and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)[1]** | $7,090,000 |
| **Payments to Officers, Directors and Stockholders** | $121,615 |
| **Payments to Financial and Business Consultants** | $0 |

---

[1] Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

# EXHIBIT L

**Debtors' Estimated Cash Receipts and Disbursements for the**
**Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash receipts and disbursements, estimated net cash gain or loss, estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

| | |
|---|---|
| **Cash Receipts** | $ 34,000,000 |
| **Cash Disbursements** | $ (58,000,000)[1] |
| **Net Cash Gain/Loss** | $ (24,000,000) |

| | |
|---|---|
| **Unpaid Obligations** | $ 43,000,000 |
| **Uncollected Receivables** | $ 53,000,000 |

---

[1]    Assumes that the Debtors' requested first day relief is approved by the Court.

## **EXHIBIT M**

**Restructuring Support Agreement**

*Execution Version*

## <u>RESTRUCTURING SUPPORT AGREEMENT</u>

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of November 18, 2016 (as amended, supplemented or otherwise modified, this "<u>Agreement</u>") by each of Speedstar Holding Corporation ("<u>Speedstar</u>"), Transtar Holding Company ("<u>Transtar</u>" or "<u>Borrower</u>"), each of their direct and indirect domestic subsidiaries that are parties hereto (all of the foregoing collectively, the "<u>Company</u>" or the "<u>Debtors</u>") and the undersigned lenders under the First Lien Credit Agreement (as defined below) (collectively, the "<u>Consenting Lenders</u>"), and Friedman Fleischer & Lowe, LLC ("<u>FFL</u>"), funds managed by FFL that hold equity interests in Speedstar, the general partner of such funds and their affiliates (collectively, "<u>Sponsor</u>," and, together with the Consenting Lenders, the "<u>Consenting Parties</u>") with respect to a restructuring of the Company's outstanding obligations under the revolving credit facility and term loan facility (together, the "<u>First Lien Credit Facility</u>") provided for by that certain Amended and Restated First Lien Credit Agreement, dated as of October 9, 2012 (as the same has been and may be further amended, restated, modified or supplemented from time to time in accordance with its terms, the "<u>First Lien Credit Agreement</u>"), by and among Speedstar, Transtar, the other Loan Parties under and as defined therein, the lenders party thereto (the "<u>First Lien Lenders</u>") and Royal Bank of Canada, solely as administrative agent and collateral agent (collectively, in such capacities, the "<u>First Lien Agent</u>"), the Company's outstanding obligations (the "<u>Second Lien Obligations</u>") under the term loan facility (the "<u>Second Lien Credit Facility</u>") provided for by that certain Amended and Restated Second Lien Credit Agreement, dated as of October 9, 2012 (as the same has been and may be further amended, restated, modified or supplemented from time to time in accordance with its terms, together with ancillary documents, the "<u>Second Lien Credit Agreement</u>"), by and among Speedstar, Transtar, the lenders party thereto (the "<u>Second Lien Lenders</u>") and Cortland Capital Market Services, LLC, as administrative agent and collateral agent (collectively, in such capacities, the "<u>Second Lien Agent</u>"), and all other Claims (as defined below) against and interests in the Company (the "<u>Restructuring</u>"), as contemplated by the restructuring term sheet attached hereto as <u>Exhibit A</u> (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "<u>Term Sheet</u>").  Each party to this Agreement may be referred to as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>."

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet, which Term Sheet and all exhibits thereto are expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein.

**Section 1.** Certain Definitions.

As used in this Agreement, the following terms shall have the following meanings:

(a)      "<u>*Claim*</u>" shall mean any "claim" (as such term is defined in section 101(5) of the Bankruptcy Code (as defined below)) against any of the Debtors.

(b)      "*DIP Credit Agreement*" shall mean that certain senior secured, superpriority Debtor-in-Possession Credit Agreement to be provided to the Debtors by the DIP Lenders (as defined herein) in form and substance consistent with the terms and conditions set forth in the DIP Term Sheet (as defined herein).

(c)      "*DIP Facility*" shall mean the delayed draw credit facility provided under the DIP Credit Agreement.

(d)      "*DIP Lenders*" shall mean the Consenting First Lien Lenders, or their affiliate designees, and any other First Lien Lenders participating in the DIP Facility.

(e)      "*DIP Term Sheet*" shall mean the DIP Term Sheet attached hereto as Exhibit B; provided, however, that, upon execution of the DIP Credit Agreement, all references to the DIP Term Sheet herein shall be deemed references to the DIP Credit Agreement.

(f)      "*Majority Consenting Lenders*" shall mean those Consenting First Lien Lenders holding in excess of fifty percent (50%) of the aggregate outstanding Loans (as defined in the First Lien Credit Agreement) held by all Consenting First Lien Lenders at the time of determination.

(g)      "*Outside Date*" shall mean February 10, 2017.

(h)      "*Transaction Expenses*" shall mean all reasonable and documented fees and expenses, not to exceed an amount acceptable to the Majority Consenting Lenders, incurred by the Consenting First Lien Lenders (which fees and expenses in respect of professionals shall be limited to the fees and expenses of Chapman and Cutler LLP, Munger, Tolles & Olson LLP, CCG Advisors LLC, Storm Consulting LLC, Porzio Bromberg & Newman, PC, Fortgang Consulting LLC, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and any other professionals agreed to by the Company and the Majority Consenting Lenders) (the "Lender Professionals")) in connection with this Agreement, the Restructuring Documents (as defined below) and the transactions contemplated hereby and thereby.

(i)      "*Transfer*" shall mean to directly or indirectly, in whole or in part, sell, contract to sell, give, assign, participate, hypothecate, pledge, encumber, grant a security interest in, offer, sell any option or contract to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (including by participation).

**Section 2.  Restructuring, Term Sheet and Restructuring Documentation.**

**2.1    Term Sheet.**

The joint chapter 11 plan of reorganization (including any amendments, modifications and supplements thereto, the "Plan") shall embody the terms contained in, and shall be consistent with, the terms and conditions of the Restructuring set forth in the Term Sheet, which Term Sheet and all schedules and exhibits thereto are expressly

incorporated by reference and made part of this Agreement as if fully set forth herein. Except as otherwise provided herein, neither this Agreement nor the Term Sheet nor any provision hereof or thereof may be modified, amended, waived or supplemented, except in accordance with Section 10.12 hereof.

**2.2      Restructuring Documents.**

(a)      The definitive documents and agreements governing the Restructuring (collectively, the "Restructuring Documents") shall consist of the following: (i) the DIP Credit Agreement and related documentation, including the motion seeking approval of the DIP Facility and authority to use collateral, including cash collateral, and grant adequate protection (the "DIP Motion") and the interim and final orders to be entered by the Bankruptcy Court (as defined below) approving such motion (respectively, the "Interim DIP Order" and the "Final DIP Order" and, together, the "DIP Order"), each as described in the DIP Term Sheet; (ii) the motion seeking authority for the Debtors to assume this Agreement pursuant to sections 105(a) and 365 of the Bankruptcy Code and perform its obligations hereunder (the "RSA Assumption Motion") and the order to be entered by the Bankruptcy Court approving the RSA Assumption Motion (the "RSA Assumption Order"); (iii) the Plan (and all exhibits and supplements thereto consistent with the Term Sheet); (iv) the disclosure statement with respect to such Plan (the "Disclosure Statement"), the other solicitation materials in respect of the Plan (such materials, collectively, the "Solicitation Materials"), the motion to approve the Disclosure Statement and Solicitation Materials (the "Disclosure Statement Motion") and the order to be entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by sections 1125 and 1126(b) of the Bankruptcy Code (the "Disclosure Statement Order," which may be the same as the Confirmation Order); (v) the order to be entered by the Bankruptcy Court confirming the Plan (the "Confirmation Order") and pleadings in support of entry of the Confirmation Order; (vi) those motions and proposed court orders that the Debtors file on or after the Petition Date (as defined below) and seek to have heard on an expedited basis at the "first day hearing," including, but not limited to, any motion regarding the Debtors' critical vendors, foreign vendors, and/or vendors holding allowed administrative expense claims under section 503(b)(9) of the Bankruptcy Code (the "First Day Pleadings"); and (vii) such other material documents, pleadings, agreements or supplements as may be necessary or advisable to implement the Restructuring.

(b)      Each of the Restructuring Documents, including the Plan, the Disclosure Statement (including, but not limited to the Disclosure Statement Order and the Solicitation Materials), the Confirmation Order, First Day Pleadings, RSA Assumption Motion, and RSA Assumption Order, shall contain terms and conditions consistent with this Agreement, the Term Sheet, and the DIP Term Sheet.  Each of the Restructuring Documents shall be in form and substance reasonably satisfactory to each of (i) the Company, (ii) the First Lien Agent, and (iii) the Majority Consenting Lenders.

**2.3     Support of the Restructuring, Term Sheet and Restructuring Documentation.**

        (a)     <u>Obligations of the Company</u>.  Until the Termination Date (as defined below), the Company, jointly and severally, agrees to take any and all necessary and appropriate actions in furtherance of the Restructuring contemplated under this Agreement and the Term Sheet, including (i) subject to the terms of this Agreement and the Term Sheet, to solicit acceptances of the Plan or other documentation required to consummate the Restructuring; (ii) following such solicitation, to commence reorganization cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"); (iii) to file and seek approval on an interim (to the extent applicable) and final basis of the First Day Pleadings, including the DIP Motion, in all respects consistent with the terms set forth in this Agreement and the Term Sheet; (iv) to file with the Bankruptcy Court and seek approval of the Plan and Disclosure Statement; (v) to ensure that any and all material pleadings to be filed in the Chapter 11 Cases shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet; (vi) to take any and all necessary and appropriate actions in furtherance of the restructuring transactions contemplated under this Agreement, the Plan and the Term Sheet; (vii) not to take any action or make any filing or commence any action challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the Obligations (as such term is defined in the First Lien Credit Agreement) owing under the First Lien Credit Agreement (collectively, the "<u>First Lien Obligations</u>"); (viii) to support and consummate the Restructuring on the terms set forth in the Term Sheet and all of the transactions contemplated herein, including, without limitation, those described in the Term Sheet (and once filed, the Plan) in accordance with the deadlines specified in Section 3 below; (ix) to take any and all necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet (and once filed, the Plan); (x) to obtain any and all required regulatory and/or third-party approvals necessary to consummate the Restructuring; (xi) to operate its business in the ordinary course based on historical practices and the operations contemplated in the Company's existing business plan (as may be updated in the ordinary course from time to time in consultation with the Majority Consenting First Lien Lenders); and (xii) to pay all Transaction Expenses incurred prior to the Termination Date of the Lender Professionals incurred pursuant to their representation of the Consenting First Lien Lenders in connection with the Restructuring and any ancillary efforts related thereto, as provided for herein; <u>provided</u>, that all such Transaction Expenses shall be paid in accordance with Section 10.16.

        (b)     <u>Obligations of Consenting Lenders</u>.  Until the Termination Date, each of the Consenting Lenders, severally and not jointly, agrees, in its capacity as a First Lien Lender: (i) subject to the terms of this Agreement and the Term Sheet, if and when solicited, to timely vote all claims for which such Consenting Lender has voting power in favor of the Plan, and, when solicited, sign, enter into, consent to, and return to the Company any such other Restructuring Document as may be required to consummate the Restructuring in a timely manner, and to not change, withdraw or revoke any such vote,

signature or consent; (ii) to support and consummate the Restructuring contemplated by the Term Sheet and all of the transactions contemplated herein (including, without limitation, the transactions contemplated by the Equity Term Sheet (as defined in the Term Sheet), the Debtors' filing of the Chapter 11 Cases and entry into the DIP Facility on the terms set forth in the DIP Term Sheet); (iii) to negotiate in good faith each of the amendments, definitive agreements, documents, motions and other pleadings referenced in, or necessary or desirable to effectuate the transactions contemplated by, the Term Sheet, including, without limitation, the Restructuring Documents, all of which shall be consistent in all material respects with the Term Sheet; and (iv) not to take any action that would prevent, hinder, interfere with, delay, or postpone the effectuation of the Restructuring contemplated by this Agreement and the Term Sheet, including the approval of the Disclosure Statement and the confirmation and consummation of the Plan.

(c)     <u>Agreement Not to Interfere</u>.  Each Party agrees (in the case of the Company, subject to Section 4 hereof) that, until the earlier of the Termination Date and the Plan Effective Date (as defined below), it will not, directly or indirectly: (i) object to, delay, postpone, challenge, reject, oppose or take any other action that would reasonably be expected to prevent, interfere with, delay or impede, directly or indirectly, in any material respect, the approval, acceptance or implementation of the Restructuring on the terms set forth in the Term Sheet and the Restructuring Documents; (ii) directly or indirectly solicit, propose, file with the Bankruptcy Court, vote for or otherwise support or approve an actual or proposed chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on one or more asset sales under section 363 of the Bankruptcy Code or pursuant to a plan) other than the Restructuring, or file any pleading or document with respect to, or propose, join in, or participate in the formation of, any actual or proposed chapter 11 plan or restructuring transaction other than the Restructuring, including, without limitation, (A) any chapter 11 plan, reorganization, restructuring, or liquidation involving the Company or any of the Debtors, (B) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of the Company or any of the Debtors, or (C) a merger, sale, consolidation, business combination, recapitalization, refinancing, share exchange, rights offering, debt offering, equity investment, or similar transaction (including the sale of all or substantially all of the assets or capital stock or other ownership interests of the Company or the Debtors whether through one or more transactions) involving the Company or any of the Debtors (each of the foregoing, an "<u>Alternative Transaction</u>"); (iii) negotiate, enter into, consummate or otherwise participate in any Alternative Transaction or take any other action, including, but not limited to, initiating any legal proceeding or enforcing rights as holders of Claims, that is inconsistent with, or that would reasonably be expected to prevent or materially delay consummation of, the Restructuring; and (iv) in the case of the Consenting Lenders, object to or oppose, or support any other person's efforts to object to or oppose, any motions filed by the Debtors that are not inconsistent with this Agreement.

(d)     <u>Good Faith Cooperation; Further Assurances; Restructuring Documentation</u>.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in

respect of all matters concerning the implementation and consummation of the Restructuring. Notwithstanding anything to the contrary contained herein, the agreement of the Parties to consummate the Restructuring shall be subject to the completion of all necessary Restructuring Documents, which shall be filed in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders, and with respect to the Sponsor as relates to its rights and obligations hereunder and pursuant to the Term Sheet. The Debtors acknowledge and agree that they will provide advance draft copies of all Restructuring Documents and any other material motions, applications and other documents that the Debtors intend to file with the Bankruptcy Court, at least five (5) calendar days prior to the date when the Debtors intend to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) to Chapman & Cutler LLP, and shall consult in good faith with Chapman & Cutler LLP regarding the form and substance of any such proposed filing; provided, however, that, subject to any applicable confidentiality restrictions, the Debtors shall deliver unredacted versions of any sealed documents or pleadings or any documents or pleadings for which the Debtors are seeking or intend to seek sealed treatment to Chapman & Cutler LLP on a "Professional Eyes Only" basis.

(e)     Direction to First Lien Agent.  Each Consenting Lender agrees that this Agreement shall be deemed a direction to the First Lien Agent: (i) to take all actions consistent with this Agreement to support consummation of the Restructuring and the transactions contemplated by the Restructuring Documents relating thereto; (ii) to the extent applicable, to take or refrain from taking such actions as are set forth in, or are consistent with, Sections 2.3(c) and 2.3(d) above, consistent with the Consenting Lenders' obligations set forth herein; and (iii) to use all authority under the First Lien Credit Agreement to bind all First Lien Lenders to the Restructuring and any Restructuring Documents relating thereto to the extent applicable.

**Section 3.  Termination Events.**

**3.1     Consenting First Lien Lender Termination Events.**

This Agreement and the obligations hereunder may be terminated by the Majority Consenting Lenders upon the occurrence and during the continuation of, any of the following events (each, a "Consenting First Lien Lender Termination Event"), which Consenting First Lien Lender Termination Event may be waived or amended in accordance with Section 10.12 hereof:

(a)     The Company fails to comply with, satisfy or achieve the following deadlines (each of which may be extended to a later date to which the Majority Consenting Lenders Agree in writing):

(1)     11:59 p.m. (Prevailing New York City Time) on November 21, 2016, unless prior thereto the Chapter 11 Cases have been commenced;

6

(2)     11:59 p.m. (prevailing Eastern Time) on November 22, 2016,
        unless prior thereto the Debtors have filed the Plan, the
        Disclosure Statement and the Disclosure Statement Motion (the
        date on which the Debtors file the Plan, the "Plan Filing
        Date"), each in form and substance reasonably satisfactory to
        the First Lien Agent and the Majority Consenting Lenders;

(3)     three (3) business days after the date of the commencement of
        the Chapter 11 Cases (the "Petition Date"), unless prior thereto
        the Bankruptcy Court has entered the Interim DIP Order in
        form and substance reasonably satisfactory to the First Lien
        Agent and the Majority Consenting Lenders;

(4)     five (5) business days after the Petition Date, unless prior
        thereto the Debtors have filed the RSA Assumption Motion in
        form and substance reasonably satisfactory to the First Lien
        Agent and the Majority Consenting Lenders;

(5)     thirty (30) calendar days after the Petition Date, unless prior
        thereto the Bankruptcy Court has entered the RSA Assumption
        Order in form and substance reasonably satisfactory to the First
        Lien Agent and the Majority Consenting Lenders;

(6)     thirty (30) calendar days after the Petition Date, unless prior
        thereto the Bankruptcy Court has entered the Final DIP Order
        in form and substance reasonably satisfactory to the First Lien
        Agent and the Majority Consenting Lenders;

(7)     forty-five (45) calendar days after the Petition Date, unless
        prior thereto the Debtors and the Majority Consenting Lenders
        have agreed on reorganization case plans and business plans
        for Alma Products I, Inc. and Axiom Automotive
        Technologies, Inc.;

(8)     thirty-five (35) business days after the Petition Date, unless
        prior thereto the Bankruptcy Court has entered the
        Confirmation Order in form and substance reasonably
        satisfactory to the First Lien Agent and the Majority
        Consenting Lenders;

(9)     fifty (50) business days after the Petition Date, unless prior
        thereto the effective date for the Plan (the "Plan Effective
        Date") has occurred;

(b)     upon five (5) days' written notice to the Company if any amendment
        or modification of the Plan or any material documents related to the
        Plan, notices, exhibits or appendices, or any of the Restructuring
        Documents, which amendment or modification has or could

7

reasonably be expected to have a material adverse effect on one or more Consenting First Lien Lenders, without the consent of the First Lien Agent and the Majority Consenting Lenders, as applicable, to the extent such parties are, or could reasonably be expected to be, materially adversely affected by such amendment or modification;

(c) upon five (5) days' written notice to the Company following the occurrence of an Event of Default under the DIP Facility, an acceleration of the obligations under the DIP Facility or entry of an order terminating the Debtors' right to use collateral, including cash collateral, or the Debtors' right to use collateral, including cash collateral, otherwise terminates for any reason;

(d) upon five (5) days' written notice to the Company if the Disclosure Statement Order or the Confirmation Order is (a) materially adversely amended or modified without the consent of the First Lien Agent and the Majority Consenting Lenders; or (b) reversed, permanently stayed, dismissed, or vacated, unless the Bankruptcy Court enters a new Disclosure Statement Order, or a new Confirmation Order, as applicable, each in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders;

(e) upon two (2) calendar days' written notice to the Company if any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Debtors shall file a motion or other request for such relief; provided, that the dismissal or conversion of the Chapter 11 Case of any entity that (x) has determined to wind down its affairs and (y) does not own more than a *de minimis* amount of assets will not constitute a Consenting First Lien Lender Termination Event;

(f) upon five (5) days' written notice to the Company if the Debtors file any motion, application, adversary proceeding or cause of action (i) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of the Claims of the First Lien Lenders or the liens securing the First Lien Obligations or the documents related thereto, (ii) otherwise seeking to impose liability upon or enjoin the First Lien Lenders or (iii) any other cause of action against and/or seeking to restrict the rights of holders of First Lien Obligations in their capacity as such (or if the Debtors support any such motion, application, adversary proceeding or cause of action commenced by any third party or consent to the standing of any such third party to bring such motion, application, adversary proceeding or cause of action);

(g)    the Company makes an assignment for the benefit of creditors;

(h)    upon five (5) days' written notice to the Company of the filing by the Debtors of any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with this Agreement and the Term Sheet, and such motion or pleading is not withdrawn within five (5) calendar days' notice thereof by the First Lien Agent or the Majority Consenting Lenders to the Debtors (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Debtors are provided with such notice such order is not stayed, reversed or vacated within five (5) business days of such notice); provided, however, that, in the case of a stay upon such judgment or order becoming unstayed and five (5) business days' notice thereof to the Debtors by the First Lien Agent or the Majority Consenting Lenders, a Consenting First Lien Lender Termination Event shall be deemed to have occurred;

(i)    upon five (5) days' written notice to the Company if the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement or the Restructuring and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement and the Restructuring within five (5) business days following notice thereof to the Debtors by the First Lien Agent or the Majority Consenting Lenders;

(j)    upon five (5) days' written notice to the Company if the Debtors withdraw or revoke the Plan or file, publicly propose or otherwise support, or fail to actively oppose, any (i) Alternative Transaction or (ii) amendment or modification to the Restructuring containing any terms that are materially inconsistent with the implementation of, and the terms set forth in, the Term Sheet unless such amendment or modification is otherwise consented to in writing by the Majority Consenting Lenders;

(k)    upon five (5) days' written notice to the Company if, on or after the RSA Effective Date, the Debtors engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than: (i) the commencement of the Chapter 11 Cases or other bankruptcy or similar proceeding; or (ii) as expressly permitted by the Restructuring Documents;

(l)    the Debtors lose the exclusive right to file and solicit acceptances of a chapter 11 plan by final order of the Court;

(m)    upon five (5) days' written notice to the Company of a material breach by the Company of any of the undertakings, representations,

9

warranties, covenants or obligations under this Agreement (to the extent not otherwise cured or waived in accordance with the terms hereof);

(n)     any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the Term Sheet or any of the Restructuring Documents in a way that cannot be remedied by the Debtors subject to the satisfaction of the First Lien Agent and the Majority Consenting Lenders, in which case this Agreement and the obligations hereunder may be terminated by the Majority Consenting Lenders immediately;

(o)     upon five (5) days' written notice to the Company that the economic substance or the legal rights, remedies or benefits of the transactions contemplated hereby is affected in any manner materially adverse to the Majority Consenting Lenders as a result of fraud, bad faith, willful misconduct, gross negligence, intentional misrepresentation or similar misconduct or bad acts by the Company or its board of directors, officers or senior management; provided, that such termination right must be exercised on or prior to two (2) calendar days prior to the confirmation hearing);

(p)     upon five (5) calendar days' written notice to the Company, as determined by the Majority Consenting Lenders, that there has been an event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a material adverse effect, taking into account that the Company has or will file the Chapter 11 Cases, on (a) the business, assets, financial condition or results of operations of the Company, taken as a whole, (b) the rights and remedies of the First Lien Agent or any First Lien Lender under any Loan Document (as defined in the First Lien Credit Agreement) or any Restructuring Document or (c) the ability of the Company to perform its obligations under this Agreement, the Term Sheet, the DIP Term Sheet or any Restructuring Document.

(q)     the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan has not occurred by the Outside Date.

**3.2     Company Termination Events.**

The occurrence of any of the following shall be a "Company Termination Event":

(a)     any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise preventing or prohibiting the consummation of the Restructuring contemplated in the Term Sheet or any of the Restructuring

10

Documents in a way that cannot be remedied by the Company subject
to the satisfaction of the Company, the First Lien Agent and the
Majority Consenting Lenders; and

(b)     the substantial consummation (as defined in section 1101 of the
Bankruptcy Code) of the Plan has not occurred by the Outside Date.

**3.3    Reserved**

**3.4    Sponsor Termination Event**

If, without the consent of the Sponsor, the treatment of the Sponsor set forth in the
Restructuring Documents is amended in a manner that is adverse to the Sponsor and
inconsistent with their treatment in Restructuring Term Sheet, such occurrence shall
constitute a "Sponsor Termination Event."

**3.5    Consensual Termination.**

In addition to any termination event otherwise set forth herein, this Agreement
shall terminate effective upon a written agreement of the Company and the Majority
Consenting Lenders to terminate this Agreement.

**3.6    Outside Date Termination.**

This Agreement and the obligations hereunder may be terminated as to any
Consenting First Lien Lender by such Consenting First Lien Lender if the substantial
consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan has not
occurred by the Outside Date.

**3.7    Termination Event Procedures.**

(a)     Company Termination Event Procedures.  Upon the occurrence and
during the continuation of any Company Termination Event, the
termination of this Agreement shall be effective upon delivery of
written notice (which may be by email from the Company's counsel)
to each of the Consenting First Lien Lenders by the Company (the date
of the effectiveness of such termination, the "Company Termination
Date"), with a copy to counsel to the Sponsor.

(b)     Consenting First Lien Lender Termination Event Procedures.  Upon
the occurrence of a Consenting First Lien Lender Termination Event,
this Agreement shall terminate automatically without further action,
unless waived, extended or amended in accordance with Section 10.12
hereof, provided, that to the extent notice is specifically required, this
Agreement shall terminate five (5) business days after the Majority
Consenting Lenders shall have given written notice to counsel to the
Company of their intent to terminate this Agreement and the breach or
other matter giving rise to the right to so terminate this Agreement

11

shall not have been cured during the five (5) business day period after receipt of such notice (the date of such termination, the "Consenting First Lien Lender Termination Date," and the date of termination of this Agreement either pursuant to a Company Termination Date or a Consenting First Lien Lender Termination Date, the "Termination Date"). The automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for purposes of providing any notice hereunder.

(c)     Reserved.

(d)     Sponsor Termination Procedures. Upon the occurrence of a Sponsor Termination Event, this Support Agreement shall terminate solely with respect to the Sponsor without further action.

(e)     Except as otherwise provided herein, upon the Termination Date, (i) this Agreement shall be of no further force and effect and the Parties shall be released from their respective commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that they would have had and shall be entitled to take all actions that they would have been entitled to take had they not entered into this Agreement; (ii) any and all consents or votes tendered by the Parties prior to such termination shall be deemed for all purposes to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement, the Restructuring, the Plan or otherwise; and (iii) if Bankruptcy Court permission shall be required for a Consenting First Lien Lender to change or withdraw (or cause to be changed or withdrawn) its vote in favor of the Plan, no Party to this Agreement shall oppose any attempt by such Party to change or withdraw (or cause to be changed or withdrawn) such vote.

(f)     Nothing in this Section 3.7 shall relieve any Party from (i) liability for such Party's breach of such Party's obligations hereunder or (ii) its obligations under this Agreement that expressly survive termination of this Agreement.

**3.8     Limitation on Termination.**

Except with respect to a termination pursuant to Section 4 below, no occurrence shall constitute a Termination Event if such occurrence is principally the result of the action or omission of the Party seeking to terminate this Agreement in violation of this Agreement.

**Section 4.  The Company's Fiduciary Obligations.**

Notwithstanding anything to the contrary herein, (a) nothing herein requires the Company or its board of directors or officers to breach any fiduciary obligations they

12

have under applicable law; and (b) to the extent the Company's board of directors
determines in good faith, upon advice of outside counsel, that its fiduciary obligations
require the Company, at the direction of its board of directors, to terminate the
Company's obligations under this Agreement, the Company may do so without incurring
any liability to any Consenting First Lien Lender under this Agreement or the Term
Sheet; provided, that (A) following receipt of any proposal, offer or indication of interest
with respect to any such Alternative Transaction the Company shall disclose to Chapman
and Cutler LLP in writing on a confidential basis (it being agreed that Chapman and
Cutler LLP may share such disclosure with the Consenting First Lien Lenders): (i) the
identity of such party; (ii) the nature of any interest expressed by such party; and (iii) the
terms and conditions of any proposal or offer or other expression of interest for an
Alternative Transaction from such party, which disclosure shall be given by the Company
to Chapman and Cutler LLP within one (1) business day of receipt by the Company.  In
the event that the Company's board of directors determines in good faith, upon advice of
outside counsel, that its fiduciary duties require the Company to terminate this
Agreement and the Term Sheet, the Company shall provide five (5) business days'
written notice (which may be by email) to the counsel to each of the Consenting First
Lien Lenders (that were original signatories hereto).  Upon termination of this Agreement
pursuant to this Section 4, all obligations of each Consenting First Lien Lender hereunder
shall immediately terminate without further action or notice.  For the avoidance of doubt,
the Company may review and discuss proposals from third parties, and at any time during
which the Consenting First Lien Lenders hold collectively less than 66 2/3% of the First
Lien Obligations, notwithstanding anything to the contrary contained herein, the
Company may negotiate such proposals and immediately terminate this Agreement and
the Term Sheet on written notice (which may be by email from the Company's counsel)
pursuant to its fiduciary obligations, as set forth above; provided, that the Company will
not review or discuss proposals from third parties or terminate this Agreement pursuant
to this section 4 for fourteen (14) days following execution of this Agreement.

**Section 5.  Senior Exit Facility.**

On the Plan Effective Date, all outstanding loans under the DIP Facility shall be
paid off using the proceeds of a super-senior secured delayed-draw term exit facility (the
"Senior Exit Facility"), which Senior Exit Facility will be amended, as of the Plan
Effective Date, to, inter alia, provide pro rata commitments (collectively, the "Delayed
Draw Commitment") from the Consenting First Lien Lenders (in such capacity, the
"Senior Lenders") to fund up to $74.15 million, in super-senior secured delayed draw
term loans (the delayed draw term loans provided pursuant to the Delayed Draw
Commitment are referred to herein as the "Senior Exit Loans"), in accordance with the
terms of the Term Sheet (and so long as this Agreement remains in full force and effect);
provided, that pro rata participation in the DIP Facility, but not the Senior Exit Facility,
shall be offered to each First Lien Lender in accordance with subscription procedures
acceptable to the Majority Consenting Lenders.

**Section 6.   Conditions Precedent to Agreement.**

The obligations of the Parties and the effectiveness of the Agreement are binding and effective immediately upon the execution and delivery of signature pages for this Agreement by the Company and each of the Consenting First Lien Lenders (the date upon which such condition is satisfied, the "RSA Effective Date").  Notwithstanding the foregoing, the Company's obligations set forth in Section 2.3(a)(xii) hereof shall not be effective until such time as Consenting First Lien Lenders that collectively hold no less than 66 2/3% of the First Lien Obligations have executed this Agreement.

**Section 7.   Representations, Warranties and Covenants.**

**7.1      Power and Authority.**

Each Party, severally and not jointly, represents, warrants and covenants to each other Party that, as of the date of this Agreement, (i) such Party has and shall maintain all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement, and, subject to the Company obtaining necessary Bankruptcy Court approvals from and after the Petition Date, to carry out the transactions contemplated by, and perform its respective obligations under this Agreement and (ii) the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part (subject with respect to the Company from and after the Petition Date, the approval of the Bankruptcy Court).  The Company further represents, warrants and covenants to each Consenting Party that the respective boards of directors (or such other governing body) for Speedstar, Transtar and each of the other Debtors has approved, by all requisite action, all of the terms of the Restructuring as set forth in the Term Sheet.  The Sponsor further represents, warrants and covenants to each Consenting Lender that its governing body has approved, by all requisite action, all of the terms of the Restructuring as set forth in the Term Sheet.

**7.2      Enforceability.**

Each Party, severally and not jointly, represents, warrants and covenants to each other Party, that this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally (including the Bankruptcy Code) or by equitable principles relating to enforceability or ruling of the Bankruptcy Court and, with respect to the Company from and after the Petition Date, subject to Bankruptcy Court approval.

**7.3      Governmental Consents.**

The Company, jointly and severally, represents, warrants, and covenants, to each Consenting Party that, as of the date of this Agreement, its execution, delivery, and performance of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including

14

the approval of the Disclosure Statement and confirmation of the Plan, (ii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (iii) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby.

**7.4    Ownership.**

(a)    Each Consenting Lender, severally and not jointly, represents, warrants and covenants to the Company that, without limiting the ability to sell, transfer or assign any of the First Lien Obligations, or any other claims against or interests in the Company (collectively, the "Holdings"), subject to Section 10 below, (i) such Party is either (1) the legal and beneficial owner of the Holdings in the principal amounts indicated on such Party's signature page hereto or (2) has investment or voting discretion or control with respect to discretionary accounts for the holders or beneficial owners of the Holdings in the principal amounts set forth on its signature page and has the power and authority to bind the legal and beneficial owner(s) of such Holdings to the terms of this Agreement; (ii) such Party (x) has and shall maintain full power and authority to vote on and consent to or (y) has received direction from the party having full power and authority to vote on and consent to such matters concerning its portion of the Holdings and to exchange, assign and transfer such Holdings; and (iii) other than pursuant to this Agreement, such Holdings are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would materially and adversely affect in any way such Party's performance of its obligations contained in this Agreement.

(b)    The Company, jointly and severally, represents, warrants and covenants to the Consenting Lenders that: (i) Speedstar is the direct or indirect record and beneficial holder of all of the equity interests in each other Debtor signatory hereto; (ii) all such equity interests are duly authorized and validly issued, fully paid and non-assessable, free and clear of any liens, claims and encumbrances of any kind (other than liens, claims and encumbrances granted  for the benefit of the (1) First Lien Lenders or as permitted under the First Lien Credit Agreement or (2) Second Lien Lenders or as permitted under the Second Lien Credit Agreement) and have been issued in compliance with applicable law; (iii) none of the equity interests in the Company are subject to, or have been issued in violation of, preemptive or similar rights; and (iv) no voting trusts, proxies, or other agreements or understandings exist with respect to the voting equity interests of any Company signatory hereto.

For purposes of this Section 7.4 "equity interests" means any: (a) partnership interests; (b) membership interests or units; (c) shares of capital stock; (d) other interest or participation that confers on a person the right to receive a share of the profits and losses

15

of, or distribution of assets of, the issuing entity; (e) subscriptions, calls, warrants, options, or commitments of any kind or character relating to, or entitling any person or entity to purchase or otherwise acquire membership interests or units, capital stock, or any other equity securities; (f) securities convertible into or exercisable or exchangeable for partnership interests, membership interests or units, capital stock, or any other equity securities; or (g) other interest classified as an equity security.

**7.5     Other Agreements.**

Without limiting the Company's obligations hereunder, until the Termination Date, the Company, jointly and severally, represents, warrants, and covenants to the Consenting Lenders that it shall not enter into any other restructuring support agreement related to a partial or total restructuring of the Company's obligations, unless such agreement is (a) consistent with the terms of the Restructuring, the Term Sheet and this Agreement and (b) consented to in writing by the Majority Consenting Lenders.

**7.6     No Conflict.**

The Company, jointly and severally, represents, warrants, and covenants to the Consenting Lenders that the execution, delivery and performance by it of this Agreement does not: (a) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational document); or (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it is a party.

The Sponsor represents, warrants, and covenants to the Consenting Lenders that the execution, delivery and performance by it of this Support Agreement does not: (a) violate any provision of law, rule or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational document); or (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any material contractual obligation to which it is a party.

**7.7     Additional Lender Parties.**

Any First Lien Lender may, at any time after the RSA Effective Date and prior to the commencement of solicitation on the Plan, become a party to this Agreement as a Consenting Lender (a "Joining Party") by executing a joinder agreement (the "Joinder") substantially in the form attached as Exhibit C hereto, pursuant to which such Joining Party represents and warrants to the Company that it agrees to be bound by the terms of this Agreement as a Consenting First Lien Lender hereunder.

**Section 8.  Liability.**

**8.1     Remedies.**

(a)     It is understood and agreed by each of the Parties that any breach of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other

remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief, without the necessity of posting a bond, for any such breach, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  The Parties agree that for so long as the Parties have not taken any action to prejudice the enforceability of this Agreement (including without limitation, alleging in any pleading that this Agreement is unenforceable), and have taken such actions as are required or desirable for the enforcement hereof, then the Parties shall have no liability for damages hereunder in the event that this Agreement is found by a court of competent jurisdiction, on a final and non-appealable basis, not to be enforceable.  Each Party further agrees that no other Party or any other person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 8.1, and each Party (1) irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (2) shall cooperate fully in any attempt by the other Party to obtain such equitable relief.

(b)     All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**Section 9.  Acknowledgement.**

This Agreement and the Term Sheet and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives.  Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, (i) a solicitation of votes for the acceptance of the Plan or any chapter 11 plan for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise or (ii) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934.

**Section 10.     Miscellaneous Terms.**

**10.1     Assignment; Transfer Restrictions.**

(a)     Each Consenting Lender hereby agrees, severally and not jointly, for so long as this Agreement shall remain in effect, not to Transfer any Holdings unless, as a condition precedent to any such transaction, the transferee thereof executes and delivers a Joinder to the Company and the Consenting Lenders upon the execution of an agreement in respect of the relevant Transfer.  Upon execution of a Joinder, the transferee shall be deemed to be a Consenting First Lien Lender for purposes of this Agreement, except as otherwise set forth or limited herein.

(b)     This Agreement shall in no way be construed to preclude any Consenting Lender from acquiring additional Holdings; provided, that any such Holdings shall automatically be deemed to be subject to the terms of this Agreement.

(c)     Any person that receives or acquires Holdings pursuant to a Transfer of such Holdings by a Consenting Lender shall be deemed a Joining Party, hereby agrees to be bound (and to be deemed to be bound regardless of whether it executes and delivers a Joinder) by all of the terms of this Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) and hereby further agrees to execute and deliver a Joinder.  Subject to the terms and conditions of any order of the Bankruptcy Court, the transferring Consenting Lender shall provide Transtar and the First Lien Agent with a copy of any Joinder executed by such Joining Party within two (2) business days following such execution in which event (A) the Joining Party shall be deemed to be a Consenting Lender hereunder with respect to all of its owned or controlled Holdings and rights or interests (voting or otherwise) and (B) the transferor Lender shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement solely to the extent of such transferred Holdings.

(d)     With respect to the Holdings of any Joining Party upon consummation of the Transfer of such Holdings, the Joining Party hereby makes (and is deemed to have made) the representations and warranties of the Consenting Lenders set forth in Section 7 hereof to the Company.

(e)     Any Transfer of any Holdings that does not comply with the procedures set forth in sub-clause (a) of this Section 10.1 shall be deemed void *ab initio*.

(f)     Notwithstanding sub-clause (a) of this Section 10.1: (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Consenting Lender to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against the Company, as applicable, by a Consenting Lender to a transferee; provided, that such transfer by a Consenting Lender to a transferee shall be in all other respects in accordance with and subject to sub-clause (a) of this Section 10.1; and (ii) to the extent that a Consenting Lender, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, the Company from a holder of such claim or interest who is not a Consenting Lender, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Consenting Lender in accordance with this Section 10.1; provided, further, that in the event a Qualified Marketmaker is, on the voting deadline for the Plan, the beneficial holder of any claim against, or interest in, the Company that was acquired from a Consenting Lender, it shall vote such claim or interest in accordance with Section 2.3(b) of this Agreement.  For purposes of this sub-clause (f), a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company and its affiliates (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company and its affiliates (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Company and its affiliates, and (y) is in

18

fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt). A Qualified Marketmaker acting in such capacity may purchase, sell, assign, transfer, or participate any Holdings against or interests in the Company other than Holdings held by a Consenting Lender without any requirement that the transferee be or become subject to this Agreement.

(g)    The restrictions in this Section 10.1 are in addition to any transfer restrictions in the First Lien Credit Agreement or Second Lien Credit Agreement, as applicable, and, in the event of a conflict, the transfer restrictions contained in this Agreement shall control.

## 10.2    Management Incentive Plan.

The reorganized Company shall implement the Management Incentive Plan (pursuant to and as defined in the Term Sheet), in form and substance consistent with the Term Sheet and otherwise on customary terms (and, to the extent of any changes that are materially inconsistent with such terms or that are not customary, otherwise satisfactory to the Company and the Majority Consenting Lenders), on and as of the Plan Effective Date. Subject to the foregoing, prior to the Plan Effective Date, the new board of directors of the Company as set forth in the Term Sheet and Speedstar shall approve all final documents, allocations, and grants to be made pursuant to the Management Incentive Plan (effective upon the Plan Effective Date).

## 10.3    No Third Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Company, the Sponsor, and each Consenting Lender and each of their respective successors and permitted assigns. No other person or entity shall be a third party beneficiary.

## 10.4    Entire Agreement.

This Agreement, including all exhibits and schedules hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Party shall survive this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

## 10.5    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed copy of this Agreement shall be deemed to be a certification by each person executing this Agreement on behalf of a Party that such person and Party has been duly authorized and empowered to execute and deliver this Agreement and each other Party may rely on such certification. Delivery of an executed signature page of this

Agreement by email or facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

**10.6    Settlement Discussions.**

        This Agreement and the Term Sheet are part of a proposed settlement of disputes among the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, the Term Sheet and all documents, agreements and negotiations relating thereto (including any prior drafts of any of the foregoing) are the product of negotiations entered into at arms' length and in good faith and shall not be admissible into evidence or constitute an admission or agreement in any proceeding involving a Party; provided, however, that the final execution versions of this Agreement and the exhibits thereto may be admissible into evidence or constitute an admission or agreement in any proceedings to enforce the terms of this Agreement, obtain entry of the RSA Assumption Order by the Bankruptcy Court and/or support the solicitation, confirmation and consummation of the Plan.

**10.7    Reservation of Rights.**

        (a)    Except as expressly provided in this Agreement or in any applicable confidentiality agreement, nothing herein is intended to, does or shall be deemed in any manner to limit (i) the ability of a Consenting Lender to consult with other Consenting Lenders, the Company or any third party, (ii) the rights of a Consenting Lender to be heard as a party in interest in the Chapter 11 Cases, or (iii) the rights of a Consenting Lender to defend against any objection to, or estimation of, any of its Holdings, in each case so long as such consultation, appearance or defense is consistent with the Consenting Lender's obligations under this Agreement.

        (b)    Except as expressly provided in this Agreement, nothing herein is intended to, nor does, in any manner waive, limit, impair or restrict any right of any Party or the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, Claims against and interests in the Company.  If the transactions contemplated by this Agreement and in the Term Sheet are not consummated as provided herein, if a Termination Date occurs, or if this Agreement, or a Party's obligations under this Agreement, is otherwise terminated for any reason, each Party fully reserves any and all of its respective rights, remedies and interests (if any) under the First Lien Credit Agreement, this Agreement, any other relevant Holdings, applicable law and in equity.

**10.8    Governing Law; Waiver of Jury Trial.**

        (a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties arising out of this Agreement, whether sounding in contract, tort or otherwise.

        (b)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York and without regard to any conflicts of law provision or

principle that would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to Section 10.8(c) hereof, any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)     Notwithstanding the foregoing, nothing in Sections 10.8(a) or (b) hereof shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Agreement.

**10.9    Successors.**

This Agreement shall be binding upon and inure to the benefit of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 10.9 shall be deemed to permit any transfer, tender, vote or consent, of any claims or interests other than in accordance with the terms of this Agreement. Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties (and those permitted assigns), any benefit or any legal or equitable right, remedy or claim under this Agreement.

**10.10   Relationship Among Consenting Lenders.**

Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Lenders under this Agreement shall be several in nature and not joint obligations.

**10.11   Acknowledgment of Counsel.**

Each of the Parties acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. This Agreement is the product of negotiations conducted at arms' length and in good faith by the Parties, and its provisions shall be interpreted in a neutral manner and one intended to effect the intent of the Parties. No Party shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**10.12   Amendments, Modifications, Waivers.**

(a)      Except as otherwise specified herein or in the Term Sheet, this Agreement (including, without limitation, the Term Sheet or the DIP Term Sheet) may only be modified, amended or supplemented by an agreement in writing signed by each of the Company and the Majority Consenting Lenders; provided, that (i) if the modification, amendment, supplement or waiver at issue adversely impacts the treatment or rights of any Consenting First Lien Lender differently than other Consenting First Lien Lenders or imposes a material obligation, cost or liability upon such Consenting First Lien Lender differently than upon other Consenting First Lien Lenders, the agreement in writing of such Consenting First Lien Lender whose treatment or rights are materially adversely impacted in a different manner than other Consenting First Lien Lenders or upon whom a material obligation, cost or liability would be imposed differently than upon other Consenting First Lien Lenders shall also be required for such modification, amendment, supplement, or waiver to be effective; and (ii) any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, under the First Lien Credit Agreement, the DIP Facility or the Senior Exit Facility may only be modified, amended or supplemented by an agreement in writing signed by (a) in the case of the DIP Facility, the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination, (b) in the case of the First Lien Credit Agreement, the Company and First Lien Lenders holding one hundred percent (100%) of the aggregate amount of loans outstanding under the First Lien Credit Agreement at the time of determination, and (c) in the case of the Senior Exit Facility, the Company and  Senior Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the Senior Exit Facility at the time of determination.  Each of the First Lien Credit Agreement, the DIP Facility and the Senior Exit Facility shall provide that any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, may only be modified, amended or supplemented by an agreement in writing signed by (a) in the case of the DIP Facility, the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination, (b) in the case of the First Lien Credit Agreement, the Company and First Lien Lenders holding one hundred percent (100%) of the aggregate amount of loans outstanding under the First Lien Credit Agreement at the time of determination, and (c) in the case of the Senior Exit Facility, the Company and Senior Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the Senior Exit Facility at the time of determination.  Any modification, amendment, supplement or waiver making distributions other than *pro rata* among holders of the PIK Debt may only be modified, amended or supplemented by an agreement in writing signed by the Company and one hundred percent (100%) of the holders of the PIK Debt at the time of determination and the PIK Notes shall provide that any modification, amendment, supplement or waiver making distributions other than *pro rata* among holders of the PIK Debt may only be modified, amended or supplemented by an agreement in writing signed by the Company

and one hundred percent (100%) of the holders of the PIK Debt at the time of determination.

(b)    In determining whether any consent or approval has been given or obtained by the Majority Consenting Lenders, any loans and/or commitments held by any then-existing Consenting First Lien Lender that is in material breach of its covenants, obligations or representations under this Agreement shall be excluded from such determination, and the loans held by such Consenting First Lien Lender shall be treated as if they were not outstanding.

(c)    Any waiver shall not be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

(d)    The failure of any Party to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party with its obligations hereunder shall not constitute a waiver by such Party of its right to exercise any such or other right, power or remedy or to demand such compliance.

(e)    Notwithstanding the foregoing provisions of this Section 10.12, no written waiver shall be required of the Company in the case of a waiver of a Consenting Lender Termination Event.

**10.13    Severability of Provisions.**

If any provision of this Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Agreement.

**10.14    Notices.**

Unless otherwise set forth herein, all notices and other communications required or permitted hereunder shall be in writing (which may be by email) and shall be deemed given when: (a) delivered personally or by overnight courier to the applicable addresses set forth below; or (b) sent by facsimile transmission or email to the parties listed below.

If to the Company, to:

>   Transtar Holding Company
>   7350 Young Drive
>   Walton Hills, Ohio 44146
>   Attention:   Joseph Santangelo
>   Telecopy:   (440) 232-0632
>   Email:      jsantangelo@transtar1.com

with a copy to (for informational purposes only):

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:   Rachel C. Strickland, Esq. and Neil W. Townsend, Esq.
Telecopy:   (212) 728-8111
Email: rstrickland@willkie.com and ntownsend@willkie.com

If to the Consenting First Lien Lenders, to the email address set forth on its signature page, with a copy to (for informational purposes only):

Chapman and Cutler LLP
1270 Avenue of the Americas, 30th Floor
New York, New York 10020
Attention:   Steven Wilamowsky, Esq.
Telecopy:   (212) 655-3332
Email:        wilamowsky@chapman.com

If to Sponsor, to the email address set forth on its signature page, with a copy to (for informational purposes only):

Young Conaway Stargatt & Taylor
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attention:   Michael R. Nestor
Telecopy:   (302) 576-3321
E-mail:       mnestor@ycst.com

**10.15   Disclosure of Consenting Lender Information.**

Unless required by applicable law or regulation, the Company and each Consenting Lender agrees to keep confidential the amount of all Holdings in the Company held (beneficially or otherwise) by any Consenting Lender absent the prior written consent of such Consenting Lender (which consent may be by email from its counsel); and if such announcement or disclosure is so required by law or regulation, the Company shall provide each Consenting Lender with advance notice of the intent to disclose and shall afford each of the Consenting Lenders a reasonable opportunity to review and comment upon any such announcement or disclosure prior to the Company making such announcement or disclosure.  If the Company determines that it is required to attach a copy of this Agreement to any document in connection with the Restructuring, it will redact any reference to a specific Consenting Lender and such holder's Holdings. The foregoing shall not prohibit the Company from disclosing the aggregate claims or interests of all Consenting Lenders as a group.

**10.16   Transaction Expenses.**

Following the closing of the DIP Facility, and prior to the Termination Date, the Company agrees to pay on demand (and in any event no later than ten (10) calendar days following receipt of an invoice) the Transaction Expenses without the need for any party to file a fee application or otherwise seek Bankruptcy Court approval of such Transaction Expenses (whether incurred prior to, on or after the Petition Date), but subject to any procedural requirements set forth in the DIP Order.

**10.17   Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 3 or Section 4 hereof, the agreements and obligations of the Parties in this Section 10, Section 3.5 and Section 4 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**10.18   Construction.**

Unless otherwise specified herein, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation."

**10.19   Headings.**

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof and shall not affect in any way the meaning or interpretation of this Agreement.

**10.20   Incorporation of Schedules and Exhibits.**

The exhibits and schedules attached hereto and identified in this Agreement are incorporated herein by reference and made a part hereof as if fully set forth herein.  For the avoidance of doubt, all reference to any Party's "obligations hereunder" shall include such Party's obligations under this Agreement, the Term Sheet and/or the DIP Term Sheet, as applicable.

**10.21   Independent Due Diligence and Decision-Making.**

Each Party confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.


SPEEDSTAR HOLDING CORPORATION


By: _____
     Name: Joseph Santangelo
     Title: EVP & CFO


TRANSTAR HOLDING COMPANY


By: _____
     Name: Joseph Santangelo
     Title: EVP & CFO


TRANSTAR GROUP, INC.
TRANSTAR INDUSTRIES, INC.
TRANSTAR INTERNATIONAL, INC.
TRANSTAR AUTOBODY TECHNOLOGIES, INC.
AXIOM AUTOMOTIVE HOLDINGS CORPORATION
AXIOM TECHNOLOGIES HOLDINGS CORP., INC.
AXIOM AUTOMOTIVE TECHNOLOGIES, INC.
DIY TRANSMISSION PARTS, LLC


By: _____
     Name: Joseph Santangelo
     Title: EVP & CEO


*[Signature Page to Restructuring Support Agreement]*

ETX HOLDINGS, INC.
ABC TRANSMISSION PARTS WAREHOUSE, INC.
ALMA PRODUCTS I, INC.
ATCO PRODUCTS, INC.
DACCO/DETROIT OF ALABAMA, INC.
DACCO/DETROIT OF ARIZONA, INC.
DACCO/DETROIT OF CHATTANOOGA, INC.
DACCO/DETROIT OF FLORIDA, INC.
DACCO/DETROIT OF GEORGIA, INC.
DACCO/DETROIT OF INDIANA, INC.
DACCO/DETROIT OF KENTUCKY, INC.
DACCO/DETROIT OF MARYLAND, INC.
DACCO/DETROIT OF MEMPHIS, INC.
DACCO/DETROIT OF MICHIGAN, INC.
DACCO/DETROIT OF MINNESOTA, INC.
DACCO/DETROIT OF MISSOURI, INC.
DACCO/DETROIT OF NEW JERSEY, INC.
DACCO/DETROIT OF OHIO, INC.
DACCO/DETROIT OF OKLAHOMA, INC.
DACCO/DETROIT OF PENNSYLVANIA, INC.
DACCO/DETROIT OF SOUTH CAROLINA, INC.
DACCO/DETROIT OF TEXAS, INC.
DACCO/DETROIT OF VIRGINIA, INC.
DACCO/DETROIT OF WEST VIRGINIA, INC.
DACCO/DETROIT OF WISCONSIN, INC.
DACCO, INCORPORATED
DACCO TRANSMISSION PARTS (CA), INC.
DACCO TRANSMISSION PARTS (CO), INC.
DACCO TRANSMISSION PARTS (LA), INC.
DACCO TRANSMISSION PARTS (NC), INC.
DACCO TRANSMISSION PARTS (NJ), INC.
DACCO TRANSMISSION PARTS (NM), INC.
DACCO TRANSMISSION PARTS (NY), INC.
ETX, INC.
ETX TRANSMISSIONS, INC.
MICHIGAN EQUIPMENT CORPORATION
NASHVILLE TRANSMISSION PARTS, INC.


By: _____
     Name: Joseph Santangelo
     Title: Treasurer, EVP & CFO


*[Signature Page to Restructuring Support Agreement]*

**CONSENTING FIRST LIEN LENDER**

_____  11/13/16

By:     Silver Point Capital, L.P., on behalf of certain funds and accounts managed

Name:  Brett Rodda

Title:   General Counsel

If a second signature is required:

_____

By:

Name:

Title:

Principal amount of First Lien Obligations:

| Notice Address: | Silver Point Capital |
|---|---|
| | 2 Greenwich Plaza |
| Attn: | Jeff Forlizzi |
| Fax: | 203-542-4141 |
| Email: | jforlizzi@silverpointcapital.com |

*[Signature Page to Restructuring Support Agreement]*

**FRIEDMAN FLEISCHER & LOWE, LLC ("FFL"),
FUNDS MANAGED BY FFL THAT HOLD EQUITY INTERESTS
IN SPEEDSTAR, THE GENERAL PARTNER OF SUCH FUNDS
AND THEIR AFFILIATES (COLLECTIVELY, "SPONSOR")**

By: _____

Name: Rajat Duggal

Title: Managing Director

Notice Address: _____
_____

Attn: _____

Fax: _____

Email: _____

*[Signature Page to Restructuring Support Agreement]*

**<u>EXHIBIT A  TO RESTRUCTURING SUPPORT AGREEMENT</u>**

**<u>TERM SHEET</u>**

*Execution Version*

## TRANSTAR: PROPOSED RESTRUCTURING TERMS

This term sheet (this "Term Sheet") outlines the key terms of a potential restructuring (the "Restructuring") of existing debt and certain other obligations of Speedstar Holding Corporation ("Holdings," and as reorganized, "Reorganized Holdings"), Transtar Holding Company ("Transtar," or the "Borrower," and as reorganized, "Reorganized Transtar") and the other Loan Parties under and as defined in (i) that certain Amended and Restated First Lien Credit Agreement, dated as of October 9, 2012 (as the same has been and may be further amended, restated, modified or supplemented from time to time in accordance with its terms, the "First Lien Credit Agreement"), by and among Holdings, Transtar, the other Loan Parties under and as defined therein, the lenders party thereto (the "First Lien Lenders") and Royal Bank of Canada, as administrative agent and collateral agent (collectively, in such capacities, the "First Lien Agent"); and (ii) that certain Amended and Restated Second Lien Credit Agreement, dated as of October 9, 2012 (as the same has been and may be further amended, restated, modified or supplemented from time to time in accordance with its terms, the "Second Lien Credit Agreement"), by and among Holdings, Transtar, the lenders party thereto and Cortland Capital Market Services, LLC, as administrative agent and collateral agent. This Term Sheet is attached to, and forms a part of, the Amended and Restated Restructuring Support Agreement, dated as of November 18, 2016 (the "Restructuring Support Agreement"), among the Company (as defined herein), certain of the First Lien Lenders party thereto (collectively, the "Consenting Lenders"), and Friedman Fleischer & Lowe, LLC ("FFL"), funds managed by FFL that hold equity interests in Speedstar, the general partner of such funds and their affiliates (collectively, "Sponsor," and, together with the Consenting Lenders, the "Consenting Parties"). The Consenting First Lien Lenders hold, in the aggregate, not less than 64.1% of the debt outstanding under the First Lien Credit Agreement as of the RSA Effective Date (as defined in the Restructuring Support Agreement). As used herein, the term "Majority Consenting Lenders" shall mean Consenting First Lien Lenders holding in excess of fifty percent (50%) of the aggregate outstanding Loans (as defined in the First Lien Credit Agreement as of October 15, 2016) held by all Consenting First Lien Lenders at the time of determination.

Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the First Lien Credit Agreement as of October 15, 2016 or Restructuring Support Agreement, as the context requires.

| | |
|---|---|
| **IMPLEMENTATION:** | The Company shall implement the Restructuring by proposing and confirming a plan of reorganization (as amended, modified or supplemented from time to time in accordance with the Restructuring Support Agreement, the "Plan") in cases (the "Chapter 11 Cases") to be commenced by Holdings, Transtar and their respective domestic wholly-owned direct and indirect subsidiaries (collectively with Holdings and Transtar, the "Debtors" or the "Company," and as reorganized, the "Reorganized Debtors") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), pursuant to the terms and conditions of the Restructuring Support Agreement and otherwise reasonably satisfactory in all respects to (i) the Company, (ii) the First Lien Agent, (iii) the Majority Consenting Lenders, (iv) solely with respect to the treatment of the Sponsor to the extent such treatment differs from this Term Sheet, the Sponsor Release (as defined below) and the conditions precedent to payment of the Sponsor Contribution (as defined below), the Sponsor. The Debtors shall |

file the Plan and the disclosure statement that relates to the Plan and is approved by the Bankruptcy Court pursuant to sections 1125 and 1126(b) of the Bankruptcy Code (the "Disclosure Statement") within one (1) business day of the date of filing (the "Petition Date") of the Chapter 11 Cases. With the consent and agreement of the Company and the Majority Consenting Lenders, the Company may implement the Restructuring with respect to Alma Products Company and Axiom Automotive Technologies other than through a reorganization under chapter 11 of the Bankruptcy Code.

The court order confirming the Plan (the "Confirmation Order") shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Restructuring.

**DIP FINANCING:**    The Consenting First Lien Lenders, on a *pro rata* basis, shall provide a postpetition secured debtor-in-possession delayed draw term loan facility (the "DIP Facility"), in an amount not to exceed $69,700,000, and shall consent to the Debtors' use of cash collateral in accordance with a budget (the "Budget"), on the terms and conditions set forth in the DIP Term Sheet attached as Exhibit B to the Restructuring Support Agreement, *provided* that availability of credit under the DIP Facility shall be blocked above $55,000,000, subject to the consent of the DIP Agent and Required DIP Lenders for availability above such amount. Each of the First Lien Lenders shall be entitled to participate on a *pro rata* basis, based on Exchanged First Lien Loan (as defined herein) commitments, in the DIP Facility (all participating institutions, the "DIP Lenders"), *provided* that such First Lien Lenders shall have elected to participate in the DIP Facility prior to noon (ET) on November 19, 2016, and, *provided further*, that each First Lien Lender's entitlement to participate in the DIP Facility shall be calculated by aggregating affiliated First Lien Lenders' Exchanged First Lien Loan commitments, such that any First Lien Lender shall be entitled to participate on a *pro rata* basis taking into account the Exchanged First Lien Loan commitments of such entity's non-participating affiliates. With respect to the foregoing, the DIP Agent shall be entitled to rely on instructions received from any First Lien Lender as to all of such First Lien Lender's affiliates. The proceeds from the initial draw of the DIP Facility shall be used for purposes consistent with the Budget. The loans outstanding under the DIP Facility shall bear interest at L + 700 (with a 125 bps floor) per annum. Silver Point Finance, LLC will act as the administrative agent under the DIP Facility (the "DIP Agent"). All loans outstanding under the DIP Facility shall be paid off on the Effective Date using proceeds from Senior Exit Loans (as defined herein) made under the Senior Exit Facility (as

defined herein). Loans made under the DIP Facility shall mature, be repayable in full, and the DIP Facility shall terminate on such date that is the earliest to occur of (i) the effective date (the "Effective Date") of a confirmed Plan, and (ii) four (4) months after the Petition Date which date may, at the request of the Borrower and subject to the prior written consent of the DIP Agent, be extended four times by one (1) month per extension.

**PRO RATA DEBT FOR EQUITY AND PIK DEBT EXCHANGE:**

On the Effective Date, the First Lien Lenders shall contribute and exchange on a *pro rata* basis $224,600,000 in outstanding Obligations under and as defined in the First Lien Credit Agreement (the "Exchanged First Lien Loans") for all of the New Equity of the Reorganized Debtors and all of the PIK Debt, subject, in each case, to dilution by the Management Incentive Plan and the distribution of New Equity and PIK Debt to Senior Lenders provided for herein (each as defined herein). The Exchanged First Lien Loans shall be exchanged at a ratio of $1 of Exchanged First Lien Loans for 1 share of New Equity. Following such contribution, such Exchanged First Lien Loans shall be cancelled and extinguished. For the avoidance of doubt, after such contribution and exchange upon the Effective Date, the pro forma aggregate amount of Loans shall be $200,000,000.

**FIRST LIEN PREPETITION INTEREST:**

No payment of accrued and unpaid prepetition interest owing under the First Lien Credit Agreement.

**SENIOR EXIT FACILITY:**

On the Effective Date, those Consenting First Lien Lenders that executed the Restructuring Support Agreement prior to noon (ET) on November 19, 2016 (in such capacity, the "Senior Lenders"), on a *pro rata* basis, shall provide commitments (collectively, the "Delayed Draw Commitment") to fund up to $74.15 million in super-senior secured delayed draw term loans (such loans, the "Senior Exit Loans") as a super-senior secured exit facility (the "Senior Exit Facility") and such Consenting First Lien Lenders shall receive, on a *pro rata* basis, (i) 8.75% of the New Equity and 8.75% of the PIK Debt, and (ii) an additional 8.75% of the New Equity and an additional 8.75% of the PIK Debt if, and only if, such Consenting First Lien Lenders shall have executed the Restructuring Support Agreement prior to noon (ET) on November 19, 2016. Consenting First Lien Lenders that executed the Restructuring Support Agreement at or after noon (ET) on November 19, 2016 shall not be entitled to participate in the Senior Exit Facility unless the Majority Consenting Lenders agree otherwise, and shall not be entitled to any New Equity or PIK Debt solely in their capacities as Senior Lenders. The Senior Exit Facility shall be implemented through an amendment or amendment and restatement of the DIP Facility documentation, and shall, *inter alia*, permit the use of loan proceeds to cash collateralize issued and undrawn letters of credit and to pay down any loans then outstanding under the DIP Facility. The Senior

3

Exit Facility shall have the following terms:

<u>Maturity</u>: The Senior Exit Loans shall mature, be repayable in full, and the Delayed Draw Commitment shall terminate on the date that is five (5) years from the Effective Date.

<u>Interest Rate</u>: The Senior Exit Loans shall bear interest at L + 425 (with a 125 bps floor) per annum.

<u>Draws</u>: The Borrower shall provide the Senior Lenders with five (5) Business Days' written notice prior to each draw.  Upon such written notice (and subject to customary conditions to borrowing), the Borrower may be able to make such draws.  Any draw made under the Delayed Draw Commitment shall be in amounts equal to not less than $5,000,000.

<u>In no event shall the aggregate principal amount of Senior Exit Loans exceed $74.15 million</u>.

The agent for the Senior Exit Facility shall be selected by the Majority Consenting Lenders, but shall not be any entity, or any affiliate thereof, that is a First Lien Lender between the date hereof and the date such agent shall be selected.

The Senior Exit Facility shall be senior in all respects to the Remaining Term Loans (as defined herein) and subject to an intercreditor agreement setting forth terms and conditions customary for this type of financing.  The loan documents for such Senior Exit Facility (the "<u>Exit Loan Documents</u>") shall be consistent with this Term Sheet and substantially similar to the loan documents for the First Lien Credit Agreement (as amended on the Effective Date in accordance with the terms of this Term Sheet), as modified to reflect the super senior status of the Senior Exit Facility.  For the avoidance of doubt, unless expressly provided to the contrary herein, the terms of the Senior Exit Facility shall be no more onerous on, or limiting to, the Borrower and the other Loan Parties, than the terms included in the facility for the Remaining Term Loans. Notwithstanding the foregoing, the Exit Loan Documents shall be reasonably acceptable in all respects to the Majority Consenting Lenders.

**UNSECURED PIK DEBT**     On the Effective Date, the Reorganized Debtors shall issue $60 million of unsecured debt (the "PIK Debt" and the notes issued in connection therewith, "PIK Notes") in exchange for the Exchanged First Lien Loans in accordance with the terms hereof, subject to dilution by the Management Incentive Plan and the distribution of PIK Notes to Senior Lenders provided for herein. The PIK Facility shall have the following terms:

Maturity: The PIK Notes shall mature and be repayable in full on the date that is five (5) years from the Effective Date. The PIK Notes shall be prepayable in whole or in part upon certain conditions to be set forth in the definitive documentation.

Interest Rate: The PIK Notes shall bear interest at 8.75% per annum, of which interest 1% shall be payable semi-annually and payable in cash, and of which 7.75% shall be payable semi-annually and payable-in-kind.

Covenants: The PIK Notes shall be "covenant lite" and include covenants to the extent relating to the repayment of the obligations. To the extent of any additional covenants, such covenants shall be stepped back from those in the First Lien Credit Agreement and deemed waived or amended upon waiver or amendment under the First Lien Credit Agreement.

Conversion: The PIK Notes shall be convertible, at each holder's option, to New Equity at 112.5% of the New Equity value as of the Effective Date. Holders of at least 51% of the PIK Debt outstanding at any time of determination may force conversion of the entire issue.

Amendments: Terms of the PIK Notes, including, but not limited to, principal, interest and maturity, may be amended by holders of at least 51% of the PIK Debt outstanding at any time of determination, *provided* that any modification, amendment, supplement or waiver making distributions other than *pro rata* among holders of the PIK Debt may only be modified, amended or supplemented by an agreement in writing signed by the Company and one hundred percent (100%) of the holders of the PIK Debt at the time of determination and the PIK Notes shall provide that any modification, amendment, supplement or waiver making distributions other than *pro rata* among holders of the PIK Debt may only be modified, amended or supplemented by an agreement in writing signed by the Company and one hundred percent (100%) of the holders of the PIK Debt at the time of determination.

5

**ORIGINAL ISSUE DISCOUNT:**

All loans funded under the Senior Exit Facility shall be funded with original issue discount of six percent (6%) (resulting in proceeds of each such loan being advanced net of the original issue discount) (the "Original Issue Discount"). The Debtors acknowledge and agree that they will receive proceeds of each loan under the Senior Exit Facility in an amount equal to ninety-four percent (94%) of the amount requested to be funded, but the entire principal amount of each such loan shall be deemed to be outstanding. To the extent that there are any unfunded commitments under the Senior Exit Facility as of the date all loans outstanding under the Senior Exit Facility are repaid in full, and all commitments thereunder terminated (the "Exit Termination Date"), the Debtors shall pay to the Senior Lenders a fee (the "Exit Fee") equal to six percent (6%) of the aggregate unfunded commitments on the Exit Termination Date, which Exit Fee shall be earned on the Closing Date (as defined in the definitive loan documents for the DIP Facility) and payable in cash on the Exit Termination Date.

**AMENDMENTS TO FIRST LIEN CREDIT AGREEMENT:**

On the Effective Date, the First Lien Lenders shall continue to retain their *pro rata* interest in the $200,000,000 of Loans that were not contributed as Exchanged First Lien Loans, subject to the amendments set forth herein (the "Remaining Term Loans"). The loan documents for such Remaining Term Loans shall be based on the form of loan documents under the Facility (as defined in the First Lien Credit Agreement as of October 15, 2016). Facility and otherwise consistent with this Term Sheet, and otherwise acceptable in all respects to the Borrower, the First Lien Agent and the Majority Consenting Lenders.

On the Effective Date, the First Lien Agent and the Majority Consenting Lenders agree to amend the First Lien Credit Agreement (the "Amendment") to:

(i) Extend the Maturity Date of the Remaining Term Loans to five (5) years from the Effective Date;

(ii) As of the Effective Date, set the interest rate of the Remaining Term Loans to L + 425 bps (with a 125 bps floor) per annum;

(iii) Set the percentage of Excess Cash Flow (as defined in the First Lien Credit Agreement as of October 15, 2016) which must be mandatorily prepaid under the First Lien Credit Agreement to: (a) fifty percent (50%) when the First Lien Leverage Ratio (as defined herein) is greater than or equal to 6.0 to 1.0: (b) twenty-five (25%) when the First Lien Leverage Ratio is less than 6.0 to 1.0 and greater than or equal to 5.0 to 1.0; and (c) zero percent (0%) when the First Lien Leverage Ratio is less than 5.0 to 1.0;

(iv) Eliminate any leverage financial covenant for the first twelve (12) full fiscal quarters after the Effective Date under the First

Lien Credit Agreement and, starting in the thirteenth (13th) fiscal quarter after the Effective Date, replace the Total Leverage Ratio financial covenant under the First Lien Credit Agreement with a first lien secured debt leverage ratio (the "First Lien Leverage Ratio") financial covenant which shall be set at a twenty percent (20%) cushion to the Borrower's final business plan which was delivered to the Consenting First Lien Lenders on November 4, 2016; *provided*, that, for purposes of determining compliance with the First Lien Leverage Ratio and any other Financial Covenant (as defined in the First Lien Credit Agreement, as amended as contemplated hereby), any cash capital contribution or cash common equity investment made in Holdings and substantially simultaneously contributed to the Borrower not later than fifteen (15) Business Days after the date financial statements are required to be delivered for the applicable fiscal quarter will, at the request of the Borrower, be included in the calculation of Consolidated EBITDA solely for purposes of determining compliance with such Financial Covenant at the end of such fiscal quarter and subsequent periods that include such fiscal quarter (each a "Specified Equity Contribution"); *provided*, that (a) in each Test Period (as defined in the First Lien Credit Agreement as of October 15, 2016), there shall be no more than two (2) fiscal quarters in which a Specified Equity Contribution is made, (b) there shall be a maximum of four (4) Specified Equity Contributions made during the term of the First Lien Credit Agreement, (c) the amount of any Specified Equity Contribution shall be no greater than the amount required to cause the Borrower to be in compliance with such Financial Covenant, (d) all Specified Equity Contributions shall be disregarded for any purpose other than determining compliance with the Financial Covenant and shall not be considered in determining any covenant baskets, in the definition of Excess Cash Flow or for purposes of determining any interest rate under the First Lien Credit Agreement and (e) Specified Equity Contributions may not reduce Indebtedness (as defined in the First Lien Credit Agreement as of October 15, 2016) for purposes of calculating the Financial Covenant; *provided*, *further*, that any Specified Equity Contribution is subject to the Borrower first seeking to obtain an amendment of or waiver under the First Lien Credit Agreement, on reasonable and customary terms, without material economic costs, as determined by the Borrower in its reasonable discretion;

(v) With respect to the delivery of the audited financial statements for the Fiscal Year immediately prior to the Fiscal Year in which the facility is scheduled to terminate, amend the applicable covenant to permit such audited financial statements to be subject to a qualification as to going concern or scope of audit pertaining solely to impending debt

maturities of any Indebtedness occurring within twelve (12) months of such audit;

(vi) Cap Consolidated EBITDA add-backs to: $16,000,000 in Fiscal Year 2017, $13,000,000 in Fiscal Year 2018 and $10,000,000 in Fiscal Year 2019 (each, an "Addback Cap"), subject to the following:

(1) the Addback Caps shall not include: (A) fees, costs and expenses relating to the forbearance, Amendment and the Chapter 11 Cases, (B) non-cash expenses recognized due to purchase accounting or goodwill impairment, (C) fees and expenses (including, if applicable, busted deal fees) incurred in connection with any Permitted Acquisition that has been consummated or any acquisition that has failed or has otherwise not been (and will not be) consummated, in each case to the extent such fees and expenses were financed entirely with proceeds of equity (other than up to $50,000,000 of assumed debt and up to $100,000,000 of permitted Investments), and (D) the amount of cost savings and synergies with respect to any Permitted Acquisition to the extent actually realized;

(2) clause (b) of the definition of "Pro Forma Adjustment" in the First Lien Credit Agreement shall be deleted, except as such clause is used for purposes of clause (vi)(3)(x) below;

(3) the Addback Caps shall include (w) non-cash charges such as warranties or write-down, write-off or reserves with respect to inventory, (x) the amount of estimated cost savings and synergies with respect to any Permitted Acquisition, subject to the limitations set forth in clause (b) of the definition of "Pro Forma Adjustment" in the First Lien Credit Agreement, (y) fees and expenses (including, without limitation, busted deal fees) incurred in connection with any Permitted Acquisition that has been consummated or any acquisition that has failed or has otherwise not been (and will not be) consummated, in each case to the extent such fees and expenses were not financed entirely with the proceeds of equity (other than up to $50,000,000 of assumed debt and up to $100,000,000 of permitted Investments) and (z) all other unusual or non-recurring charges;

(4) the Addback Cap for any Fiscal Year can be increased by twenty-five percent (25%) of the amount of Consolidated EBITDA (without giving effect to any add-backs for synergies and cost savings) of a target company acquired in connection with a Permitted Acquisition occurring in such Fiscal Year;

(5) the aggregate amount of the Consolidated EBITDA addbacks to be included in the Addback Cap for each Test Period (as defined in the First Lien Credit Agreement as

of October 15, 2016) occurring within any Fiscal Year shall not exceed the Addback Cap for such Fiscal Year (*e.g.,* for the four-fiscal quarter period ended March 31, 2018, the aggregate amount of addbacks that are included in the Addback Cap is $13,000,000);

(6) for the avoidance of doubt, unusual or non-recurring gains are being deducted from Consolidated EBITDA for such period; and

(7) to the extent that there are (x) non-cash charges such as warranties or write-down, write-off or reserves with respect to inventory and/or (y) estimated cost savings and synergies with respect to any Permitted Acquisition, in either case, added back with regard to any Test Period pursuant to, and subject to the limitations above, any future cash payments with respect to the foregoing clause (x) and/or future actual and realized synergies with respect to the foregoing clause (y), in each case, received in later periods, such amounts shall be deducted from Consolidated EBITDA in the relevant period in which such cash payments and/or actual and realized synergies, as the case may be, occur;

(vii)    Amend the First Lien Credit Agreement to expressly prohibit use of the "Permitted Receivables Facility" basket for Permitted Acquisitions;

(viii)    Modify the reporting covenants under the First Lien Credit Agreement to:

(1) with respect to the annual and quarterly reports that become due on or before the Effective Date, require Borrower to use best efforts to deliver such reports on or before the date that is thirty (30) days after the Effective Date, but in no event beyond a date to be determined;

(2) add conference calls among the First Lien Agent, First Lien Lenders and the chief financial officer and chief executive officer of Transtar on a quarterly basis;

(3) increase the number of times the First Lien Agent and the First Lien Lenders, as a group, may exercise their visitation and inspection rights in the absence of an Event of Default to one (1) per Fiscal Year (at a location and with up to ten (10) attendees to be mutually acceptable);

(ix) Amend the covenants and baskets of the First Lien Credit Agreement as follows:

(1) All "Permitted Acquisitions" shall be financed with proceeds of equity (other than up to $50,000,000 of assumed debt and not, for the avoidance of doubt, with cash from the balance sheet or use of the basket for a Permitted Receivables Facility) and Holdings shall be

permitted to acquire subsidiaries that are not required to become obligors under the facilities, subject to any applicable limitation on investments in non-Loan Parties and provided that this provision shall not be construed to allow any current obligors under the facilities to be removed as obligors under the facilities;

(2) The Permitted Receivables Facility shall be available as reflected in the existing First Lien Credit Agreement, subject, however, to the consent (without qualification as to the reasonableness of granting or withholding such consent) of the First Lien Agent to all such Permitted Receivables Facilities and all Permitted Receivables Facility Documents and provided that the First Lien Agent shall grant or withhold such consent only at the direction of the Majority Consenting Lenders; *provided*, *however*, that any Permitted Receivables Facility entered into on substantially identical terms as those executed in connection with that certain Forbearance Agreement, dated as of March 31, 2016 (the "Precedent Facilities"), by and among Holdings, the Borrower, the First Lien Lenders Party thereto and the First Lien Agent (as the same has been and may be further amended, supplemented or modified from time to time in accordance with its terms) do not require the consent of the First Lien Agent, but in any event will otherwise be subject to the terms and provisions of the First Lien Credit Agreement (it being understood that changes to provisions that are not adverse to the First Lien Lenders or the Collateral (as defined in the First Lien Credit Agreement as of October 15, 2016), as compared to the Precedent Facilities, shall be deemed to be substantially identical);

(3) Increase the general "permitted Investments" basket to $100,000,000 in the aggregate;

(4) Amend the debt and lien covenants to permit the incurrence of a debt facility senior to the Senior Exit Facility of up to $90,000,000, *provided* that if any holder of equity in the Company provides credit to the Company under a debt facility senior to the Senior Exit Facility, all other equity holders shall be entitled to participate on a *pro rata* basis;

(5) Permit the Company to incur incremental first lien debt without "MFN" protections for the First Lien Lenders if the First Lien Leverage Ratio is equal to or less than 7.0 to 1.0 after giving pro forma effect to such incurrence; and

(6) Permit under the affiliate transaction covenant a shared management/services arrangement between the Borrower and non-Loan Party subsidiaries of Holdings.

(x) Amend the First Lien Credit Agreement to add a covenant that

10

the Loan Parties shall not permit Liquidity as of any date to be less than $5,000,000, to be tested and reported by the Borrower to the First Lien Agent every other week, on the third business day of such week. The Loan Parties shall be in compliance with the Liquidity covenant at all times. As used herein, "<u>Liquidity</u>" as of any date of calculation means unrestricted cash and Cash Equivalents permitted in accordance with GAAP to be reflected on the balance sheet of the Loan Parties, plus any undrawn commitments, in each case as of such date;

(xi) Amend the First Lien Credit Agreement to convert all Revolving Credit Loans held (directly or indirectly) by First Lien Lenders (collectively, the "<u>Converting Lenders</u>") to First Lien Term Loans and, in connection therewith, terminate any unfunded Revolving Credit Commitments and participations in L/C Exposure held by the Converting Lenders; *provided*, that the Converting Lenders' L/C Exposure is cash collateralized or backstopped by one or more letters of credit from a third party issuing bank by the Company in a manner satisfactory to the L/C Issuer; *provided*, *further*, that such conversion shall only take effect with the requisite consent under the First Lien Credit Agreement;

(xii)    As of the Effective Date, terminate in full the Swing Line Facility (as defined in the First Lien Credit Agreement as of October 15, 2016);

(xiii)    Amend such other terms, conditions and provisions as may be mutually agreed among the Majority Consenting Lenders and the Loan Parties; and

(xiv)    Replace the First Lien Agent with an agent to be selected by the Majority Consenting Lenders, which successor agent shall not be any entity, or any affiliate thereof, that is a First Lien Lender between the date hereof and the date such agent shall be selected.

**EQUITY STRUCTURE**:    On the Effective Date, Reorganized Holdings shall issue common stock (the "<u>New Equity</u>") in exchange for the Exchanged First Lien Loans in accordance with the terms hereof. The principal terms of the New Equity shall be set forth in the Equity Term Sheet (the "<u>Equity Term Sheet</u>") attached hereto as <u>Exhibit A</u>. All existing equity of Holdings shall be cancelled or diluted to a negligible percentage of the ownership interest therein on the Effective Date in a manner acceptable to the Majority Consenting Lenders. All issuances of the New Equity set forth herein shall be subject to dilution by the Management Incentive Plan and the distribution of New Equity to Senior Lenders provided for herein.

If the Majority Consenting Lenders and the Company reasonably determine that such a structure will have beneficial tax

implications for Transtar and/or the other Loan Parties and/or the equity holders, then Reorganized Holdings and/or any of its subsidiaries shall be structured as limited partnerships, LLCs or other pass-through entities rather than as corporations and shall issue limited partnership interests (or membership interests, or otherwise, as applicable) (the "New Interests") having equivalent terms to those provided for the New Equity in the Equity Term Sheet, in which case all references herein to New Equity shall automatically be treated as references to the New Interests and necessary conforming changes will be made to reflect the revised structure while keeping the substantive rights as nearly the same as possible. If any such entities shall be structured as limited partnerships, LLCs or otherwise and, as a result, equity holders of Reorganized Holdings will be allocated tax liabilities of Reorganized Holdings and its subsidiaries, then the restricted payment covenants and related provisions under the First Lien Credit Agreement and the PIK Notes, if applicable, shall include customary provisions to permit distributions in respect of allocated tax liabilities.

**PAYMENT OF CERTAIN PROFESSIONAL FEES**

The parties, including Holdings, Transtar, each of the other Loan Parties, the First Lien Agent, the First Lien Lenders, the Sponsor, the DIP Agent, the DIP Lenders and each of their respective directors, officers, employees, partners, affiliates, agents, advisors and other representatives, each in their capacity as such, on the one hand, and Kaye Scholer LLP and CDG Group, LLC, on the other hand, shall provide each other mutual general releases of all claims and causes of action; *provided*, *however*, that such releases shall not waive or release any claim or cause of action arising out of (a) any express contractual obligation owing by any such party, including any applicable confidentiality agreement or (b) the willful misconduct, intentional fraud or criminal conduct of any such party.  In exchange, the Company shall pay up to $1.25 million to Kaye Scholer LLP and CDG Group, LLC, collectively, in respect of fees and expenses incurred up to the date hereof and hereafter by such professionals in connection with their representation of certain First Lien Lenders, the First Lien Agent and/or any other party in connection with the Restructuring.

**SECOND LIEN TREATMENT:**

The Plan shall provide for the following second lien treatment:

All Obligations under the Second Lien Credit Agreement shall be cancelled.

12

**GENERAL UNSECURED CLAIM TREATMENT**

The Plan shall unimpair all trade claims, *provided* that such amount, in the aggregate, shall be less than $41.36 million, and other creditors associated with ordinary course operations (e.g., IT, employees, ordinary course professionals and safety capital expenses), the pension and retiree benefits, in each case, for entities to be reorganized or not sold under the Plan. All other unsecured creditors, which, for the avoidance of doubt, shall include creditors holding deficiency claims, shall receive a maximum aggregate recovery of $500,000 in cash.

**SPONSOR CONTRIBUTION**

Subject to the conditions precedent set forth herein, the Sponsor shall contribute $2.5 million in cash to the Debtors (the "Sponsor Contribution") in exchange for being released by, without limitation, (a) the Debtors, (b) the parties to the Restructuring Support Agreement and (c) the Debtors' creditors that vote to accept the Plan, of all claims and causes of action related to the Debtors (such release, the "Sponsor Release"). The Sponsor Contribution shall only be made and payable (i) on or before seven (7) business days after the later of (i) entry by the Bankruptcy Court of the Confirmation Order that includes and approves the Plan with the Sponsor Releases and such Confirmation Order being final and no longer subject to reconsideration, contest or appeal (the "Final Order") and (ii) the Effective Date and (b) if the Sponsor Release, as approved by the Bankruptcy Court in the Final Order is in form and substance acceptable to the Sponsor in its sole discretion.

The Debtors and Consenting Lenders agree to grant the Sponsor Release on the terms and conditions set forth herein.

**MANAGEMENT INCENTIVE PLAN**:

On or around the Effective Date, Reorganized Holdings and Reorganized Transtar shall adopt a management incentive plan (the "Management Incentive Plan") equal to 5-8% of the New Equity and 5-8% of the PIK Debt subject to time and performance metrics as determined by the new Board of Directors of Holdings. Reorganized Holdings and Reorganized Transtar will use reasonable efforts to structure, without material economic costs, the grants constituting PIK Debt in a manner that is as tax efficient as possible and preserves the economic intentions of this paragraph.

**RELEASES**:

On the Effective Date, and subject to the terms and conditions set forth in the Restructuring Support Agreement, the parties, including Holdings, Transtar, each of the other Loan Parties, the First Lien Agent, the First Lien Lenders, the Sponsor, the DIP Agent, the DIP Lenders and each of their respective directors,

13

officers, employees, partners, affiliates, agents, advisors and other representatives, each in their capacity as such, will provide each other with general releases of claims; *provided, however*, that such releases shall not waive or release any claim or cause of action arising out of (a) any express contractual obligation owing by any such party, including any applicable confidentiality agreement or (b) the willful misconduct, intentional fraud or criminal conduct of any such party.

**WAIVERS**: The Amendment will contain such waivers and consents as are necessary to effectuate the Restructuring, including, without limitation, waivers for all Defaults and Events of Default under the First Lien Credit Agreement.

**STOCKHOLDERS AGREEMENT:** The holders of the New Equity shall enter into a stockholders agreement (the "Stockholders Agreement") substantially consistent with the terms set forth in the Equity Term Sheet.

**BOARD OF DIRECTORS:** The Board of Directors of Holdings shall be determined and governed in the manner provided in the Stockholders Agreement.

**TAX STRUCTURE:** To the extent possible, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most tax-beneficial structure for Transtar and the other Loan Parties and the equity holders post-transaction as determined by the Majority Consenting Lenders and Transtar. Amounts owed to Sponsor (as defined in the First Lien Credit Agreement as of October 15, 2016) shall be forgiven or otherwise eliminated in a tax efficient manner.

**CONDITIONS PRECEDENT TO EFFECTIVENESS**: The Effective Date shall occur upon the satisfaction or waiver of the following conditions precedent:

(1) the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, the Majority Consenting Lenders, and solely with respect to the Sponsor Release, the Sponsor, and shall

    (a) authorize the Debtors to take all actions necessary to enter into, implement and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan; and

    (b) decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; and

    (c) authorize the Debtors, as applicable/necessary, to (A) implement the Restructuring; (B) make all distributions and issuances as required under the Plan; and (C) enter into any agreements, transactions and sales of property as set forth in the Plan Supplement, including the Management Incentive Plan; and

(d) approve the Disclosure Statement and the solicitation and tabulation of votes with respect to the Plan; and

(e) authorize the implementation of the Plan in accordance with its terms; and

(f) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition or transfer of assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax; and

(g) have become final and non-appealable, unless waived by the Debtors, the Majority Consenting Lenders and the Sponsor.

(2) the First Lien Agent shall have received counterparts of the Amendment executed by Transtar, Holdings, the other Loan Parties and First Lien Lenders that collectively hold no less than 66 2/3% of the First Lien Obligations (as defined in the Restructuring Support Agreement); and

(3) the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate the Plan and evidence thereof shall have been delivered to the First Lien Agent; and

(4) the First Lien Agent shall have received copies of such certificates of resolution or other action, incumbency certificates and/or other certificates of Responsible Officers of Holdings and Transtar evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the transactions contemplated hereby; and

(5) the final version of the Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Term Sheet and the Plan, and shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent and the Majority Consenting Lenders; and

(6) the Restructuring Support Agreement shall remain in full force and effect; and

(7) Transtar shall deliver or cause to be delivered officer's certificates and legal opinions of the type delivered on the Effective Date to the extent reasonably requested by, and in

15

form and substance reasonably satisfactory to, the First Lien Agent; and

(8) the First Lien Agent shall have received evidence of payment by the Company of (a) all fees and expenses payable to the First Lien Agent (including the fees and expenses of Paul Hastings LLP), and (b) all Transaction Expenses (as defined in the Restructuring Support Agreement) incurred from and after the last invoice paid to the extent invoiced and in an aggregate amount not to exceed an amount acceptable to the Majority Consenting Lenders; and

(9) the Majority Consenting Lenders shall be satisfied that the transactions contemplated hereby are structured in a way that obtains the most beneficial tax and pension structuring for Transtar, the other Loan Parties and the equity holders post-transaction as determined by the Majority Consenting Lenders and Transtar; and

(10)    the Debtors shall have implemented the Restructuring, including all transactions contemplated by this Term Sheet, in a manner consistent in all respects with the Restructuring Support Agreement, this Term Sheet and the Plan and according to documentation for each Restructuring Document (as defined in the Restructuring Support Agreement) in form and substance reasonably satisfactory to each of the Company, the First Lien Agent and the Majority Consenting Lenders.

**OTHER:**

The Plan shall contain other customary provisions for chapter 11 plans of this type.  The Plan and supporting and implementing documentation (including all briefs and other pleadings filed in support thereof, all documents filed as part of the Plan Supplement and the Confirmation Order) shall be in form and substance reasonably satisfactory to each of the Debtors, the First Lien Agent and the Majority Consenting Lenders.

The Company shall provide all "first day" and "second day" pleadings as soon as reasonably practicable in advance of filing and shall consult in good faith with respective counsel to each of the First Lien Agent and the Majority Consenting Lenders regarding the form and substance of any such proposed pleading.

**AMENDMENTS, MODIFICATIONS AND WAIVERS:**

Except as otherwise specified herein or in the Restructuring Support Agreement, this Term Sheet may only be modified, amended or supplemented by an agreement in writing signed by each of the Company and the Majority Consenting Lenders, *provided* that any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, under the First Lien Credit Agreement, the DIP Facility or the Senior Exit Facility may only be modified,

16

amended or supplemented by an agreement in writing signed by (a) in the case of the DIP Facility, the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination, (b) in the case of the First Lien Credit Agreement, the Company and First Lien Lenders holding one hundred percent (100%) of the aggregate amount of loans outstanding under the First Lien Credit Agreement at the time of determination, and (c) in the case of the Senior Exit Facility, the Company and  Senior Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the Senior Exit Facility at the time of determination.  Each of the First Lien Credit Agreement, the DIP Facility and the Senior Exit Facility shall provide that any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, may only be modified, amended or supplemented by an agreement in writing signed by (a) in the case of the DIP Facility, the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination, (b) in the case of the First Lien Credit Agreement, the Company and First Lien Lenders holding one hundred percent (100%) of the aggregate amount of loans outstanding under the First Lien Credit Agreement at the time of determination, and (c) in the case of the Senior Exit Facility, the Company and Senior Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the Senior Exit Facility at the time of determination.

**Exhibit A to the RSA Term Sheet**

**Equity Term Sheet**

**TRANSTAR HOLDING COMPANY**
**TRANSTAR NEW EQUITY – SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

| | |
|---|---|
| New Equity Structure | The only equity of the company will be a single class of common shares to be issued on the plan effective date ratably to the first lien lenders, subject to the MIP described below. |
| MIP | 5-8% of the shares will be granted by the Board on or around the plan effective date, and vesting subject to time and quarterly or annual performance metrics determined by the Board. |
| Equityholders Agreement | On the plan effective date, all holders of the new equity, including MIP participants, shall enter into an agreement providing for the governance and other rights and obligations described herein. |
| Voting Rights | Shares issued to the first lien lenders will each have one vote.  Shares held by participants in the MIP will be non-voting, but once sold by participants in the MIP to a non-participant, the shares will become voting shares. |
| Board of Directors | The initial Board will have seven members: the CEO and six individuals to be identified by holders of the voting equity.  Each holder or group of holders of at least 20% of the voting equity shall have the right to nominate one or more directors, and election will be by majority vote. Directors will serve one year terms. One of the non-CEO directors shall be required to be an independent director. |
| Indemnification | The company will provide customary indemnification and exculpation to officers and directors. |
| Transferability | The equity will be freely transferrable, subject to customary restrictions on transfers to certain transferees such as competitors, and the requirement that new holders sign the Equityholders Agreement. |
| Drag-Along Rights | If the holders of a majority of the voting equity approve a "Company Sale," they shall have the right to require all other holders of equity to participate in the Company Sale, on the same terms.  A "Company Sale" is a transaction or series of transactions in which an unaffiliated third party acquires a majority of the voting power of the company (whether by merger, consolidation, transfer, new issuance of shares or otherwise), or all or substantially all of the assets of the company and its subsidiaries. |
| Tag-Along Rights | Each holder of equity shall have the right to tag-along on transfers by a holder or a group of holders of at least 25% |

| | of all of the equity. |
|---|---|
| Preemptive Rights | Each holder of equity shall have the right to purchase its pro rata share of all new equity issued by the company, subject to customary exceptions. |
| Registration Rights | Following an IPO, customary registration rights will apply, including customary demand and piggyback registration rights. |
| Requisite Equityholder Approvals | The company actions described on <u>Exhibit A</u> hereto shall require the approval of the holders of a majority of the voting equity. Approval may be obtained by written consent of the required shareholders without a meeting. |
| Information Rights | Each holder of equity holding at least 5% of the outstanding shares shall be entitled to receive financial information comparable to what the first lien lenders are entitled to receive under the first lien credit agreement, subject to the same confidentiality requirements set forth in that agreement. |
| Termination of Rights | All rights and restrictions set forth in "Board of Directors," "Transferability," "Drag-Along Rights," "Tag-Along Rights," "Preemptive Rights," "Requisite Equity Holder Approvals," and "Information Rights" shall terminate upon an IPO of the company or Company Sale. |
| Management Fees | Any management fees to be paid by the company: (i) shall be approved by the Board, (ii) shall be on reasonable and customary terms for a company of its size, and (iii) there shall be a relationship between the management fee and the number of personnel assigned to the company. |

## EXHIBIT A
## REQUISITE EQUITY HOLDER APPROVALS

1. Any reorganization, merger, share exchange, consolidation, business combination or similar transaction

2. Any non-technical amendment, alteration, repeal or waiver of any provision of organizational documents of the company or any of its subsidiaries, except that no amendment or waiver shall disproportionately disadvantage any shareholder or group of shareholders, unless consented to by the affected shareholders.

3. Entry into a related party transaction (which shall also require the approval of a majority of disinterested directors), excluding (i) matters relating to compensation or employment arrangements with management, which shall be governed by the Board or a committee thereof, and (ii) entry into related party transactions having a value of greater than $25 million, which shall require the approval of the holders of a majority of the voting equity, the approval of a majority of disinterested directors, and a third party fairness opinion.

2

4.  Any material tax election

5.  Any issuance, sale or transfer of any equity securities or any securities convertible into such equity securities (other than issuances of equity securities under the MIP), or any increase or decrease in the authorized equity capital of the company or any of its subsidiaries

6.  Any acquisition or disposition of (i) any interest in any other entity or business enterprise or (ii) assets, in a single transaction or in a series of related transactions, with a purchase price in excess of $40,000,000

7.  Liquidation, dissolution or filing any voluntary petition in bankruptcy or insolvency

8.  Any material change to the lines of business conducted by the company and its subsidiaries

## EXHIBIT B TO RESTRUCTURING SUPPORT AGREEMENT

## DIP TERM SHEET

*Execution Version*

# TRANSTAR HOLDING COMPANY
## Outline of Terms and Conditions for Senior Secured
## Debtor-In-Possession Delayed Draw Credit Facility

*The following Outline of Terms and Conditions (this "Term Sheet") is for discussion purposes only and shall not be binding upon any party. This Term Sheet is neither an expressed nor implied commitment by any person to provide any financing or assist in providing the financing described herein, which commitment, if any, shall only be as set forth in (and subject to the terms and conditions of) a separate commitment letter or other applicable agreement. This Term Sheet is strictly confidential and may not be shared with anyone other than its intended recipients and their representatives and advisors, or as may be required by applicable law. This Term Sheet is attached to, and forms a part of, the Amended and Restated Restructuring Support Agreement, dated as of November 18, 2016 (the "Restructuring Support Agreement"), among the Company (as defined in the Restructuring Support Agreement), certain of the Prepetition 1st Lien Lenders (as defined herein) party thereto (collectively, the "Consenting First Lien Lenders"), and Friedman Fleischer & Lowe, LLC ("FFL"), funds managed by FFL that hold equity interests in Holdings (as defined herein), the general partner of such funds and their affiliates.*

| | |
|---|---|
| **Borrower:** | Transtar Holding Company (the "Borrower") will be a debtor and debtor-in-possession in a case (the "Borrower's Case") commenced voluntarily under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). |
| **Guarantors:** | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by (i) Speedstar Holding Corporation ("Holdings") and (ii) each wholly-owned direct and indirect domestic subsidiary of the Borrower (the "Subsidiary Guarantors") that guaranteed the obligations of the Borrower under the Amended and Restated First Lien Credit Agreement, dated as of October 9, 2012 (as amended, the "Prepetition 1st Lien Credit Agreement"),[1] among the Borrower, Holdings, the lenders party thereto (the "Prepetition 1st Lien Lenders"), Royal Bank of Canada, as administrative agent and collateral agent (collectively, in such capacities, the "Prepetition 1st Lien Agent") and the other Persons party thereto (Holdings and the Subsidiary Guarantors are collectively referred to herein as the "Guarantors"; the Guarantors and the Borrower shall be referred to herein collectively as the "DIP Credit Parties"). Each Guarantor will be a debtor and debtor-in-possession in a case (such cases, collectively, the "Guarantors' Cases"; the Guarantors' Cases and the Borrower's Case are collectively referred to herein as the "Cases") commenced voluntarily under chapter 11 of the Bankruptcy Code. |

---

[1]    Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Prepetition 1st Lien Credit Agreement as of October 15, 2016, or the Restructuring Support Agreement, as applicable.

| | |
|---|---|
| **Second Lien Credit Agreement:** | That certain Amended and Restated Second Lien Credit Agreement, dated as of October 9, 2012 (as amended, the "Prepetition 2nd Lien Credit Agreement"), among the Borrower, Holdings, the lenders party thereto (the "Prepetition 2nd Lien Lenders"), Cortland Capital Markets LLC (as successor to Royal Bank of Canada), as administrative agent and collateral agent (collectively, in such capacities, the "Prepetition 2nd Lien Agent") and the other Persons party thereto. |
| **Intercreditor Agreement:** | That certain Amended and Restated Intercreditor Agreement, dated as of October 9, 2012 (as amended, the "Intercreditor Agreement"), between the Prepetition 1st Lien Agent and Prepetition 2nd Lien Agent. |
| **DIP Agent:** | Silver Point Finance, LLC, in its capacity as administrative agent and collateral agent (collectively, in such capacities, the "DIP Agent"). |
| **DIP Lenders:** | The Consenting First Lien Lenders, or their affiliate designees, and any other Prepetition 1st Lien Lenders participating in the DIP Facility (collectively, the "DIP Lenders"); provided that such lenders shall have elected to participate in the DIP Facility prior to noon (ET) on November 19, 2016. |
| **Majority Consenting Lenders:** | Consenting First Lien Lenders holding in excess of fifty percent (50%) of the aggregate outstanding Loans (as defined in the Prepetition 1st Lien Credit Agreement as of October 15, 2016) held by all Consenting First Lien Lenders at the time of determination. |
| **Petition Date:** | The date of the commencement of the Cases, which date shall be no later than November 21, 2016 (the "Petition Date"). |
| **Closing Date:** | The closing date in respect of the DIP Facility (defined below) (the "Closing Date"), which shall be no later than five (5) business days following the entry of the Interim Order (defined below). |
| **DIP Facility:** | A senior secured debtor-in-possession delayed draw credit facility (the "DIP Facility" and the extensions of credit under the DIP Facility, the "DIP Loans") providing for extensions of credit not to exceed $69,700,000 (the "Maximum Amount"), including the issuance of one or more letters of credit at any time up to $5 million (the "L/C Subfacility"). The L/C Subfacility will be fully cash collateralized with the proceeds of DIP Loans in an amount equal to $5,250,000 (such DIP Loans, the "L/C Loans"). As set forth in this Term Sheet, the DIP Facility will be provided on a "super-priority" basis and secured by liens on the assets of the DIP Credit Parties as described below under the heading "Priority and Liens; Collateral." |
| **Availability:** | Subject to all of the terms and conditions hereof, upon the entry of an order (the "Interim Order") by the Bankruptcy Court in form and substance satisfactory to the DIP Agent and DIP Lenders holding a majority in amount of outstanding commitments under the DIP Facility (the "Required DIP Lenders"), availability under the DIP Facility shall (a) prior to the entry of the Final Order (defined below), be in an |

amount not to exceed $30,000,000, (b) upon entry of the Final Order, be in an amount not to exceed the remaining portion of the Maximum Amount, and (c) at all times, be blocked above $55,000,000, subject to the consent of the DIP Agent and Required DIP Lenders for availability above such amount. Subject to the foregoing limits, the DIP Loans shall be available under the DIP Facility in increments of no less than $5,000,000 per draw. Amounts repaid with respect to DIP Loans may not be re-borrowed. Notwithstanding the foregoing, the Borrower shall, upon prior written notice to the DIP Agent and the DIP Lenders, have the right to reduce the L/C Subfacility and, upon such reduction, an amount equal to 105% of an amount equal to such reduction shall be released to the Borrower from the cash collateral account; provided, that, after giving effect to such release, the amount on deposit as cash collateral for the L/C Subfacility shall not be less than an amount equal to 105% of the L/C Subfacility as so released. Amounts released to the Borrower pursuant to the foregoing shall continue to constitute DIP Loans for all purposes under the DIP Facility, and shall be subject to the provisions and limitations applicable thereto (including, without limitation, interest and use of proceeds).

**Purpose/Use of Proceeds:** Proceeds of loans under the DIP Facility (and letters of credit issued thereunder) may be used by the Borrower in the Cases solely for: (i) general working capital purposes (including providing cash collateral in connection with the issuance of letters of credit pursuant to the L/C Subfacility); (ii) to pay all DIP Transaction Expenses (as defined herein) and those reasonable and documented fees and expenses payable to the Prepetition 1st Lien Agent (limited to Paul Hastings LLP); (iii) paying fees, costs and expenses to the extent such fees, costs and expenses are consistent with the Budget and are approved by the Bankruptcy Court (allowance of such fees shall be subject to final approval of the Bankruptcy Court); and (iv) to make certain payments on account of prepetition obligations (including "critical vendor payments"), to be mutually agreed with the Required DIP Lenders and the Majority Consenting Lenders, and as approved by the Bankruptcy Court. In no event shall any proceeds of the extensions of credit under the DIP Facility be used to challenge or contest any of the Liens or claims of the DIP Agent, the DIP Lenders, the Prepetition 1st Lien Agent and the Prepetition 1st Lien Lenders, in their capacity as Prepetition 1st Lien Lenders.

**Use of Cash Collateral:** The Debtors shall be entitled to use cash collateral of the DIP Agent (on behalf of the DIP Lenders), the Prepetition 1st Lien Agent (on behalf of the Prepetition 1st Lien Lenders) and the Prepetition 2nd Lien Agent (on behalf of the Prepetition 2nd Lien Lenders) during the period from the Petition Date through and including the Maturity Date (defined below) for working capital and general corporate purposes and as otherwise set forth herein.

**Budget:** The Borrower will provide the DIP Agent and the DIP Lenders with a detailed weekly budget covering the succeeding 10-week period (as amended or modified from time to time, the "Budget"), substantially in

the form attached as <u>Exhibit A</u> hereto, that shall set forth in reasonable detail receipts and disbursements of the Debtors on a weekly basis for the 10-week period following the Petition Date, which Budget shall be subject to approval by the DIP Agent, which approval shall not be unreasonably withheld, and the Borrower will provide the DIP Agent and the DIP Lenders with an update to the Budget every fourth week (by no later than the third business day of such week), commencing for the first full week following the Petition Date, for each rolling 10-week period commencing on the date each such updated budget is delivered, which Budget updates shall also be subject to approval by the DIP Agent, which approval shall not be unreasonably withheld.   Each updated Budget shall be identical to the previously approved Budget except with respect to the four weeks not covered by such prior Budget (the final four weeks of the updated Budget).   The Borrower shall provide the DIP Lenders with variance reports (in substantially the same format as the Budget) showing actual cash receipts, disbursements and net cash flow for the immediately preceding week, noting therein all variances from values set forth for such period(s) in the Budget (and updates thereto), which variance reports will be provided on a weekly basis (by no later than the third business day of each week).

Notwithstanding anything to the contrary in this Term Sheet, the Budget, any Financing Order, or the definitive documentation for the DIP Facility, if the Majority Consenting Lenders and the Company determine that Holdings and/or any of its subsidiaries shall issue New Interests (as defined in, and in accordance with, the Restructuring Term Sheet) and/or the Debtors otherwise elect pass-through tax treatment through conversion to partnership or LLC form, and, as a result of such changes or the work associated therewith additional costs, expenses or claims arise (the "<u>Increased Costs</u>"), then the Budget and all agreements, covenants and arrangements set forth herein applicable thereto shall be amended to reflect any such Increased Costs, subject to the consent of the DIP Agent, which consent shall not be unreasonably withheld.

**Maturity Date:**

DIP Loans under the DIP Facility shall mature, be repayable in full, and the DIP Facility shall terminate on such date (the "<u>Maturity Date</u>") that is the earliest to occur of (i) the effective date (the "<u>Effective Date</u>") of a confirmed Plan (defined below), (ii) four (4) months after the Petition Date (which date may, at the request of the Borrower and subject to the prior written consent of the DIP Agent, be extended four times by one (1) month per extension, subject to the payment of a fee to the DIP Lenders in an amount equal to 0.25% of the Maximum Amount) and (iii) the date on which the obligations under the DIP Facility are accelerated following the occurrence of an Event of Default (defined below). On the Effective Date, all DIP Loans under the DIP Facility shall be paid off using proceeds from Senior Exit Loans (as defined in the Restructuring Support Agreement) made under the Senior Exit Facility (as defined in the Restructuring Support Agreement).

**Priority and Liens;**
**Collateral:**

Subject to the Carve-Out (defined below), all Obligations of the DIP Credit Parties to the DIP Agent and the DIP Lenders, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

- pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "Superpriority Claims"), which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Credit Parties and all proceeds thereof, including, without limitation, subject to the entry of the Final Order (defined below), all proceeds or other amounts received in respect of the DIP Credit Parties' claims and causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds or other amounts received in respect thereof (collectively, the "Causes of Action");

- pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first-priority lien on all now owned or hereafter acquired assets and property of the DIP Credit Parties and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the DIP Credit Parties) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (collectively, the "First Lien Collateral"); provided, however that the First Lien Collateral shall not include the Causes of Action but, subject to the entry of the Final Order, the First Lien Collateral shall include any proceeds or property recovered in respect of any Causes of Action;

- pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on all property of the DIP Credit Parties (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and

equipment of the DIP Credit Parties) that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, other than as set forth below (collectively, the "Second Lien Collateral", and together with the First Lien Collateral, the "DIP Collateral"); and

- pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets that are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, in each case, to the extent that such liens were granted pursuant to the Prepetition 1st Lien Credit Agreement (collectively, the "Existing 1st Lien Primed Liens") or the Prepetition 2nd Lien Credit Agreement (collectively, the "Existing 2nd Lien Primed Liens").

**Carve-Out:**    The aforementioned Superpriority Claims and liens of the DIP Agent and DIP Lenders and the Adequate Protection Claims and Adequate Protection Liens (each defined below) and any pre-Petition Date liens and claims shall be subject only to (1) (x) after delivery by the DIP Agent, at the direction of the Required DIP Lenders, of the Carve Out Trigger Notice (defined below), to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by Professionals[2] from and after the date following the date of delivery of the Carve Out Trigger Notice, in an aggregate amount not to exceed $1,000,000 (such amount, the "Post-Carve Out Trigger Notice Cap") *plus* (y) the amount of all accrued and/or unpaid fees, disbursements, costs and expenses incurred by Professionals on and before the date of delivery of the Carve Out Trigger Notice, to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time (including after the date of delivery of the Carve Out Trigger Notice); provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any Professionals or any other Person or entity; (2) the payment of fees required pursuant to 28 U.S.C. § 1930; and (3) all reasonable and documented fees and expenses incurred by a trustee appointed under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 ((1), (2) and (3), together, the "Carve-Out").

---

[2]    Solely for purposes of this Carve-Out section, the term "Professionals" shall mean the professionals retained by the DIP Credit Parties and a statutory committee of unsecured creditors to the extent one is appointed in the Cases and approved by the Bankruptcy Court (the "Committee").

"Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent at the direction of the Required DIP Lenders to the Debtors and their lead counsel, the United States Trustee for the Southern District of New York (the "U.S. Trustee"), the Prepetition 1st Lien Agent and lead counsel to the Committee, which notice may be delivered following the occurrence and during the continuance of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the DIP Credit Parties shall be permitted to pay compensation and reimbursement of fees and expenses of Professionals allowed and payable under Bankruptcy Code sections 328, 330 and 331, as the same may be due and payable, and the same shall not reduce the Carve-Out.  No portion of the Carve-Out or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of the Restructuring Support Agreement, any liens or claims of the DIP Agent, the DIP Lenders, the Prepetition 1st Lien Agent or the Prepetition 1st Lien Lenders, or the initiation or prosecution of any claim or action against any of the foregoing or their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof.  The Debtors' stipulations, acknowledgements and covenants concerning the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Prepetition 1st Lien Credit Agreement, the liens securing the obligations under the Prepetition 1st Lien Credit Agreement shall be binding on the Debtors, their estates, and any successor in interest in these or any successor cases, and subject to any applicable investigation period required by local rule or otherwise agreed to by the DIP Agent and Required DIP Lenders in their sole discretion; provided, that no more than $25,000 in the aggregate of the DIP Loans and Carve-Out may be used by a Committee solely to investigate claims or causes of action against the Prepetition 1st Lien Lenders.

**Adequate Protection (Prepetition 1st Lien Lenders):**

The Prepetition 1st Lien Agent, on behalf of the Prepetition 1st Lien Lenders, shall be granted the following as adequate protection of their interest in the Collateral (as defined in the Prepetition 1st Lien Credit Agreement as of October 15, 2016) in an amount equal to the aggregate diminution in the value of their interests therein:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold Existing 1st Lien Primed Liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (collectively, the "1st Lien Adequate Protection Liens"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facility, which 1st Lien Adequate

Protection Liens shall rank in the same relative priority and right as do the respective Existing 1st Lien Primed Liens (and any security interests granted with respect thereto) as of the Petition Date;

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "1st Lien Adequate Protection Claims"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Agent and the DIP Lenders under the DIP Facility. Except for the Superpriority Claims held by the DIP Agent and the DIP Lenders, no claims shall be permitted with priority *pari passu* with or senior to the 1st Lien Adequate Protection Claims;

- current cash payments of all DIP Transaction Expenses and those reasonable and documented fees and expenses payable to the Prepetition 1st Lien Agent (limited to Paul Hastings LLP), promptly upon receipt of invoices therefor; and

- copies of all financial statements (including, without limitation, the monthly financial statements and cash forecasts referred to herein) furnished to the DIP Agent, the DIP Lenders and the Financial Advisor (defined below).

**Adequate Protection (Prepetition 2nd Lien Lenders):**

The Prepetition 2nd Lien Agent, on behalf of the Prepetition 2nd Lien Lenders, shall be granted the following as adequate protection of their interest in the Collateral (as defined in the Prepetition 2nd Lien Credit Agreement as of October 15, 2016), only to the extent of such Prepetition 2nd Lien Lenders' interest in the Collateral, in an amount equal to the aggregate diminution in the value of their interests therein:

- effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold Existing 2nd Lien Primed Liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral (collectively, the "2nd Lien Adequate Protection Liens" and, together with the 1st Lien Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate only to (w) the 1st Lien Adequate Protection Liens, (x) the Carve-Out, (y) the liens securing the DIP Facility and (z) the Existing 1st Lien Primed Liens, which 2nd Lien Adequate Protection Liens shall rank in the same relative priority and right as do the respective Existing 2nd Lien Primed Liens (and any security interests granted with respect thereto) as of the Petition Date; and

- a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "2nd

Lien Adequate Protection Claims" and, together with the 1st Lien Adequate Protection Claims, the "Adequate Protection Claims"), subject and subordinate only to (w) the 1st Lien Adequate Protection Claims, (x) the Carve-Out, (y) the Superpriority Claims held by the DIP Agent and the DIP Lenders under the DIP Facility and (z) the Existing 1st Lien Primed Liens. Except for the Superpriority Claims held by the DIP Agent and the DIP Lenders and the 1st Lien Adequate Protection Claims, no claims shall be permitted with priority *pari passu* with or senior to the 2nd Lien Adequate Protection Claims.

|  |  |
|---|---|
| **363 Sales:** | Other than the sale or other disposition of assets having an aggregate value of less than $250,000, no sale of assets of any Debtor under section 363 of the Bankruptcy Code, outside the ordinary course of business, will be authorized without the DIP Agent's and the Required DIP Lenders' consent, unless the proceeds of such sale or other disposition will be sufficient to pay all of the advances under the DIP Facility in full. Nothing herein will affect the right, if any, of the Prepetition 1st Lien Agent, the Prepetition 1st Lien Lenders, the Prepetition 2nd Lien Agent or the Prepetition 2nd Lien Lenders to give, or withhold, their respective consent to any proposed sale or other disposition, in each case, subject to the terms and provisions of the Intercreditor Agreement. |
| **Interest Rate:** | "Eurodollar Rate" (as defined in the Prepetition 1st Lien Credit Agreement as of October 15, 2016, including the 1.25% floor provided for therein), for an interest period of one month *plus* 7.00% per annum. Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Agent or Required DIP Lenders, upon receipt by the Borrower of written notice thereof, all obligations under the DIP Facility shall bear interest at a rate of 2.00% above the otherwise applicable rate. |
| **Agency Fee:** | The Borrower shall pay to the DIP Agent, for its own account, an agency fee in an amount set forth in a separate fee letter. |
| **Taxes and Increased Costs:** | The DIP Facility will contain customary provisions for facilities of this kind, including, without limitation, in respect of tax gross-ups, increased costs (including Dodd-Frank and Basel III costs, but not including taxes), capital adequacy, liquidity and illegality, which provisions are substantially similar to the corresponding provisions in the model credit agreement provisions published by the LSTA). There will be a customary exception to the gross-up obligations for withholding taxes (with customary limitations and exclusions) imposed as a result of the failure to comply with the requirements of the applicable provisions of the Internal Revenue Code and any regulations promulgated thereunder or guidance issued pursuant thereto. |
| **Representations and Warranties:** | The documentation evidencing the DIP Facility (the "DIP Loan Documents") shall include representations and warranties that are |

substantially similar to the equivalent provisions in the Prepetition 1st Lien Credit Agreement, with changes to be mutually agreed by the DIP Credit Parties, DIP Agent and the Required DIP Lenders, including such changes as may be required to reflect the pendency of the Cases, and/or updating to reflect institutional requirements of the DIP Agent and the DIP Lenders including, without limitation, continued effectiveness of orders of the Bankruptcy Court, including the Interim Order and the Final Order, as applicable, and full disclosure and good faith accuracy of the Budget.

**EU Bail-In:**            The DIP Loan Documents shall include EU Bail-In provisions substantially similar to those proposed by the LSTA.

**Covenants:**            The DIP Loan Documents shall include affirmative and negative covenants that are substantially similar to the equivalent provisions in the Prepetition 1st Lien Credit Agreement and shall be acceptable in all respects to the DIP Agent and the Required DIP Lenders, and with such changes as may be required to reflect the pendency of the Cases and/or to reflect current LSTA standards, including, without limitation, (a) other than for a purpose (and subject to the limitations) described under "Purpose/Use of Proceeds" above, prohibiting the use of funds for disbursements outside of the ordinary course of business, (b) providing the DIP Lenders with the same types of information required to be provided to the Prepetition 1st Lien Lenders under the Prepetition 1st Lien Credit Agreement, (c) within twenty-five (25) calendar days after the previous month's month-end, commencing for the month ended October 31, 2016, providing the DIP Lenders with (i) monthly flash reporting with respect to the Borrower's estimated revenue, Consolidated EBITDA (as defined in the Prepetition 1st Lien Credit Agreement as of October 15, 2016) by business segment (in each case in a form substantially consistent with such reporting required to be delivered under the Forbearance Agreement to First Lien Credit Agreement, dated as of March 31, 2016, as amended, among Holdings, the Borrower, the Prepetition 1st Lien Agent and the Consenting First Lien Lenders) and (ii) a reasonably detailed summary of all Consolidated EBITDA adjustments, (d) providing the DIP Lenders with variance reports (in substantially the same format as the Budget) showing actual cash receipts, disbursements and net cash flow for the immediately preceding week, noting therein all variances from values set forth for such period(s) in the Budget (and updates thereto), which variance reports will be provided on a weekly basis (by no later than the third business day of each week), (e) allowing the DIP Agent reasonable access to (i) the Borrower's advisors and (ii) in the absence of an Event of Default (as defined below), the Borrower's books and records once per month upon reasonable notice and during normal business hours, to the extent allowing such access does not interfere with the operations of the Borrower's business; <u>provided</u>, that if an Event of Default has occurred and is continuing, such access shall be allowed up to two (2) times per month, (f) conducting a conference call during the week succeeding delivery of monthly financial statements required to be delivered pursuant to clause (c) above, led by the Chief

Financial Officer of the Borrower and the Financial Advisor, which may also be attended by the DIP Agent, DIP Lenders, and the Consenting First Lien Lenders, for the purpose of discussing, *inter alia*, the most recently delivered monthly flash reporting, the Debtors' financial performance, operations, current trends, variance reports and other material events, (g) the Borrower shall not permit cumulative net cash flow on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 12.5% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date), (h) the Borrower shall not permit cumulative receipts on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 15% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date), (i) the Borrower shall not permit each of cumulative freight disbursements on a cumulative basis and cumulative trade disbursements on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 17.5% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date), provided, however, that for weeks three (3) through six (6) following the Petition Date such covenant shall be subject to a variance of not greater than 25%; (j) the Borrower shall not permit any cumulative individual Budget line item, other than net cash flow, receipts or freight and trade disbursements, on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 17.5% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date), (k) promptly after the occurrence thereof, notifying the DIP Agent if any third party expresses an interest either formally or informally in acquiring all or any substantial part of the Borrower's business, and (l) the Borrower shall not pay or otherwise unimpair any claims except for (x) trade claims, provided that such amount, in the aggregate, shall be less than $41.36 million, and (y) other creditors associated with ordinary course operations (e.g., IT, employees, ordinary course professionals and safety capital expenses), the pension and retiree benefits, in each case, for entities to be reorganized or not sold under the Plan; provided, however, that all other unsecured creditors shall receive a maximum aggregate recovery of $500,000 in cash.

**Events of Default:**  The DIP Loan Documents will include events of default that are substantially similar to the equivalent provisions in the Prepetition 1st Lien Credit Agreement, with changes to be mutually and reasonably agreed by the DIP Credit Parties, the DIP Agent and the Required DIP Lenders, with such changes as may be required to reflect the pendency of the Cases and/or updating to reflect institutional requirements of the DIP Agent and the DIP Lenders (subject to grace, notice and cure periods to be agreed) (each, an "Event of Default"), including, without limitation, confirmation of any chapter 11 plan of reorganization or liquidation in any of the Cases other than the Plan; filing of a chapter 11 plan of reorganization or liquidation by a person or entity other than the Debtors; amendment (other than as consented to by the DIP Agent and Required DIP Lenders) or stay of either of the Financing Orders (described below) or reversal, modification, or vacation of either of the Financing Orders, whether on appeal or otherwise; the filing of any motion or other request with the Bankruptcy Court seeking authority to use any cash proceeds of any of the DIP Collateral without the DIP Lenders' consent or any Debtor seeking any financing under section 364(d) of the Bankruptcy Code secured by any of the DIP Collateral that does not require the payment in full of all DIP Loans under the DIP Facility; any Person holding a Lien upon any prepetition or postpetition assets of any Debtor being granted relief from the automatic stay with respect to any DIP Collateral or any other asset of a Debtor where the aggregate value of the property subject to all such orders is greater than $500,000; the Debtors' and their Subsidiaries' cessation of all or any material part of their business operations (other than in connection with a sale of assets permitted by the DIP Loan Documents or otherwise consented to by the Required DIP Lenders); the termination of the Restructuring Support Agreement for any other reason; failure of the Company to comply with, satisfy or achieve the following deadlines (each of which may be extended to a later date to which the Majority Consenting Lenders Agree in writing): (a) five (5) business days after the Petition Date, unless prior thereto the Debtors have filed the RSA Assumption Motion in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; (b) 11:59 p.m. (prevailing Eastern Time) on November 22, 2016, unless prior thereto the Debtors have filed the Plan, the Disclosure Statement and the Disclosure Statement Motion (the date on which the Debtors file the Plan, the "Plan Filing Date"), each in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; (c) thirty (30) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered the RSA Assumption Order in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; (d) thirty (30) calendar days after the Petition Date, unless prior thereto the Bankruptcy Court has entered the Final DIP Order in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; (e) thirty (30) calendar days after the Petition Date, unless prior thereto the Debtors and the Majority Consenting Lenders have agreed on reorganization case plans and business plans for Alma

Products Company and Axiom Automotive Technologies (f) thirty-five (35) business days after the Petition Date, unless prior thereto the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; and (g) fifty (50) business days after the Petition Date, unless prior thereto the effective date for the Plan (the "Plan Effective Date") has occurred; upon five (5) days' written notice to the Company if any amendment or modification of the Plan or any material documents related to the Plan, notices, exhibits or appendices, or any of the Restructuring Documents, which amendment or modification has or could reasonably be expected to have a material adverse effect, as determined by the Majority Consenting Lenders, on one or more Consenting First Lien Lenders, without the consent of the First Lien Agent and the Majority Consenting Lenders, as applicable, to the extent such parties are, or could reasonably be expected to be, materially adversely affected by such amendment or modification; upon five (5) days' written notice to the Company following entry of an order terminating the Debtors' right to use collateral, including cash collateral, or the Debtors' right to use collateral, including cash collateral, otherwise terminates for any reason; upon five (5) days' written notice to the Company if the Disclosure Statement Order or the Confirmation Order is (a) materially adversely amended or modified without the consent of the First Lien Agent and the Majority Consenting Lenders; or (b) reversed, permanently stayed, dismissed, or vacated, unless the Bankruptcy Court enters a new Disclosure Statement Order, or a new Confirmation Order, as applicable, each in form and substance reasonably satisfactory to the First Lien Agent and the Majority Consenting Lenders; upon two (2) calendar days' written notice to the Company if any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Debtors shall file a motion or other request for such relief; provided, that the dismissal or conversion of the Chapter 11 Case of any entity that (x) has determined to wind down its affairs and (y) does not own more than a *de minimis* amount of assets will not constitute an event of default; upon five (5) days' written notice to the Company if the Debtors file any motion, application, adversary proceeding or cause of action (i) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of the Claims of the First Lien Lenders or the liens securing the First Lien Obligations or the documents related thereto, (ii) otherwise seeking to impose liability upon or enjoin the First Lien Lenders or (iii) any other cause of action against and/or seeking to restrict the rights of holders of First Lien Obligations in their capacity as such (or if the Debtors support any such motion, application, adversary proceeding or cause of action commenced by any third party or consent to the standing of any such third party to bring such motion, application, adversary proceeding or cause of action); the Company makes an assignment for the benefit of creditors; upon five (5) days'

written notice to the Company of the filing by the Debtors of any motion or pleading with the Bankruptcy Court that is not consistent in all material respects with the Restructuring Support Agreement and the term sheet attached thereto (the "RSA Term Sheet"), and such motion or pleading is not withdrawn within five (5) calendar days' notice thereof by the First Lien Agent or the Majority Consenting Lenders to the Debtors (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Debtors are provided with such notice such order is not stayed, reversed or vacated within five (5) business days of such notice); provided, however, that, in the case of a stay upon such judgment or order becoming unstayed and five (5) business days' notice thereof to the Debtors by the First Lien Agent or the Majority Consenting Lenders, an event of default shall be deemed to have occurred; upon five (5) days' written notice to the Company if the Bankruptcy Court grants relief that is inconsistent in any material respect with the Restructuring Support Agreement or the Restructuring and such inconsistent relief is not dismissed, vacated or modified to be consistent with the Restructuring Support Agreement and the Restructuring within five (5) business days following notice thereof to the Debtors by the First Lien Agent or the Majority Consenting Lenders; upon five (5) days' written notice to the Company if the Debtors withdraw or revoke the Plan or file, publicly propose or otherwise support, or fail to actively oppose, any (i) Alternative Transaction or (ii) amendment or modification to the Restructuring containing any terms that are materially inconsistent with the implementation of, and the terms set forth in, the RSA Term Sheet unless such amendment or modification is otherwise consented to in writing by the Majority Consenting Lenders; upon five (5) days' written notice to the Company if, on or after the RSA Effective Date, the Debtors engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than: (i) the commencement of the Chapter 11 Cases or other bankruptcy or similar proceeding; or (ii) as expressly permitted by the Restructuring Documents; the Debtors lose the exclusive right to file and solicit acceptances of a chapter 11 plan by final order of the Court; upon five (5) days' written notice to the Company of a material breach by the Company of any of the undertakings, representations, warranties, covenants or obligations under the DIP Facility (to the extent not otherwise cured or waived in accordance with the terms hereof and thereof); any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated in the RSA Term Sheet or any of the Restructuring Documents in a way that cannot be remedied by the Debtors subject to the satisfaction of the First Lien Agent and the Majority Consenting Lenders, in which case the DIP Facility and the obligations thereunder may be terminated by the Required DIP Lenders immediately; upon five (5) days' written notice to the Company that the economic substance or the legal rights, remedies or benefits of the transactions contemplated hereby is affected in any manner materially

adverse to the DIP Lenders as a result of fraud, bad faith, willful misconduct, gross negligence, intentional misrepresentation or similar misconduct or bad acts by the Company or its board of directors, officers or senior management; provided, that such termination right must be exercised on or prior to two (2) calendar days prior to the confirmation hearing); upon five (5) calendar days' written notice to the Company, as determined by the Required DIP Lenders, that there has been an event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a material adverse effect, taking into account that the Company has or will file the Chapter 11 Cases, on (a) the business, assets, financial condition or results of operations of the Company, taken as a whole, (b) the rights and remedies of the DIP Agent or any DIP Lender under any Loan Document (as defined in the First Lien Credit Agreement) or any Restructuring Document or (c) the ability of the Company to perform its obligations under the Restructuring Support Agreement, the RSA Term Sheet, this Term Sheet or any Restructuring Document; breach of the Borrower's covenant not to permit cumulative net cash flow on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 12.5% of such amount set forth in the Budget for such period(s) (the foregoing to be tested every week, commencing with the third week following the Petition Date); breach of the Borrower's covenant not to permit cumulative receipts on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be less than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 15% of such amount set forth in the Budget for such period(s) (the foregoing to be tested every week, commencing with the third week following the Petition Date); breach of the Borrower's covenant not to permit each of cumulative freight disbursements on a cumulative basis and cumulative trade disbursements on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 17.5% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date), provided, however, that for weeks three (3) through six (6) following the Petition Date such covenant shall be subject to a variance of not greater than 25%; breach of the Borrower's covenant not to permit any cumulative individual Budget line item, other than net cash flow, receipts or freight and trade disbursements, on a cumulative basis for the period commencing with the Petition Date and ending on the relevant date of determination to be greater than the corresponding amounts set forth in the Budget for such period(s), subject to a variance of not greater than 17.5% of such amount set forth in the Budget for such period(s) (the foregoing covenant to be tested every week, commencing with the third week following the Petition Date); the substantial consummation (as defined in section 1101 of the

Bankruptcy Code) of the Plan has not occurred by the Outside Date; or the breach of the Borrower's covenant not to pay or otherwise unimpair any claims except for (x) trade claims, provided that such amount, in the aggregate, shall be less than $41.36 million, and (y) other creditors associated with ordinary course operations (e.g., IT, employees, ordinary course professionals and safety capital expenses), the pension and retiree benefits, in each case, for entities to be reorganized or not sold under the Plan; provided, however, that all other unsecured creditors shall receive a maximum aggregate recovery of $500,000 in cash.

**Remedies:**

Customary remedies, including, without limitation, the right (after providing five (5) business days' prior notice to the Borrower, the Committee (if any), the Prepetition 1st Lien Agent, the Prepetition 2nd Lien Agent and the U.S. Trustee) to realize on all DIP Collateral without the necessity of obtaining any further relief or order from the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the DIP Credit Parties, under the Interim Order and the Final Order, and with respect to the DIP Collateral.

**Assignments and Participations:**

The DIP Facility will contain customary provisions for facilities of this kind, including, without limitation, each DIP Lender's right to (i) assign its DIP Loans to other DIP Lenders or affiliates thereof without the consent of the DIP Credit Parties, (ii) participate its DIP Loans without notice to, or consent of, the DIP Credit Parties and (iii) pledge its DIP Loans to the Federal Reserve or any applicable central bank; provided, however, that the DIP Facility will prohibit any assignments to vendors, customers or competitors of the Debtors that have been identified in writing to the DIP Lenders.

**Chapter 11 Plan:**

The Debtors' plan of reorganization (the "Plan") shall, among other things, provide for (i) payment in full, on the Effective Date thereof, of all DIP Loans under the DIP Facility, or (ii) such other treatment as may be acceptable in all respects to the DIP Agent and Required DIP Lenders.

**Conditions Precedent:**

(a)     The conditions precedent to the obligation of the DIP Lenders to make DIP Loans under the DIP Facility will be customary and appropriate for financings of this type and acceptable to the DIP Agent and the Required DIP Lenders, including, without limitation, the execution and delivery by the Debtors of the Restructuring Support Agreement and the commencement of the Cases by the Debtors by the date specified above, and:

- The DIP Agent's and the Required DIP Lenders' review of and satisfaction with the Budget (it being agreed that the Budget delivered on or about November 11, 2016 is satisfactory);

- Execution and delivery by the DIP Credit Parties of definitive DIP Loan Documents, in form and substance consistent with

this Term Sheet, and otherwise satisfactory in all respects to the DIP Agent and the Required DIP Lenders;

- The absence of any Default or Event of Default under any of the DIP Loan Documents;

- The DIP Agent's receipt of favorable legal opinions of Borrower's and Guarantors' counsel as to such matters as may be required by the DIP Agent (including, without limitation, enforceability of the DIP Loan Documents, non-disturbance of all prepetition Liens of the Prepetition 1st Lien Agent and the Prepetition 1st Lien Lenders, and perfection of all Liens granted to the DIP Agent under the DIP Loan Documents);

- The Bankruptcy Court's entry of the Interim Order, as described below;

- The DIP Agent's and Required DIP Lenders' review of and reasonable satisfaction with all "first day orders" (other than the Interim Order, which shall be satisfactory in all respects to the DIP Agent and Required DIP Lenders);

- Borrower shall have paid to the DIP Agent and the DIP Lenders all fees and expenses required to be paid to the DIP Agent and the DIP Lenders on the Closing Date pursuant to any of the DIP Loan Documents and the transactions contemplated thereby;

- All proceedings taken in connection with the execution of the DIP Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related to the DIP Facility) shall be satisfactory in all respects to the DIP Agent and the Required DIP Lenders;

- All representations and warranties made by the DIP Credit Parties under the DIP Loan Documents shall be true and correct in all material respects on and as of the date of each extension of credit under the DIP Facility, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all material respects as of such earlier date); and

- Receipt of a notice of borrowing from the Borrower. The request for and acceptance of each DIP Loan by the Borrower shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied.

(b)    The following shall be conditions precedent with respect to subsequent DIP Loans made, and letters of credit issued, under the DIP Facility:

- The Bankruptcy Court's entry of the Interim Order or the Final Order, as applicable, within the time periods set forth below;

- No Default or Event of Default under the DIP Loan Documents

shall exist;

- The representations and warranties contained in the DIP Loan Documents shall be true and correct in all respects on and as of the date of each DIP Loan thereunder as though made on and as of such date, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all respects as of such earlier date); and

- Receipt of a notice of borrowing from the Borrower.  The request for and acceptance of each DIP Loan by the Borrower shall constitute a representation and warranty that the conditions to each DIP Loan shall have been satisfied.

(c) The following shall be a post-closing obligation of the Borrower:

- Within twenty (20) calendar days (or such longer period as may be agreed by the DIP Agent), the DIP Agent shall have received evidence, in form, scope and substance, satisfactory to the DIP Agent, of all insurance coverage as required by the DIP Loan Documents.

| | |
|---|---|
| **Financing Orders:** | Interim Order.  A condition precedent to the DIP Lenders' DIP Loans under the DIP Facility will be the entry of the Interim Order, in form and substance satisfactory in all respects to the DIP Agent and the Required DIP Lenders, by the Bankruptcy Court, which must occur no later than three (3) business days after the Petition Date, following proper notice and hearing thereon, which, among other things, approves the form and substance of the definitive DIP Loan Documents evidencing the DIP Facility; approves Borrower's stipulation of the validity, extent, amount, perfection, priority, enforceability, and non-avoidability of the Prepetition 1st Lien Agent's and Prepetition 1st Lien Lenders' claims and Liens; grants adequate protection (as hereinabove provided) for the benefit of the Prepetition 1st Lien Agent and Prepetition 1st Lien Lenders; authorizes the DIP Agent to enforce its Liens and the DIP Loan Documents upon the occurrence and during the continuance of Events of Default, upon the giving of at least five (5) business days' notice to the Borrower and its counsel, the U.S. Trustee, the Prepetition 1st Lien Agent, the Prepetition 2nd Lien Agent and counsel for any Committee; contains a Carve-Out for Professional fees and expenses on terms and conditions described herein; confers section 364(c)(1) priority status on all DIP Loans under the DIP Facility and provides for the securing of all such DIP Loans by a Lien on all DIP Collateral having the priority provided herein; finds that the DIP Agent and the DIP Lenders have acted in good faith in connection with the proposed financing and are entitled to the benefits of section 364(e) of the Bankruptcy Code; provides that the Liens granted to the DIP Agent under the DIP Loan Documents and pursuant to the Interim Order are deemed perfected without the necessity of the filing for record of any documents, notices, or other filings (but the DIP Credit Parties agree to execute and deliver to the DIP Agent, and to authorize the DIP Agent to file, any such documents at the DIP Agent's sole |

discretion); and contains such other terms and conditions as the DIP Agent shall request or find acceptable.

<u>Final Order</u>.  The final financing order (the "<u>Final Order</u>") shall be entered, in form and substance satisfactory in all respects to the DIP Agent and the Required DIP Lenders, not later than thirty (30) calendar days after the Petition Date, (i) shall contain provisions substantially the same as those in the Interim Order, (ii) shall provide that all prepetition Liens of Prepetition 1st Lien Agent and Prepetition 1st Lien Lenders shall be deemed finally allowed and approved as legal, valid, binding and enforceable Liens that are not subject to any equitable subordination, defense, or avoidance and the prepetition claims of the Prepetition 1st Lien Agent and Prepetition 1st Lien Lenders shall be deemed allowed as claims that are not subject to offset, equitable subordination, reduction, counterclaim, or defense, in each case if the same are not challenged by the commencement of appropriate proceedings by an interested party having standing to do so on the sooner to occur of seventy-five (75) calendar days after the entry of the Final Order or confirmation of a plan of reorganization or liquidation in any of the Cases, and (iii) shall provide that all prepetition Liens of the Prepetition 2nd Lien Agent and Prepetition 2nd Lien Lenders shall be deemed finally allowed and approved as legal, valid, binding and enforceable Liens that are not subject to any equitable subordination, defense, or avoidance and the prepetition claims of Prepetition 2nd Lien Agent and Prepetition 2nd Lien Lenders shall be deemed allowed as claims that are not subject to offset, equitable subordination, reduction, counterclaim, or defense, in each case if the same are not challenged by the commencement of appropriate proceedings by an interested party having standing to do so on the sooner to occur of seventy-five (75) calendar days after the entry of the Final Order or confirmation of a plan of reorganization or liquidation in any of the Cases.  The Final Order shall also prohibit any surcharge on the collateral subject to the Prepetition 1st Lien Agent's Liens, the Prepetition 2nd Lien Agent's Liens and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise.

**Governing Law:**          New York, except as governed by the Bankruptcy Code.

**Indemnity:**          The DIP Credit Parties shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party, and except to the extent resulting from claims between or among any DIP Lenders in their capacity as such) (including the reasonable and documented fees and expenses of appropriate counsel to each of the DIP Agent and the DIP Lenders).  As used herein, the "<u>appropriate counsel</u>" for any person or group means (i) one firm of outside counsel thereto, (ii) if necessary, one firm of local counsel thereto in each appropriate material jurisdiction and (iii)

if necessary, one additional firm for each group of similarly-situated persons in the case of actual or potential conflicts of interest.

| | |
|---|---|
| **Expenses:** | The Borrower shall pay, not to exceed an amount acceptable to the Required DIP Lenders, (a) all reasonable and documented expenses of the DIP Agent (including the reasonable and documented fees and expenses of appropriate counsel to the DIP Agent, including, but not limited to Chapman and Cutler LLP) associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto, (b) all reasonable and documented expenses of the DIP Agent (including the reasonable and documented fees and expenses of appropriate counsel to the DIP Agent, including, but not limited to Chapman and Cutler LLP) in connection with the enforcement of the DIP Loan Documents, and (c) all Transaction Expenses (as defined in the Restructuring Support Agreement) (collectively, the "DIP Transaction Expenses"). |
| **Amendments, Modifications and Waivers:** | Except as otherwise specified herein, this Term Sheet may only be modified, amended or supplemented by an agreement in writing signed by each of the Company and the Required DIP Lenders, provided that any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, under the DIP Facility may only be modified, amended or supplemented by an agreement in writing signed by the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination.  The DIP Facility shall provide that any modification, amendment, supplement or waiver related to interest rate, term, security and/or priority, and any modification, amendment, supplement or waiver making distributions other than *pro rata* among lenders, may only be modified, amended or supplemented by an agreement in writing signed by the Company and DIP Lenders committed to providing one hundred percent (100%) of the aggregate amount of loans under the DIP Facility at the time of determination. |
| **Rating:** | The DIP Credit Parties, the DIP Agent and the DIP Lenders will use best efforts to secure an agency rating for the DIP Facility. |
| **Counsel to Prepetition 1st Lien Agent:** | Paul Hastings LLP |
| **Counsel to DIP Lenders and DIP Agent:** | Chapman and Cutler LLP |
| **Counsel to Debtors:** | Willkie Farr & Gallagher LLP |

**Exhibit A to the DIP Term Sheet**

**Budget**

Subject to all applicable confidentiality arrangements

Project Mission

You hereby are reminded that the information being provided herein is strictly confidential and may contain material non-public information. It is being provided subject to your confidentiality undertakings in the Credit Agreement to which you are, and remain, bound. Any breach of such undertakings will have a serious negative impact on the Company, its operations and prospects.

By accepting the enclosed information, you acknowledge the potential damages that may be sustained by the Company.

SUBJECT TO ALL CONFIDENTIALITY RESTRICTIONS SET FORTH IN THE APPLICABLE CREDIT AGREEMENT

11/14/2016 6:50 AM

Subject to all applicable confidentiality arrangements

## DIP Budget Summary

| | | Notes |
|---|---|---|
| Filing Date | 11/20/16 | |
| Emergence Date | 1/27/17 | |
| Duration in Weeks | 10 | |
| **($ in 000s)** | | |
| Operating Receipts | $ 87,647 | |
| Operating Disbursements + Cap Ex | (72,599) | |
| Pre-petition Vendors | (41,360) | Critical, Foreign, 503(b)(9) & Other Essential vendors |
| **Operating Cash Flow** | **(26,313)** | |
| Debtor Pro Fees | - | WFG / FTI / Ducera |
| SP Pro Fees | (771) | Storm / Chaim / Chapman |
| 1L Pro Fees | - | KS & CDG |
| Claims Agent / UCC Fees / Other | - | |
| **Total Pro Fees Paid During Case** | **(771)** | |
| Capital Leases / LC Fees | (182) | |
| DIP Debt Service | (684) | |
| **Total Debt Service** | **(866)** | |
| **Other BK Related ITEMS** | | |
| LC Needs | (4,785) | P-card provider, cash mgmt, bank, and cash collateral to renew expiring LCs |
| US Trustee | (45) | |
| KERP / KEIP / Assumed Retention Plan | (500) | $45K paid during case, $50K paid at exit |
| Cash to balance sheet Prior to Exit | (12,720) | Cash Balance Prior to Exit Costs |
| **Total Exit Items** | **(18,050)** | |
| **Funded via Exit Financing** | | |
| Debtor Professional Fee Escrow | (4,896) | Professional fees paid at exit |
| 1L Professional Fee Escrow | (1,200) | |
| SP Pro Fees Escrow | (1,879) | Professional fees paid at exit |
| Claims Agent / UCC Fees / Other | (375) | Professional fees paid at exit |
| Final US Trustee Payment | (50) | US Trustee paid at exit |
| LC Needs | 710 | Return of collateral |
| Payment From FFL | 2,500 | |
| Payment to 2L | - | |
| Other exit items | (2,000) | Contingency |
| Exit Items Ex Debt Service and Cash to B/S | (7,190) | |
| **Total Exit Items** | **(10,000)** | Cash Used from Balance Sheet |

## Summary

| | | |
|---|---|---|
| **Starting cash** | $ 1,000 | Cash balance immediately prior to filing, net of prepetition amounts paid |
| Operating Cash Flow (Incl Foreign+Critical) | (26,313) | |
| Pro Fees | (771) | |
| Debt Service | (866) | |
| Other BK Related Items | (18,050) | |
| **DIP Balance Prior to Exit** | **(45,000)** | |
| Net Exit Items | (10,000) | |
| **Balance at Exit** | **$ (55,000)** | |
| **Cash on B/S at Exit** | **$ (15,530)** | |

**NOTE:**

Figures reflected herein are based upon a number of assumptions as to the impact of a bankruptcy proceeding on the Company's business, the aggregate amount of professional fees the Company may be required to pay while the proceeding is pending or upon exit from bankruptcy, and other matters. Actual results may differ from these assumptions.

This budget does not address, and management is making no representation herein, as to the adequacy of any exit financing or the Company's long term liquidity upon exit from bankruptcy.

Subject to all applicable confidentiality arrangements

# WEEKLY CASH FLOW FORECAST

| Week # | Pre | Pre | Pre | 1 BK | 2 BK | 3 BK | 4 BK | 5 BK | 6 BK | 7 BK | 8 BK | 9 BK | 10 BK | Exit BK | Case Total w/o Exit | Case Total w/ Exit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in 000s) | 11/4 | 11/11 | 11/18 | 11/25 | 12/2 | 12/9 | 12/16 | 12/23 | 12/30 | 1/6 | 1/13 | 1/20 | 1/27 | Exit | Total | Total |
| **Cash Flow From Operations** | | | | | | | | | | | | | | | | |
| **Cash Sources** | | | | | | | | | | | | | | | | |
| Total Cash Sources | $ 7,356 | 6,469 | 9,242 | 6,906 | 8,038 | 7,256 | 8,669 | 10,189 | 9,865 | 7,374 | 8,828 | 10,437 | 10,684 | — | $ 87,647 | 87,647 |
| **Operating Activities** | | | | | | | | | | | | | | | | |
| Payroll and Benefits | (2,720) | (2,785) | (2,720) | | | | | | | | | | | | (21,018) | (21,018) |
| Foreign Vendor Pre-petition | | | | (909) | | (4,796) | (930) | (3,427) | (907) | (2,985) | (3,182) | (3,149) | | | (9,008) | (9,008) |
| Critical Vendor Pre-petition | | | | (1,351) | (1,802) | (1,802) | (1,543) | (1,351) | (1,351) | (450) | (450) | (450) | | | (15,429) | (15,429) |
| 503(b)(9) | | | | (3,857) | (3,857) | (3,857) | (1,543) | (771) | (771) | (772) | (772) | (386) | | | (7,717) | (7,717) |
| Other Essential Supplier Pre-petition | (4,805) | (3,923) | (4,995) | (3,820) | (3,890) | (4,796) | (921) | (2,269) | (2,553) | (4,008) | (4,184) | (4,276) | (4,276) | | (35,568) | (35,568) |
| Freight and Courier | (909) | (625) | (628) | (542) | (2,972) | (921) | (3,197) | (2,289) | (522) | (626) | (598) | (600) | | (771) | (9,206) | (9,206) |
| Rent | (25) | (120) | (205) | (34) | (807) | (25) | (25) | (582) | (34) | (34) | (58) | (58) | | | (6,347) | (6,347) |
| Taxes | (642) | (120) | (0) | (167) | (167) | (97) | (621) | (40) | (21) | (21) | (167) | (2) | | | (1,750) | (1,750) |
| Other | (31) | (40) | (642) | (682) | (24) | (621) | (40) | (2) | (2) | (40) | (661) | (2) | | | (703) | (703) |
| Funding to Foreign Subsidiaries | | (37) | (31) | (0) | (26) | (24) | (431) | (437) | (27) | (27) | (24) | (33) | | | (2,166) | (2,166) |
| Other | (31) | | | (150) | | | | | | (244) | | | (290) | | (1,492) | (1,492) |
| **Total Operating Cash Uses** | (9,462) | (8,122) | (9,462) | (11,223) | (13,210) | (16,391) | (13,699) | (13,659) | (10,281) | (11,025) | (12,299) | (10,928) | | | (113,960) | (113,960) |
| **Cash Flow from Operations** | (2,107) | (1,653) | (221) | (4,317) | (5,172) | (9,134) | (5,470) | (3,470) | (416) | (3,651) | (3,651) | (491) | 2,512 | (7,572) | (26,313) | (26,313) |
| **Cash Flow From Financing Activities** | | | | | | | | | | | | | | | | |
| Interest on 1st Lien | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | (18) | | (182) | (182) |
| Principal on 1st Lien | | | | | | | | | | | | | | | | |
| LC Fees | | | | (150) | | | | | | | | | | (150) | (150) | (150) |
| DIP Facility Fee | | | | | | | | | | | | | | (534) | (534) | (824) |
| Interest on DIP Loan | | | | | | | | | (45) | | | | | (50) | | (95) |
| Unused Line Fee on DIP Loan | | | | | | | | | (45) | | | | | | | |
| Pre-Petition Disbursements | | | | | | | | | | | | | | (2,000) | (2,000) | (2,000) |
| **Restructuring / Bankruptcy Related** | | | | | | | | | | | | | | | | |
| Professional Fees | (18) | (18) | (7,701) | (600) | | (150) | | (1,050) | (244) | (500) | (735) | | | (8,350) | (9,121) | (15,791) |
| KEIP / KERP / Assumed Retention Plan [2] | | | | | | | | | | | | | | (4,785) | (4,785) | (4,075) |
| Super Super Senior Term Loan | | | | (3,000) | | | | | | | | | | (8,350) | (6,101) | (15,791) |
| Super Super Senior Term Loan Draw | | | | | | | | | | | | | | 2,500 | 2,500 | 2,500 |
| Other | | | | | | | | | | | | | | 55,000 | 55,000 | 55,000 |
| Super Senior Term Loan Draw | | | | | | | | | | | | | | 57,000 | 57,000 | 56,634 |
| **Activity** | | | | | | | | | | | | | | | | |
| Net Cash Flow from Operations | (2,107) | (1,653) | (221) | (4,317) | (5,172) | (9,134) | (5,470) | (3,470) | (416) | (3,651) | (3,651) | (491) | 2,512 | (7,572) | (26,313) | (26,313) |
| Net Cash Flow from Non-Op / BK | (18) | (18) | (7,701) | (168) | (18) | (18) | (18) | (18) | (262) | (416) | (18) | (308) | | (9,690) | (33,280) | (14,530) |
| Net Cash Flow | (2,125) | (1,671) | (7,939) | (1,779) | (5,190) | (9,153) | (5,047) | (4,338) | (724) | (4,149) | (3,660) | (1,244) | 2,204 | 47,810 | (33,280) | 14,530 |
| **Cash Balances** | | | | | | | | | | | | | | | | |
| Beginning Balance | 10,836 | 8,701 | 7,030 | 1,000 | 9,221 | 14,031 | 14,878 | 9,831 | 10,292 | 9,969 | 10,420 | 11,760 | 10,516 | 12,720 | 1,000 | 1,000 |
| Net Cash Flow | (2,125) | (1,671) | (7,939) | (1,779) | (5,190) | (9,153) | (5,047) | (4,338) | (724) | (4,149) | (3,660) | (1,244) | 2,204 | 47,810 | (33,280) | 14,530 |
| Cash From DIP Account Draw | | | 1,000 | 10,000 | 10,000 | 10,000 | | 5,000 | | 5,000 | 5,000 | | | (45,000) | 47,810 | (45,000) |
| **Ending Operating Cash Balance** | 8,701 | 7,030 | 1,000 | 9,221 | 14,031 | 14,878 | 9,831 | 10,292 | 9,969 | 10,420 | 11,760 | 10,516 | 12,720 | 15,530 | 12,720 | 15,530 |
| Up-Front DIP Account Draw | | | | 10,000 | 10,000 | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | | (45,000) | 45,000 | 45,000 |
| **DIP Loan** | | | | | | | | | | | | | | | | |
| Total Drawn on DIP Loan | — | — | 1,000 | 10,000 | 10,000 | 10,000 | 30,000 | 30,000 | 40,000 | 40,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| DIP Available | — | — | 63,000 | 53,000 | 43,000 | 43,000 | 38,000 | 38,000 | 33,000 | 28,000 | 28,000 | 28,000 | 28,000 | 73,000 | 28,000 | 73,000 |

**Footnotes:**

$1.2MM payment to 1L Steering Committee Advisors (CDG & KS) included within the professional fees paid at exit.

[1] Steering Committee Advisors (CDG & KS) included within the professional fees paid at exit.

[2] Additional $500K Assumed Retention Plan payment to be paid outside of period covered by this budget.

## EXHIBIT C TO RESTRUCTURING SUPPORT AGREEMENT

## JOINDER

This Joinder to the Restructuring Support Agreement (the "Joinder"), dated as of [●], 2016 by and among each of Transtar Holding Company, each of their domestic direct and indirect subsidiaries party thereto (collectively with Speedstar Holding Corporation, the "Company"), and the Consenting Lenders signatory thereto (as amended, supplemented or otherwise modified, the "Agreement"), is executed and delivered by [_____] (the "Joining Party") as of [_____], 2016.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement.

1.    Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Lender" and a Party for all purposes under the Agreement.

2.    Representations and Warranties.  With respect to the aggregate principal amount of Holdings held by the Joining Party upon consummation of the Transfer of such Holdings (listed on the signature page hereto), the Joining Party hereby makes the representations and warranties, as applicable, to the Company set forth in Section 7 of the Agreement.

3.    Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

Name of Institution: _____

By: _____

Name: _____

Title: _____

Telephone: _____

Facsimile: _____

E-mail: _____

Address: _____

_____

_____

**Aggregate Principal Amount**

| | |
|---|---|
| First Lien Credit Agreement | |
| Second Lien Credit Agreement | |
| Other Claims or Interests (specify type and amount) | |

## ANNEX I TO JOINDER

[Restructuring Support Agreement]